UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X

UNITED STATES OF AMERICA,                    11-CR-836 (KBF)

v.

YESID RIOS SUAREZ,

                Defendant.

-------------------------------------------------X


**<u>SENTENCING MEMORANDUM ON BEHALF OF YESID RIOS SUAREZ</u>**


 

John Meringolo, Esq.
Meringolo Law
375 Greenwich Street, 7th Floor
New York, NY 10013
(212) 941-2077
*Attorney for Yesid Rios Suarez*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ....................................................................................... iv

INTRODUCTION ......................................................................................................... 1

PERSONAL HISTORY AND CHARACTERISTICS ....................................... 2

OFFENSE CONDUCT ............................................................................................... 12

LEGAL AUTHORITY IN SUPPORT OF A NON-GUIDELINES SENTENCE ........... 13

I.    The Court Has Significant Discretion to Impose an Appropriate Sentence. .......... 14

II.   The Parties' Guidelines Calculations Differ Widely and a Non-Guidelines
      Sentence Is Appropriate. ....................................................................................... 16

III.  The Court Could Consider the Circumstances of Mr. Rios Suarez's Guilty
      Plea in Calculating an Appropriate Sentence ..................................................... 20
   A.  The Court Should Apply the Guideline Range as Set Forth in the Negotiated
       Plea Agreement. ............................................................................................. 20
      1.  The Government's Refusal to Extend the Deadline for Acceptance of the
          Negotiated Plea Agreement Violated Mr. Rios Suarez's Sixth Amendment
          Right to Counsel. ..................................................................................... 21
      2.  Because Mr. Rios Suarez Was Deprived of the Right to Counsel, He Was
          Likewise Deprived of Due Process of Law at the Plea Bargaining Stage
          of his Case. .............................................................................................. 27
      3.  The Government's Proposed Guidelines Range and the Guidelines Range
          Calculated by the Court Violates the Terms of the Colombian Extradition
          Order. ....................................................................................................... 29
   B.  The Court Should Hold Mr. Rios Suarez Accountable Only for the Quantity of
       Narcotics Reasonably Foreseeable to Him. ....................................................... 31
      1.  Factual Basis for Mr. Rios Suarez's Plea: Mr. Rios Suarez Pled Guilty to
          Conspiracy to Import At Least Five Kilograms of Cocaine and the
          Government Failed to Prove His Knowledge of a Greater Quantity. ........ 31
      2.  Applicable Law: The Quantity for Which Mr. Rios Suarez Is Held
          Responsible Must Have Been Reasonably Foreseeable to Him. ............... 32
   C.  The Court Should Not Apply the Enhancements Requested by the
       Government. .................................................................................................... 37
      1.  The Court Should Reconsider its Decision and Should Not Apply the
          Two-Point Enhancement for Use of an Aircraft in the Importation of a
          Controlled Substance (U.S.S.G. § 2D1.1(b)(3)). ..................................... 38
      2.  The Court Should Reconsider its Decision and Should Not Apply the

Two-Point Enhancement for Use of a Firearm During the Offense
(U.S.S.G. § 2D1.1(b)(1)). ........................................................................... 39

3.  The Court Should Reconsider its Decision and Should Not Apply the
Two-Point Enhancement for the Direction of the Use of Violence
(U.S.S.G. § 2D1.1(b)(2)). ..................................................................... 40

4.  The Court Should Reconsider its Decision and Should Not Apply the
Four-Point Organizer/Leader Enhancement (U.S.S.G. § 3B1.1). .............. 43

5.  The Court Should Reconsider its Decision and Should Not Apply the
Two-Point Criminal Livelihood Enhancement
(U.S.S.G. § 2D1.1(b)(14)). ..................................................................... 46

D.  The Court Should Reconsider its Decision and Should Not Include Narcotics
Sent from One Country Outside the United States to Another Country Outside
the United States When Calculating the Appropriate Quantity and Resulting
Guidelines Range. ........................................................................................... 47

IV.  The Court Could Appropriately Consider the Pending Smarter Sentencing Act
and the Proposed Two-Point Guidelines Reduction and Consider These
Proposals Indicative of the Changing Attitudes Toward Excessive Sentences. ... 49

A.  The Court Should Consider the Proposed 5-Year Mandatory Minimum
Sentence for a Violation of 21 U.S.C. § 960(b) in the Smarter
Sentencing Act. ............................................................................................... 50

B.  The Court Should Grant Mr. Rios Suarez a Two-Level Guidelines Reduction
in Accordance with the Sentencing Commission's Proposal. .......................... 51

C.  Mr. Rios Suarez Should Be Afforded the Three Points for Acceptance of
Responsibility ................................................................................................. 52

V.  The Court Could Appropriately Consider Mr. Rios Suarez's Foreign Conviction
and the Previously Imposed Colombian Sentence in Calculating an Appropriate
Sentence. ................................................................................................................ 52

A.  Facts of the Previous Colombian Conviction ................................................. 52

B.  The Court Should Consider the Current Conviction to Be Related Conduct
Under U.S.S.G. § 1B1.3. ............................................................................... 53

C.  The Court Should Credit Mr. Rios Suarez With the 100 Months That He Will
Serve in Colombia Under 18 U.S.C. § 3553(a), U.S.S.G. § 5G1.3, and Case
Law in this Circuit. ....................................................................................... 54

1.  A Reduced Sentence Is Appropriate Based On the 3553(a) Factors. ........ 56

2.  A Reduced Sentence Is Appropriate Based on Section 5G1.3 of the
Sentencing Guidelines. ......................................................................... 58

3.  A Reduced Sentence Is Appropriate Based on Case Law In This Circuit. 61

D.  Calculation Of A Reduced Sentence. ............................................................. 64

VI.  The Court Should Credit Mr. Rios Suarez With the 14 Months that He Spent in
Colombian Custody Awaiting Extradition. ........................................................... 66

VII.  The Court Should Consider the Need to Avoid Sentencing Disparities ............ 67

VIII.   The Court Should Impose a Non-Guidelines Sentence ..................................... 69
    A.   A Downward Departure Based on Prison Conditions Is Warranted................ 69
        1.   Facts of Mr. Rios Suarez's Prior Incarceration.......................................... 70
        2.   Legal Authority: A Downward Departure for Harsh Prison Conditions
             Is Warranted............................................................................................ 74
    B.   A Downward Departure Based on Duress and Coercion Is Warranted. ........... 77
    C.   A Downward Departure Based on Family Circumstances Is Warranted.......... 82
    D.   A Downward Departure Based on Age and Health Is Warranted. ................... 84
    E. Mercy Is An Appropriate Sentencing Consideration. .......................................... 85

CONCLUSION........................................................................................................... 87

INDEX OF EXHIBITS............................................................................................... 88

# TABLE OF AUTHORITIES

## Cases

*Aguilar de Polanco v. United States Dep't of Justice*, 123 F. App'x 19
  (2d Cir. 2005)................................................................................................... 28
*Iowa v. Tovar*, 541 U.S. 77, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004)........................... 24
*Lafler v. Cooper*, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012) ........................................ 24
*Nelson v. United States*, 129 S. Ct. 890 (2009)............................................................. 16
*Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010) .............. 25
*Rickenbacker v. United States*, 365 F.Supp.2d 347 (E.D.N.Y. 2005) ............................. 77
*Setser v. United States*, 132 S. Ct. 1463 (2012)............................................................. 58
*Spears v. United States*, 129 S. Ct. 840 (2009).............................................................. 16
*Trapnell v. United States*, 725 F.2d 149 (2d Cir. 1983).................................................. 25
*United States v. Azeem*, 946 F.2d 13 (2d Cir. 1991)...................................................... 47
*United States v. Blarek*, 7 F. Supp. 2d 192 (E.D.N.Y. 1998) ......................................... 86
*United States v. Booker*, 543 U.S. 220 (2005).............................................................. 15
*United States v. Cabrera Cuevas, et al.*, Case No. 03-CR-554 (JR) (D.D.C.) ................ 68
*United States v. Carty*, 264 F.3d 191 (2d Cir. 2001) ............................................... 74, 75
*United States v. Castillo*, 460 F.3d 337 (2d Cir. 2006).................................................. 15
*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) (*en banc*) ........................ 15, 16, 56
*United States v. Chunza–Plazas*, 45 F.3d 51 (2d Cir. 1995) .......................................... 47
*United States v. Conon-Solis*, 354 F.3d 10 (1st Cir. 2004)............................................. 33
*United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005)............................................. 15, 56
*United States v. Culbertson*, 670 F.3d 183 (2d Cir. 2012),
  as amended (Feb. 16, 2012) ...................................................................... 34, 35
*United States v. Doe*, 297 F.3d 76 (2d Cir. 2002).......................................................... 34
*United States v. England*, 13-CR-18 (SRU) (D. Ct.)...................................................... 51
*United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978).............................................. 1, 33
*United States v. Feliciano*, 26 Fed. Appx. 55 (2d Cir. 2001) ........................................ 33
*United States v. Francis*, 129 F.Supp.2d 612 (S.D.N.Y. 2001)................................. 76, 77
*United States v. Fuller*, 426 F.3d 556 (2d Cir. 2005) ................................................... 55
*United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997) ............................................... 83
*United States v. Gall*, 128 S. Ct. 586 (2007)............................................................... 14
*United States v. Garcia-Hernandez*, 237 F.3d 105 (2d Cir. 2000) ............................ 61, 62
*United States v. Geto*, 729 F.3d 221 (2d Cir. 2013)...................................................... 32
*United States v. Gonzalez*, 420 F.3d 111 (2d Cir. 2005) .......................................... 33, 34
*United States v. Hernandez-Santiago*, 92 F.3d 97 (2d Cir. 1996) .................................. 33
*United States v. Hilario*, 449 F.3d 500 (2d Cir. 2006)................................................... 55
*United States v. Ignacio Leal Garcia*, Case No. 04-CR-446 (TFH) (D.D.C.)................ 69
*United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992).................................................. 86
*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) .................................................... 16
*United States v. Juan Carlos Sierra Ramirez*, 02-CR-388 (ESH) (DC)........................ 68
*United States v. Larry*, 13-CR-75 (ILG).................................................................... 51
*United States v. Leo*, 706 F. Supp. 2d 544 (S.D.N.Y. 2010) ........................ 62, 63, 64, 65
*United States v. Maicor Hernandez Bones*, 11-0444 (RRM) (E.D.N.Y.)........................ 51
*United States v. Mateo*, 299 F.2d 201 (S.D.N.Y. 2004) ........................................... 75, 76

*United States v. Matera*, 489 F.3d 115 (2d Cir. 2007)....................................................... 61
*United States v. McLean*, 287 F.3d 127 (2d Cir. 2002) ...................................................... 34
*United States v. Medina*, 09-CR-983 (DAB) ...................................................................... 51
*United States v. Monaco*, 23 F.3d 793 (3d Cir. 1994). ...................................................... 83
*United States v. Phanor Arizabaleta,* 03-CR-331 (CKK) (DC) ........................................ 67
*United States v. Rios Suarez*, 11-CR-836 (KBF) ................................................................. 1
*United States v. Sencion*, 38 Fed. Appx. 638 (2d Cir. 2002) ............................................ 62
*United States v. Stevens*, 985 F.2d 1175 (2d Cir. 1993) .................................................... 44
*United States v. Studley*, 47 F.3d 569 (2d Cir. 1995)........................................................ 33
*United States v. Suarez*, 12-CR-71 (ADS) (EDNY) .......................................................... 51
*United States v. Teyer*, 322 F. Supp. 2d 359 (S.D.N.Y. 2004) ......................................... 43
*United States v. Thomas*, 274 F.3d 655 (2d Cir. 2001) ..................................................... 34
*United States v. Tingham*, 11-CR-1040 (SHS) .................................................................. 51
*United States v. Torres*, 01 CR. 1078 (LMM), 2005 WL 2087818
    (S.D.N.Y. Aug. 30, 2005) ............................................................................................ 67, 77
*United States v. Turner*, 624 F. Supp. 2d 206 (E.D.N.Y. 2009) ...................................... 52
*United States v. Yu*, 285 F.3d 192 (2d Cir. 2002) ............................................................. 34
*Witte v. United States*, 515 U.S. 389, 115 S. Ct. 2199 (1995) .................................... 61, 63

**Statutes**

18 U.S.C. § 3552(b) ........................................................................................................... 66
18 U.S.C. § 3553(a) .......................................................................................... 2, 14, 56, 86
18 U.S.C. § 3553(a)(2)........................................................................................................ 56
18 U.S.C. § 3553(a)(2)(D) .................................................................................................. 58
18 U.S.C. § 3584(a) ...................................................................................................... 56, 58
18 U.S.C. § 3584(b) ........................................................................................................... 56
21 U.S.C. § 963...................................................................................................... 1, 12, 23

**United States Sentencing Guidelines**

U.S.S.G. § 1B1.3 Background ............................................................................................ 64
U.S.S.G. § 1B1.3(a)(1)(A) ................................................................................................. 53
U.S.S.G. § 1B1.3(a)(2)........................................................................................................ 53
U.S.S.G. § 2D1.1 Application Note 11(B) ......................................................................... 40
U.S.S.G. § 2D1.1 Application Note 29(c) .......................................................................... 46
U.S.S.G. § 2D1.1(b)(1) ...................................................................................................... 39
U.S.S.G. § 2D1.1(b)(2) ...................................................................................................... 40
U.S.S.G. § 2D1.1(b)(3) ...................................................................................................... 38
U.S.S.G. § 2D1.1(c)(1) ....................................................................................................... 35
U.S.S.G. § 3B1.1 Application Note 4 ................................................................................ 43
U.S.S.G. § 3B1.1(a) ........................................................................................................... 43
U.S.S.G. § 4A1.2 Application Note 1 ................................................................................ 53
U.S.S.G. § 4A1.2(h)............................................................................................................ 54
U.S.S.G. § 4B1.3 Application Note 2 ................................................................................ 46
U.S.S.G. § 5G1.3 Application Note 2(C) ........................................................................... 65
U.S.S.G. § 5G1.3 Application Note 3(A) ........................................................................... 60
U.S.S.G. § 5G1.3(b)............................................................................................................ 59

U.S.S.G. § 5G1.3(b)-(c) ........................................................................... 59
U.S.S.G. § 5G1.3(c) Application Note 3(E) .............................................. 65
U.S.S.G. § 5H1.6 Policy Statement, Application Note 1(B)(i) ................... 86
U.S.S.G. § 5H1.6 Policy Statement ........................................................... 83
U.S.S.G. § 5H1.6 Policy Statement, Application Note 1(A) ...................... 83
U.S.S.G. § 5H1.6 Policy Statement, Application Note 1(B) ...................... 84
U.S.S.G. § 5K2.0(a)(1)(A) ......................................................................... 54
U.S.S.G. § 5K2.12 .................................................................................... 78
U.S.S.G. § 5K2.23 (Policy Statement) ...................................................... 55

**Constitutional Amendments**

U.S. Const. Amend. V. .............................................................................. 27
U.S. Const. Amend. VI .............................................................................. 24

## INTRODUCTION

On June 6, 2014, Yesid Rios Suarez will appear before the Court to be sentenced upon his plea of guilty to Count One of the indictment in the above-captioned case, which charged him with a conspiracy to import "five kilograms and more of mixtures and substances containing a detectable amount of cocaine," in violation of 21 U.S.C. § 963.  See *United States v. Rios Suarez*, 11-CR-836 (KBF), Indictment at p. 1-2.

On May 2 and 7, the Court held a hearing pursuant to *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978), to allow the government to attempt to prove the applicability of several Guidelines enhancements and a base offense level of 38.  On May 15, 2014, the Court agreed with the government and ruled that Guidelines level 49, which is treated as a Guidelines level 43, applied to Mr. Rios Suarez's case.  The parties have not yet received the Presentence Report or, therefore, the Probation Department's calculation of Mr. Rios Suarez's offense level or Guidelines range.  An offense level of 43 results in a Guidelines sentence of life imprisonment.

Notwithstanding the Court's Order setting forth the basis for its determination of Mr. Rios Suarez's applicable Guidelines level, the defense respectfully submits that a non-Guidelines sentence would be appropriate and, indeed, is mandated by the terms of the Colombian extradition order pursuant to which Mr. Rios Suarez appears before this Court[1], and asks the Court to sentence Mr. Rios Suarez to a term of imprisonment that adequately takes into consideration the facts and circumstances of Mr. Rios Suarez's

---

[1] "[T]he Government of the United States recognizes the conditions under which the Government of Colombia agreed to the extradition of Mr. RIOS SUAREZ, and guarantees the Government of Colombia that **a sentence of life imprisonment will not be sought or imposed on Mr. RIOS SUAREZ** . . ."  **Exhibit P**, Letter to the Honorable Katherine B. Forrest from Elsa Gladys Cifuentes Aranzazu, Consul General, dated Jan. 31, 2014, at p. 1 (emphasis supplied).

plea of guilty in this case, his previously-imposed and undischarged sentence of 100 months to be served in Colombia upon his deportation from the United States after he completes Your Honor's sentence, the time that Mr. Rios Suarez spent in detention awaiting extradition to the United States in this case, and Mr. Rios Suarez's history and characteristics under 18 U.S.C. § 3553(a).

## PERSONAL HISTORY AND CHARACTERISTICS

Yesid Rios Suarez (age 46) was born in Arauquita, Colombia on ████████ ████ to Amos Rios and Laura Suarez. Amos Rios was murdered by decapitation in 1970, an event Mr. Rios Suarez witnessed as a young child. Laura Suarez died on December 23, 2001 from a respiratory infection. Mr. Rios Suarez is the youngest of sixteen (16) children. Two siblings died at very young ages, and as discussed in further detail below, Mr. Rios Suarez's brother, Amos, was murdered in 1995. Furthermore, while Mr. Rios Suarez was incarcerated this year, his elder sister Maria Elcy passed away after battling cancer.

Mr. Rios Suarez has a common law wife, Emildre Rodriguez Arenas (age 43), and together they have two sons, ages 13 and six. He also has a 16-year-old son from a previous relationship. His six-year-old son suffers from a rare medical condition called Perthes Disease, a condition in children characterized by a loss of blood supply to the hip. As a result, he suffers from pain and stunted growth.  He is undergoing therapy to help remedy this condition.

Mr. Rios Suarez grew up in Las Bancas, a rural, mountainous area that was disconnected from the rest of the country.  His family owned a farm where they grew

plantains, cocoa beans, and yucca. At the age of four, Mr. Rios started working with his family in the fields.

In 1970, Mr. Rios Suarez, then age three, witnessed his father's decapitation by farm workers who did not want to pay him.  To this day, Mr. Rios Suarez has a vivid memory of the killing. It was an extremely traumatic experience that has and will continue to haunt him for the rest of his life. To his knowledge, the men that are responsible for killing his father still roam free in Colombia. At no point throughout his life did Mr. Rios Suarez ever retaliate against these men.

The untimely and heartbreaking passing of Mr. Rios Suarez's father was a great hardship for his family. His mother struggled to support the large brood. Oftentimes, there was not much food to eat. Mr. Rios and his siblings would collect animal carcasses and try to salvage the remaining edible portions of the corpses. Because they raised hogs on their farm, they would also eat whatever food remained from the hogs' troughs.  His sisters washed clothes for a living. When Mr. Rios Suarez was three years old, he accompanied his sisters to the river to watch them wash clothes there. While in the river unattended, Mr. Rios Suarez nearly drowned.

Mr. Rios Suarez attended elementary school in Arauquita, which was three hours away from Las Bancas. As a young boy, he would venture on the daily trip by donkey. On one of these journeys, he was injured when the donkey suddenly threw Mr. Rios Suarez off.

In 1973, the Rios Suarez family sold their house and farm in Las Bancas and moved to Arauca. It was difficult getting around in Arauca, as the town often suffered from floods. As a result, Mr. Rios Suarez would have to wade through high waters to get

3

through the streets to go to school. In 1975, while walking along the roads of Arauca, Mr. Rios Suarez was hit by a truck. He suffered serious injuries and could not walk for six months. Mr. Rios Suarez underwent extensive physical therapy to aid his healing.

In 1985, Mr. Rios Suarez moved to Bogota with two of his sisters. From 1986 to 1988, Mr. Rios Suarez attended a military academy. In 1988, he graduated to a superior military school. The school focused on academics but also trained their students in military fighting. As a student, Mr. Rios Suarez engaged in fights against paramilitary groups such as the FARC (also known as *Fuerzas Armadas Revolucionarias de Colombia – Ejército del Pueblo*, or the Revolutionary Armed Forces of Colombia – People's Army), the ELN (also known as *Ejército de Liberación Nacional* or the National Liberation Army), and other paramilitary drug trafficking groups associated with Pablo Escobar and Yair Klein, the latter of whom was a former lieutenant colonel of the Israeli army convicted of training paramilitary groups and militias of drug traffickers. In 1989, Mr. Rios Suarez was discharged from the academy due to hearing loss he sustained from bomb detonations. Today, he suffers from 70% irreversible hearing loss in one ear.

In 1990, Mr. Rios Suarez moved back to Arauquita and worked for an agriculture company. During this time, his older brother, Amos Rios Suarez, was elected mayor of Arauquita. Amos served as mayor for two years. He belonged to the Patriotic Union (*Union Patriotica,* or "UP"), a leftist party that experienced a surge in popularity during this time. During the mayoral term, Mr. Rios Suarez worked as his brother's personal assistant. Jose Edin Olivares Real, former Secretary of Treasury of Arauca and former mayor of Arauquita, attests to Mr. Rios Suarez's work in the mayor's office:

4

> [W]hile carrying out my duties I had the opportunity to meet Mr. YESID RIOS SUAREZ…and who I can testify has served as the driver of the vehicles of the mayor's office and as a livestock farmer, belonging to this profession and developing farming projects which have allowed him to help maintain his family.[2]

Unfortunately, the Patriotic Union had been under attack by paramilitary groups working in conjunction with the Colombian government. Mr. Rios Suarez and Amos were the victims of several attacks and Amos was eventually killed on December 29, 1995 along with many other Colombian politicians. The deaths have since been deemed a *magnicidio*, an attack of great magnitude.

Ana Myriam Sarmiento Rivera, Mr. Rios Suarez's previous spouse and the mother of his eldest son, worked in the Mayor's Office in Arauquita at the same time as Mr. Rios Suarez and his brother. As she explains:

> Given the fact that we were far from the family and working in such an important position, we used to work from Monday through Sunday because the mayor was very dedicated to his community and on weekends we would go to small rural neighborhoods to listen to people's needs.  That is how I got to know and spend time with Yesid Rios Suarez, the mayor's brother, who was also working in the mayor's office.  A few months later, we started to date.  We all worked diligently on projects of the Municipal Administration.

> Despite the violence that preceded our administration, several sports, health and education works and projects were developed, bringing peace as the people in those different small rural neighborhoods attested. Farmers started to take their crops to municipal markets but that situation caused political jealousy from opponents, who initiated strikes and blockades harassing the mayor.  This was the reason why we had to resign and move to Arauca, the capital of the Department of Arauca; our lives were in danger.

> Soon, we started to work for the government of Arauca. The former mayor and his brother, that is, Yesid Rios Suarez, worked for the Department of Agriculture while I joined the Chief of Staff's office at the departmental government.  However, the former mayor's solidarity and

---

[2] **Exhibit A**.

popularity gained him an unstoppable political force, which, if it would have continued, would surely have led him to succeed at the next departmental elections.   He would have become the next governor of Arauca had his political opponents not have killed him.[3]

As discussed further below, Amos' death was the product of political persecution that has unjustly haunted Mr. Rios Suarez throughout his life including the time period at issue in the present case. Mr. Rios Suarez was arrested on April 9, 1998 and charged with rebellion. The prosecution alleged that he was affiliated with the FARC – the very same paramilitary group he had fought against when serving his country in the 1980s. Mr. Rios Suarez was acquitted of the charges in 2001. From 1998 until May 10, 2001, however, he was incarcerated while awaiting the outcome of the case against him.[4]

After his acquittal in 2001, while living in Arauca, Mr. Rios Suarez and his family were victims of a bombing attack on their home. As his wife's aunt, Irma Leonor Arenas, who was living in the home at the time of the bombing, explains:

> In 2001, I went to live with him and his wife, working with them in the job of helping to raise, at that time, their first son ████████, and from then on I began to live and work with his family.   At that time we lived in Arauca, capital of the department of Arauca, where we stayed for over a year.   Then we had to leave that town since there took place a terrorist attack against the family.   That day I was in the house with my niece, Emildre, her son ████████ and Mr. Yesid's mother.   An explosive was placed in the entrance of the house, and thank God we were in the back of the house and were unharmed.[5]

After the attack, Mr. Rios Suarez moved to Arauquita and opened a gas station. He had a legal permit to operate the station and to sell gasoline. Since gasoline was much cheaper in Venezuela than in Colombia, Mr. Rios Suarez would bring gasoline from Venezuela to Colombia. In 2002, the government ordered that the gas station was

---

[3] **Exhibit B**.
[4] See **Exhibit Y**, Affidavit of Luis Ricardo Anselmi Roca.
[5] **Exhibit C**.

illegal and rescinded his permit. His customers were sent to prison. From 2005 until his imprisonment for the instant case, Mr. Rios Suarez invested in a farm and a car wash in Venezuela.

In 2010, Mr. Rios Suarez was tried *in absentia* by the Colombian government for drug trafficking. Mr. Rios Suarez was not present for these proceedings, as he was living in Venezuela and the Colombian authorities failed to locate and arrest him. He was convicted and sentenced to 200 months' imprisonment. The sentence was appealed and subsequently lowered to 100 months, based on the appellate court's recalculation of the applicable drug quantity. Mr. Rios Suarez will serve the remaining portion of that 100-month sentence upon his return to Colombia. As discussed further below, we respectfully request that the Court take into consideration Mr. Rios Suarez's pending Colombian sentence, and the facts and circumstances surrounding that prosecution when imposing sentence.

Mr. Rios Suarez's many family members and friends have written to the Court on his behalf.

1)   Maria Elcy, Mr. Rios Suarez's recently deceased sister, wrote[6]:

> Judge, I am Yesid's sister, and my greatest wish is to see him here soon, since I am very sick, for it was approximately a year ago that I was diagnosed with cancer.  I am in treatment, but each day I feel that I am weaker, my defenses lower constantly.  I receive chemotherapy treatment every 15 days and it has been very hard for me, since each time they suspend the treatment on account of my continued weakness…
>
> Judge, I tell you this because I am the matriarch of the family.  I have four daughters, who depend on me, and my economic situation has been very difficult, since my brother was the one who most helped with the studies of my daughters.  Now, everything has changed since they took him.  My

---

[6] Maria Elcy was unable to sign this document prior to her passing. We respectfully request the Court to take the unsigned letter into consideration.

entire family has few economic resources, and my brother was the one who helped everyone.  Now, because of my illness and his being far away, everything has changed…

Judge, let me remind you again of the case of my brother Yesid, have mercy of him and of us, who are suffering enormously for him.[7]

2)      Emildre Rodriguez Arenas, Mr. Rios Suarez's common law wife, writes:

First of all, I would like to tell you about my situation. Right now, I am going through a very difficult time in my life, perhaps the worst time I have ever experienced. Due to my husband's absence, I have had to continue educating our 2 sons by myself.  At the present moment, I don't have a formal job given that the economic situation and the unemployment in my country are quite concerning.  However, with my relatives' help and my sister's and her husband's support, we have been able to continue our lives for the past 3 years.  It has been hard to cope with this situation because in addition to the economic and emotional adversities, my youngest child, ████████, was diagnosed 5 year ago with legg calve perthes (sic) (a disease affecting his waist that causes the destruction of part of the femur's head, known as "waist's ball").  Right now, he is being treated at the Roosevelt Children's Orthopedic Institute located in the city of Bogota. This has required constant traveling, since we live in a city near the capital and the treatment is quite long and requires physical and emotional support.  You can't imagine how sad and painful it is to see my young son asking for his father daily; he wants to see him.  What's more, the day of his birthday, he made a beautiful present for his father and he is holding onto it until his father comes back.  It breaks my heart just thinking that many years can go by without that meeting ever taking place…

My oldest son, ██████, is starting this adolescent stage and perhaps he is the most affected by this change in his life for he went from counting with his father unconditionally to not seeing him and having his support.  He fell into a depression and I had to look for a psychologist to help him understand and assimilate this situation. Your Honor, I want you to know that my husband, Yesid, is a great man, excellent family member, best father, unconditional brother, and an understanding, loving and faithful husband.[8]

3)      ████████████████, Mr. Rios Suarez's eldest son, writes:

---

[7] **Exhibit D**.
[8] **Exhibit E**.

This is to express the reason why my dad should be returned to Colombia. My father is a person who has made mistakes like any other human being but I would like him to serve his sentence in Colombia.  His family, friends and his sons, ███████, ███████ and myself need our father close and as a second voice of support.  My mom is excellent; she has raised me well with the ethical and moral values and principles required to be a good citizen.  However, I ask you to understand that every child, every young person needs a father figure, but due to my father's mistakes, when I finally had him close and was able to hug him, justice sent him to another country without taking into account that his children needed him.[9]

4)   Faviola Andrea Diaz Rios, Mr. Rios Suarez's niece, writes:

I would like to respectfully request your mercy in the sentence of my uncle Mr. Yesid, since he has 3 children (all boys) who need to grow up at their father's side.  For I personally recognize the difficulty one has, as a mother, having to raise sons when there is no father figure for direction and education.  I have a son and I have had to raise him alone for the last five years, for my husband and the father of my child was kidnapped, taken and made to disappear without leaving a trace.  I also want to tell you that my uncle and his family, at that time, offered me their support both emotional and financial.  Therefore, as niece, I recognize and have faith that my uncle Yesid is a responsible person, hard-working, dedicated to his family and above all has a humble heart willing to help others.[10]

5)   Elsa Rojas de Fernandez, former mayor of Arauquita, writes:

He was raised and remained in this town all his life in the company of his parents and other members of his family, all of whom are honorable persons who have left a good legacy in this town.  I can certify under the seriousness of an oath "if it were necessary" that during the time that I knew YESID RIOS SUAREZ, he distinguished himself by his good conduct and reliability in carrying out his obligations as son, father, husband, and irreproachable citizen within the context of the laws.[11]

6)   Katherine Arenas Madrid writes:

I am 21 years old and I have known Mr. Yesid Rios Suarez since I was born.  Since then, he has been a very important person to me and my family for he was always very helpful whenever he could be. Mr. Rios has been like a father to me since I do not have a father or a mother.

_____

[9] **Exhibit F**.
[10] **Exhibit G**.
[11] **Exhibit H**.

He is a very generous human being who helps his family without any hesitation. I can say with certainty that he has a very noble heart and he is concerned with the well-being of those around him. Thanks to his help, I was able to graduate high school and attend the first few semesters of college. At present, I am doing the ninth semester of environmental engineering…

I am writing this letter not only to ask you for another opportunity but mostly for you to know Mr. Yesid Rios a bit more than what his file says. I know that judges do not know about defendants' lives in depth, their virtues, defects, families, loved ones, dreams, ideas, thoughts but most importantly the reasons to be free. Your Honor, I can tell you that Mr. Yesid Rios is a good person and is not a danger to society.[12]

7)   Marcela Acosta, family friend, writes:

I have the habit of analyzing people by the way they speak, the way they express themselves, how they react under certain circumstances, and through that I can see many qualities in a person, and a few flaws, which are natural for human beings. But as I wrote earlier, I am Christian and I prefer to see the good side of people. A few years ago, the first impression I had of Yesid was that he was a very serious man, but within a few months, I was able to find in him a person valuable not only to his family, but to those of us who have had the privilege of knowing him. Yesid has a great quality that very few people possess and that is the capacity to worry about the well-being of those that surround him, and he not only worries, but he takes it upon himself to resolve the situation, because his priority is family and the well-being of its members. It is for that reason that he always goes one step further than the material, and it is that human side that makes him valuable, for I am not part of his family, and nevertheless he welcomed me like I was.[13]

8)   Mayvy Rodriguez Arenas, Mr. Rios Suarez's sister-in-law, writes:

He and my sister have given me two beautiful treasures, whom I love with all my heart. I am referencing my two nephews, who are sweet and lively angels, who fill the house with happiness, with their smiles and their mischief. Moreover, we all make mistakes but nevertheless we deserve a second chance. I think separating him from his children is punishment enough; the older boy has already entered the stage of adolescence, and it is very difficult as a woman to raise two men without the assistance of a father. To the younger one we have always said that his father is studying and every night he prays to God that his father finish his studies in New

---

[12] **Exhibit I**.
[13] **Exhibit J**.

York soon so that he can return to spend time with them.  Therefore, I would like to respectfully request that, at the time you make your decision, you take into consideration my nephews, their need to be able to enjoy the protection and love of their father.  They find themselves at a time in their childhood and development where they need a father figure.[14]

9)   Nohora Lucelly Reina Arenas writes:

I want to tell you, Your Honor, that I know YESID RIOS SUAREZ to be somebody with great human qualities, respectful, and helpful to his family and those who need him.  He and his family are going through a very difficult situation, especially his children who are still very young and do not understand what is going on.  In particular, his son, ███████ is very affected by the situation and prefers not to talk about his father for he starts to cry and becomes depressed. They took him to see a psychologist to help him concentrate at school and manage his depression.  I would also like to tell you, Judge Katherine [sic], that they are not a wealthy family.  His wife and children are in financial need, they don't even own their own home. They are living at a sister's house, which has three bedrooms, so they live all packed together.

Your Honor, from the bottom of my heart and because of the children, I am asking you to give YESID RIOS SUAREZ a second opportunity so that he can go back to his family.[15]

10)   Mr. Rios Suarez's sister, Yaneth Rios, writes:

Judge, I want to thank you for everything you can do for my brother Yesid Rios Suarez…Yesid was two and a half years old when his father passed away. He is the youngest of all the siblings. Many of us were little kids and others older. You can imagine the suffering and amount of work we went through. Only my mother and grandfather were working in whatever type of job they were able to get. Thanks to God, who is so great and powerful, and never abandons anyone, we were able to move ahead. That is the reason why we are such a close-knit family with moral and religious principles. We grew up all together, we shared everything, we are a very poor family and that is the reason why we need Yesid so much, especially his sons, who are very young and need his guidance and love.[16]

11)   ████████████   writes:

---

[14] **Exhibit K**.
[15] **Exhibit L**.
[16] **Exhibit M**.

Mr. Yesid Rios has been very supportive of me. I have known him for many years, and thanks to him I have learned the value of family union for in life one needs to enjoy and take care of our loved ones.[17]

12)   Leonel de Jesus Ramos Bedoya and Gloria Ines Grisales de Ramos write:

We can say that, many years ago we met Mr. Yesid Rios Suarez when he was but a child, son of Mrs. Laura Suarez, a lady well-regarded in our town who lived next to her sons and daughters (one of them also a teacher, recently deceased; the others employees, already retired) who we knew as a family very respected, hard-working and honorable. We know that, later on, Yesid, when he was young, worked in the municipal mayor's office of this town alongside his brother who held the position of mayor, up until the moment they went to live in the city of Arauca. We can say that this youth was a kind person, open to the service of others, honest, just, and very hard-working.[18]

The foregoing excerpts attest to Mr. Rios Suarez's good character and to the positive impact that he has had on the lives of those around him. The Court is respectfully requested to consider these letters and the lives of these individuals who have written to the Court on Mr. Rios Suarez's behalf, especially his young sons, and to impose a non-Guidelines sentence, which would be sufficient but not greater than necessary to meet the objectives of sentencing.

## OFFENSE CONDUCT

Mr. Rios Suarez pled guilty to the indictment, which charged him with a conspiracy to import "five kilograms and more of mixtures and substances containing a detectable amount of cocaine," in violation of 21 U.S.C. § 963.[19] At his change of plea hearing on February 4, 2014, Mr. Rios Suarez testified that:

I wish to plead guilty to the indictment and the allegation therein. From 1992 until September 2011, I conspired with others to import at least 5

---

[17] **Exhibit N**.
[18] **Exhibit O**.
[19] **Exhibit V**, *United States v. Rios Suarez*, 11-CR-836 (KBF), Indictment at p. 1-2.

kilos of cocaine from Col[o]mbia to the U.S., specifically, the Southern District of New York.

My role in the conspiracy was to fill the planes with fuel. I knew that those planes were filled with cocaine. I knew that those planes were flying between Col[o]mbia and Venezuela. I knew that the cocaine was manufactured in laboratories in Col[o]mbia. I knew what I was doing was illegal and wrong. I am very sorry to the Court for these activities. Thank you, your Honor.[20]

The time period with which Mr. Rios Suarez is charged in Count One of the indictment is both "[f]rom in or about 1992, up to and including the present" and "[f]rom in or about 1996, up to and including the present." See Indictment at p. 1-2. Pursuant to the Colombian extradition order (see Section III(A)(3), below), however, Mr. Rios Suarez may only be held responsible for "acts committed after December 17, 1997."[21]

Mr. Rios Suarez did not testify at the *Fatico* hearing. The government offered the testimony of two cooperating witnesses, Yon Pelayo Garzon Garzon and Luis Alberto Ramirez-Pajon, whose testimony is discussed where relevant below. The defense respectfully submits that the government's witnesses were not credible and that their inconsistent and contradictory assertions about Mr. Rios Suarez's role in the charged conspiracy should not receive greater consideration from the Court than Mr. Rios Suarez's own testimony, given under oath, as to his admitted conduct.

**LEGAL AUTHORITY IN SUPPORT OF A NON-GUIDELINES SENTENCE**

In the following sections, we respectfully set forth legal authority and factual arguments pursuant to which the Court is respectfully requested to impose a non-

---

[20] **Exhibit Q,** Plea Hearing Trans. at p. 26, lines 12-23.
[21] **Exhibit R** at ¶ 6.

Guidelines sentence that reflects all of the facts and circumstances of this case and Mr.

Rios Suarez's personal history and characteristics.

## I.   The Court Has Significant Discretion to Impose an Appropriate Sentence.

"The Court shall impose a sentence sufficient, but not greater than necessary, . . .

[and] shall consider—

1.   The nature and circumstances of the offense and the history and characteristics of the defendant;

2.   The need for the sentence imposed—

   a.   To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   b.   To afford adequate deterrence to criminal conduct;

   c.   To protect the public from further crimes of the defendant;

   d.   To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3.   The kinds of sentences available;

4.   The kinds of sentence and the sentencing range established . . . [by the  Sentencing Guidelines];

5.   Any pertinent policy statement . . .

6.   The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7.   The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a) (some minor alterations not noted).

Though the Guidelines are an important factor in the sentencing analysis, they

are advisory and the Court is generally free to impose a non-Guidelines sentence.

*United States v. Gall*, 128 S. Ct. 586 (2007); *United States v. Booker*, 543 U.S. 220

(2005).  "The sentencing judge should decide, after considering the Guidelines and all

the other factors set forth in section 3553(a), whether (i) to impose the sentence that

would have been imposed under the Guidelines, *i.e.,* a sentence within the applicable

Guidelines range or within permissible departure authority, or (ii) to impose a non-

Guidelines sentence."  *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005); *see*

*also United States v. Castillo*, 460 F.3d 337, 352 (2d Cir. 2006).

In an *en banc* opinion, the Second Circuit reaffirmed that "[a] sentencing judge

has *very wide latitude* to decide the proper degree of punishment for an individual

offender and a particular crime."  *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir.

2008) (*en banc*) (italics supplied).  The *Cavera* court elaborated as to the proper role of

the Guidelines in the sentencing calculus and a district court's concomitant authority to

issue a non-Guidelines sentence:

> The Guidelines provide the "**starting point and the initial benchmark**"
> for sentencing, *Gall,* 128 S. Ct. at 596, and district courts must "remain
> cognizant of them throughout the sentencing process," *id.* at 596 n. 6.  **It
> is now, however, emphatically clear that the Guidelines are
> guidelines—that is, they are truly advisory.  A district court may not
> presume that a Guidelines sentence is reasonable; it must instead
> conduct its own independent review of the sentencing factors, aided
> by the arguments of the prosecution and defense.  District judges are,
> as a result, generally free to impose sentences outside the
> recommended range**.  When they do so, however, they "must consider
> the extent of the deviation and ensure that the justification is sufficiently
> compelling to support the degree of the variance." *Id.* at 597.  **In this
> way, the district court reaches an informed and individualized
> judgment in each case as to what is "sufficient, but not greater than
> necessary" to fulfill the purposes of sentencing**.  18 U.S.C. § 3553(a).

*Cavera*, 550 F.3d at 189 (emphasis supplied) (footnotes omitted).

In *Cavera*, the Court of Appeals made clear that it would "not substitute [its]

own judgment for the district court's on the question of what is sufficient to meet the §

3553(a) considerations in any particular case." *Cavera*, 550 F.3d at 189.  The Court

emphasized that it would not second-guess the determinations of the District Court: "To

the extent that our prior cases may be read to imply a more searching form of

substantive review, we today depart from that understanding." *Cavera* 550 F.3d at 189.

The Supreme Court confirmed *Cavera*'s approach in *Nelson v. United States*,

129 S. Ct. 890 (2009), and *Spears v. United States*, 129 S. Ct. 840 (2009).  In *Nelson*,

the Court instructed that:

> [T]he sentencing court does not enjoy the benefit of a legal presumption
> that the Guidelines sentence should apply. Instead, the sentencing court
> must first calculate the Guidelines range, and then consider what sentence
> is appropriate for the individual defendant in light of the statutory
> sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the
> former with reference to the latter.

*Nelson*, 129 S. Ct. at 891-92 (internal citations omitted).  Thus, "[t]he Guidelines are not

only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable."

*Nelson*, 129 S. Ct. at 892 (emphasis in original).

The Second Circuit has also recognized that "[r]arely, if ever do the pertinent

facts dictate one and only one appropriate sentence but rather experienced district judges

may reasonably differ."  *United States v. Jones*, 531 F.3d 163, 173 (2d Cir. 2008).

## II. The Parties' Guidelines Calculations Differ Widely and a Non-Guidelines Sentence Is Appropriate.

The parties' calculations of the appropriate sentencing Guidelines range for Mr.

Rios Suarez differ widely.  It is not disputed that Mr. Rios Suarez pled guilty to a

violation of 21 U.S.C. § 963, which carries a mandatory minimum sentence of 10 years

of incarceration.  However, nearly every other aspect of the correct sentencing range for

Mr. Rios Suarez is in dispute.  The defense recognizes that the Court has calculated that

a Guidelines level of 43 is applicable.  Nonetheless, to preserve Mr. Rios Suarez's

rights, the defense respectfully asserts that a substantially lower Guidelines level or, in

the alternative, a non-Guidelines sentence, is appropriate.

 As set forth in Section III, below, the defense argues that Mr. Rios Suarez should

be given the benefit of the negotiated plea agreement to which he offered to plead guilty

with the assistance of new counsel, combined with the two-point anticipated Guidelines

reduction, for a resulting offense level of 33 (Criminal History Category I), calculated as

follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2D1.1(c)(1) (more than150 kilograms of cocaine) | 38[22] |
| Acceptance of Responsibility (U.S.S.G. §3E1.1) | -3 |
| New 2014 Guidelines 2-point reduction for drug sentences (see ussc.org) | -2 |
| **TOTAL OFFENSE LEVEL** | **33[23]** |

 At Guidelines level 33, Mr. Rios Suarez faces a sentencing range of 135-168

months of imprisonment.  As discussed below, the defense respectfully submits that

even this level overstates Mr. Rios Suarez's responsibility based on his plea allocution,

---

[22] The defense notes that, under the proposed Sentencing Commission amendments to the Guidelines, a level 38 would apply to offenses involving "more than 450 kilograms of cocaine" and a level 36 would apply to offenses involving "at least 150 kilograms but less than 450 kilograms of cocaine."  See Proposed Guidelines Amendments at p. 13, available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/20140430_Amendments.pdf.  Because the negotiated plea agreement referenced 150 kilograms of cocaine, a base offense level of 36 would be an appropriate starting point for the Court's calculation of the appropriate Guidelines range.  The defense's proposed two-point reduction in the calculation on this page attempts to achieve the same result, given that Mr. Rios Suarez is entitled to the two-point reduction as per the instruction of Attorney General Eric Holder even though the Guidelines amendments are not scheduled to go into effect until November 2014.

[23] In the negotiated plea agreement, the government agreed not to seek enhancements including those that it now insists are necessary and proper.  See **Exhibit U**.

in which he stated that he had been aware that the conspiracy involved five kilograms of cocaine[24], which, under 21 U.S.C. § 841(b)(1)(A) carries a mandatory minimum sentence of 10 years.[25]   However, because Mr. Rios Suarez indicated to counsel that he would agree to the terms of this plea agreement, the defense agrees that the Court could find that he is subject to the higher sentencing range.   Therefore, the defense urges the Court to find that Mr. Rios Suarez's maximum sentencing range is 135-168 months, and that a sentence at the low end of the Guidelines (or the mandatory minimum sentence of 10 years under 21 U.S.C. § 841(b)(1)(A)) would be sufficient but not greater than necessary to meet the recognized objectives of sentencing.

The defense has not yet received a copy of the Presentence Report and respectfully reserves all objections to the Report's findings, including its calculation of Mr. Rios Suarez's Guidelines range in anticipation of reviewing the Report with Mr. Rios Suarez on the date of sentencing and reserves the right to submit an additional sentencing memo concerning the PSR if necessary.

The government, which, as discussed below, declined to accept Mr. Rios Suarez's offer to plead guilty to the previously negotiated plea agreement, now urges the Court to find that Mr. Rios Suarez should be sentenced at a level 42,[26] with a corresponding range of 360 months to life imprisonment, calculated as follows:[27]

---

[24] *See* **Exhibit Q**, Plea Hearing Trans. at p. 26, lines 12-16.

[25] Level 32: 5 to 15 kilograms of cocaine is equated with 121-151 months of imprisonment.  However, with the 2-point reduction, a level 30 is equated with 97-121 months of imprisonment.

[26] The defense respectfully notes that, pursuant to Attorney General Eric Holder's instruction to the Assistant United States Attorneys not to oppose a 2-level reduction pending the November 2014 official publication of the amended drug quantity tables in U.S.S.G. § 2D1.1 and the correspondingly lowered sentencing ranges, the appropriate level would now be a level 40, with a Guidelines range of 292-365 months of

18

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2D1.1(c)(1) (more than 150 kilograms of cocaine) | 38 |
| Use of an aircraft in the importation of a controlled substance (U.S.S.G. § 2D1.1(b)(3)) | +2 |
| Possession of a firearm during the offense (U.S.S.G. § 2D1.1(b)(1)) | +2 |
| Managerial role enhancement (U.S.S.G. § 3B1.1) | +3 |
| Acceptance of Responsibility (U.S.S.G. §3E1.1) | -3 |
| **TOTAL OFFENSE LEVEL** | **42** |

The government has agreed that it is precluded from seeking a sentence of life imprisonment under the extradition order pursuant to which Mr. Rios Suarez is subject to the jurisdiction of this Court and that Mr. Rios Suarez is entitled to the three-point reduction for acceptance of responsibility based on his timely plea of guilty.[28]   The government has also taken the position that Mr. Rios Suarez is in Criminal History Category I.[29]  The defense concurs with the government on these points.

In the following sections of this memorandum, the defense respectfully sets forth its arguments in support of a non-Guidelines sentence that adequately considers the

imprisonment.  See **Exhibit S**, Department of Justice, "Attorney General Holder Urges Changes in Federal Sentencing Guidelines to Reserve Harshest Penalties for Most Serious Drug Traffickers," Mar. 13, 2014. Available at http://www.justice.gov/opa/pr/2014/March/14-ag-263.html ("The Commission is expected to vote on the proposal endorsed by Holder in April.  Until then, the Justice Department will direct prosecutors not to object if defendants in court seek to have the newly proposed guidelines applied to them during sentencing.").

[27] The following calculation is taken from the government's revised proposed plea agreement, dated Jan. 30, 2014 (**Exhibit T**).  At the plea hearing, the government's calculation was a level 47, which, pursuant to the Guidelines, is reduced to the maximum level of 43 (life imprisonment). See **Exhibit Q**, Plea Hearing Trans. at p. 5, lines 8-25; p. 6, lines 1-15.

[28] **Exhibit Q**, Plea Hearing Trans. at p. 4, lines 4-9; p. 5, lines 1-7; p. 6, lines 13-15.

[29] **Exhibit Q**, Plea Hearing Trans. at p. 6, lines 21-25.

complexities of Mr. Rios Suarez's situation and the particular circumstances

surrounding his appearance before this Court and his plea of guilty.

### III. The Court Could Consider the Circumstances of Mr. Rios Suarez's Guilty Plea in Calculating an Appropriate Sentence.

Given the unique circumstances under which Mr. Rios Suarez pled guilty to the

Indictment and the last minute substitution of counsel that occurred on the day on which

the negotiated plea agreement expired, the defense respectfully believes that the

circumstances of Mr. Rios Suarez's plea are relevant to a determination of the

appropriate sentence to be imposed and that Mr. Rios Suarez should be given the benefit

of that plea agreement.

### A. The Court Should Apply the Guideline Range as Set Forth in the Negotiated Plea Agreement.[30]

The Court should apply the Guidelines range set forth in the negotiated plea

agreement, which is substantially lower than the range the government now asserts

should apply.  In the negotiated plea agreement, which was sent to Mr. Rios Suarez's

prior attorney, the government agreed to a base offense level of 38, no enhancements,

and a 3-point reduction for acceptance of responsibility, leading to a Guidelines level of

35 (Criminal History Category I) and a corresponding sentencing range of 168-210

months of imprisonment.[31]  Given the United States Sentencing Commission's recent

unanimous vote to lower the drug guidelines by two points, Mr. Rios Suarez would be at

a level 33, with a Guidelines range of 135-168 months of imprisonment.  Considering

---

[30] Moreover, as set forth in Section IV(B), below, the Court should further reduce Mr. Rios Suarez's sentencing Guidelines range by two points in light of the United States Sentencing Commission's recent unanimous vote.
[31] See **Exhibit U**.

the facts and circumstances surrounding Mr. Rios Suarez's guilty plea, the defense

respectfully submits that this is the proper—and the just—Guidelines range.

### 1. The Government's Refusal to Extend the Deadline for Acceptance of the Negotiated Plea Agreement Violated Mr. Rios Suarez's Sixth Amendment Right to Counsel.

The government's refusal to extend the deadline for Mr. Rios Suarez to accept

the previously negotiated guilty plea, despite the government's awareness that Mr. Rios

Suarez was effectively without counsel at the critical moment, violated Mr. Rios

Suarez's Sixth Amendment right to counsel.

### a. Timeline and Facts of Mr. Rios Suarez's Entry of a Plea of Guilty to the Indictment

In or about early January 2014, the government offered a plea agreement to Mr.

Rios Suarez through his former counsel in this matter.[32]  The deadline for acceptance of

the plea agreement was January 7, 2014. Two days before the expiration of the plea

offer, current counsel for Mr. Rios Suarez was contacted for a substitution of counsel, at

which time all relevant individuals were aware that communication between Mr. Rios

Suarez and his prior attorney had broken down and that he was effectively without the

advice of counsel at this critical moment.

On January 7, 2014, the parties appeared before the Court for the substitution of

counsel hearing.  During the hearing, the government stated that the plea offer would

expire that day.  After the hearing, defense counsel was under the impression that the

deadline would be extended in order to give new counsel an opportunity to discuss the

case and the plea offer with Mr. Rios Suarez.  Counsel was unaware of the details of the

---

[32] See **Exhibit U**.  The proposed plea agreement is dated January __, 2014 and is addressed to Mr. Rios Suarez's former counsel, whose handwriting evidencing the negotiations between the parties is visible on the document.

case and the terms of the plea agreement prior to the hearing and takes full responsibility for the fact that he was unable to ethically advise Mr. Rios Suarez to take the plea during the hearing at which he was appointed on January 7, 2014.

Thereafter, counsel immediately reviewed the case and the plea offer, contacted an interpreter to assist him, and then met with Mr. Rios Suarez as expeditiously as possible, on January 9 and 14, 2014, to discuss the case and the plea offer. At the conclusion of the second meeting, Mr. Rios Suarez informed counsel that he would like to accept the plea and that he wanted to take responsibility for his actions.

On January 14, 2014, within seven days of his appointment as counsel of record and after reviewing all relevant documents, counsel advised the government that he had met with Mr. Rios Suarez, and that Mr. Rios Suarez had decided to take the plea. This was the earliest date at which counsel was able to confirm Mr. Rios Suarez's desire to plead guilty with the effective assistance of counsel's advice.

However, in a telephone conversation two days later, the government denied having agreed to extend the deadline so that counsel could competently and ethically advise Mr. Rios Suarez, and stated that the plea was no longer available. The government then insisted that it was not possible to re-offer the previous plea agreement or a similar agreement, and that Mr. Rios Suarez would, if he wanted to plead guilty, have to agree to a significantly higher Guidelines range as well as several enhancements that the government had previously agreed to omit.

Thereafter, the government offered Mr. Rios Suarez an unacceptable plea agreement in which the government asserted that the base offense level was 38 because the offense had involved more than 150 kilograms of cocaine, and sought enhancements

22

for the use of commercial aircraft, firearms, and a managerial role, leading to a base offense level of 42 (after subtracting points for acceptance of responsibility) and a Guidelines level of 360 months to life imprisonment.[33]  The government declined to consider the original plea.  To the best of the defense's knowledge, there was no change in circumstances *other than the expiration of the prior deadline* behind the government's changed position.  No new information concerning Mr. Rios Suarez's conduct or the facts of the offense had come to light.

On February 4, 2014, Mr. Rios Suarez pled guilty to the Indictment, which charges him with a conspiracy to import "five kilograms and more of mixtures and substances containing a detectable amount of cocaine," in violation of 21 U.S.C. § 963, an offense that carries a statutory minimum sentence of 10 years.

Mr. Rios Suarez stated:

I wish to plead guilty to the indictment and the allegation therein.  From 1992 until September 2011, I conspired with others to import at least **5 kilos of cocaine** from Col[o]mbia to the U.S., specifically, the Southern District of New York.

My role in the conspiracy was to fill the planes with fuel.  I knew that those planes were filled with cocaine.  I knew that those planes were flying between Col[o]mbia and Venezuela.  I knew that the cocaine was manufactured in laboratories in Col[o]mbia.  I knew what I was doing was illegal and wrong.  I am very sorry to the Court for these activities.  Thank you, your Honor.[34]

At the change of plea hearing, the government stated that it would seek sentencing enhancements for the use of an aircraft, the possession of a firearm, and a managerial role—a position directly contrary to that taken in the negotiated plea agreement dated January __, 2014.  The defense respectfully submits that the

---

[33] *See* **Exhibit T**, Plea Agreement addressed to present counsel, dated January 30, 2014.
[34] **Exhibit Q**, Plea Hearing Trans. at p. 26, lines 12-23 (emphasis supplied).

government's imposition of an arbitrary deadline[35] and subsequent refusal to negotiate a reasonable plea agreement with Mr. Rios Suarez—and its concurrent insistence that the previously abandoned enhancements were, in fact, a necessary condition of any plea—is blatantly unjust and contrary to the Department of Justice's mandate to seek justice. Moreover, such actions violate Mr. Rios Suarez's Constitutional rights.

### b. Applicable Law: The Government's Withdrawal of the Offered Plea Violated Mr. Rios Suarez's Sixth Amendment Right to Counsel.

The Sixth Amendment of the United States Constitution guarantees a defendant in a criminal case the right to the effective assistance of counsel.  U.S. Const. Amend. VI.  The Supreme Court has held that this right extends to plea-bargaining.

**If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it.** If that right is denied, prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence.

*Lafler v. Cooper*, 132 S. Ct. 1376, 1387, 182 L. Ed. 2d 398 (2012) (emphasis supplied).

The Court explained that the pretrial critical stages of a criminal prosecution "are part of the whole course of a criminal proceeding, a proceeding in which defendants cannot be presumed to make critical decisions without counsel's advice." *Lafler*, 132 S. Ct. at 1388 (collecting cases).  Thus, "the right to adequate assistance of counsel cannot be defined or enforced without taking account of the central role plea bargaining plays in securing convictions and determining sentences." *Lafler*, 132 S. Ct. at 1388.  *See also Iowa v. Tovar*, 541 U.S. 77, 81, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004) ("entry of a guilty plea, whether to a misdemeanor or a felony charge, ranks as a 'critical stage' at

---

[35] As the Court is no doubt aware, plea deadlines are notoriously flexible, given the customary ongoing negotiation between the parties in every criminal case.

which the right to counsel adheres"); *Padilla v. Kentucky,* 559 U.S. 356, 130 S.Ct. 1473, 1486, 176 L.Ed.2d 284 (2010) ("the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel").

In the Second Circuit, effective assistance is "reasonably competent assistance," which means that, "the quality of a defense counsel's representation should be within the range of competence reasonably expected of attorneys in criminal cases." *Trapnell v. United States*, 725 F.2d 149, 153 (2d Cir. 1983).

The government knowingly denied Mr. Rios Suarez the right to the assistance of counsel as mandated by the Supreme Court in *Lafler* when it refused to extend the deadline to accept the plea agreement. All parties involved in the negotiation of a plea of guilty for Mr. Rios Suarez were aware of, shortly before January 7, 2014, that communications between Mr. Rios Suarez and his former counsel had broken down and that new counsel had not yet been appointed, leaving Mr. Rios Suarez without the effective assistance of counsel (or, indeed, without *any* assistance of counsel).

Simultaneously, Mr. Rios Suarez, a Spanish-speaking citizen of Colombia who had never before been to the United States, was held in pretrial detention at the Metropolitan Detention Center, without access to alternative legal advice or even a way to contact his family or friends (all of whom reside outside the United States) to ask them to help him find another lawyer.

Thus, during the time in which he could theoretically have considered whether or not to accept the plea agreement and discussed his options with his attorney, Mr. Rios Suarez was entirely without recourse to the advice of competent counsel or any means by which to engage the services of an attorney to advise him.

When the parties appeared before the Court on January 7, 2014, for the substitution of counsel hearing, it was evident to all concerned that Mr. Rios Suarez had not been able to discuss the plea offer with his current attorney.  Moreover, because the undersigned had not yet been assigned to represent Mr. Rios Suarez or seen any of the paperwork relating to the case, he was not familiar with the facts of the case, the discovery, the plea agreement terms, or any other of the essential information that would have made it possible for him to provide Mr. Rios Suarez with competent legal advice.

A one-week extension of the deadline for acceptance of the plea agreement was simply the least that the government could have done to preserve Mr. Rios Suarez's constitutional rights and offer professional courtesy to new counsel.  The government's denial of its responsibility to do justice in this manner has caused Mr. Rios Suarez substantial prejudice and violated the Constitutional rights that the government is bound to protect.

After the substitution of counsel hearing, current counsel met with Mr. Rios Suarez expeditiously with the understanding that he would still be able to accept the previously offered plea agreement, and within a week's time, was able to represent to the government that Mr. Rios Suarez wanted to accept the plea and to plead guilty.  The government's subsequent withdrawal of the offer and refusal to honor its agreement to extend the deadline cannot be interpreted in any other manner than as a denial of Mr. Rios Suarez's right to the assistance of counsel in violation of the holding of *Lafler* because the government was aware of Mr. Rios Suarez's situation before the substitution of counsel and on the date that the plea offer was scheduled to expire.

In making this argument, counsel is aware, after having represented numerous clients who have entered pleas of guilty before courts in this District and the Eastern District of New York, that such deadlines are typically fungible and extended innumerable times as long as negotiations are continuing and neither party is prejudiced by such an extension or the trial date is not quickly approaching.  Therefore, counsel respectfully submits that there was no good faith reason why the deadline to accept the previously offered plea could not have been extended by a week or ten days to allow Mr. Rios Suarez to have the advice of counsel while considering this extremely critical decision.  The government's lack of professional courtesy, however, is less egregious than the government's effective violation of Mr. Rios Suarez's Constitutional rights.

Because there is no valid reason why the government should now be given the opportunity to enhance Mr. Rios Suarez's Guidelines range beyond the range set forth in the previously negotiated plea agreement based on the history of this case, the Court should protect Mr. Rios Suarez's right to the effective assistance of counsel and apply the Guidelines range set forth in the previously negotiated (and effectively accepted) plea agreement, with an adjustment based on the United States Sentencing Commission's recent vote to lower all drug guidelines ranges by two points.

> **2. Because Mr. Rios Suarez Was Deprived of the Right to Counsel, He Was Likewise Deprived of Due Process of Law at the Plea Bargaining Stage of his Case.**

The Fifth Amendment of the United States Constitution provides in part that no person shall "be deprived of life, liberty, or property, without due process of law."  U.S. Const. Amend. V.  In the context of immigration law, "ineffective assistance of counsel may be the basis for a due process violation."  *Aguilar de Polanco v. United States Dep't*

*of Justice*, 123 F. App'x 19, 21 (2d Cir. 2005) (referencing *Rabiu v. INS,* 41 F.3d 879, 882–83 (2d Cir. 1994)).

In the instant case, not only was Mr. Rios Suarez deprived of effective assistance during the critical few days in which he was presumed to be considering whether or not to accept the government's plea offer; he was without any assistance of counsel at all because of the breakdown in attorney-client communications that had occurred. Therefore, the government's subsequent refusal to extend the deadline for acceptance of the negotiated plea agreement so that Mr. Rios Suarez could consult with new counsel effectively deprived Mr. Rios Suarez of the effective assistance of counsel and simultaneously deprived him of the due process of law to which he was guaranteed.

In fact, it should be noted that it would have been a further violation of Mr. Rios Suarez's Constitutional rights if new counsel had simply advised Mr. Rios Suarez to accept the negotiated plea agreement before new counsel had been able to learn about the case and to advise Mr. Rios Suarez of the immigration consequences of his plea of guilty. *See Padilla*, 559 U.S. at 374 ("we now hold that counsel must inform her client whether his plea carries a risk of deportation. Our longstanding Sixth Amendment precedents, the seriousness of deportation as a consequence of a criminal plea, and the concomitant impact of deportation on families living lawfully in this country demand no less.").

The government's refusal to extend the deadline as a courtesy and a simple matter of justice violated Mr. Rios Suarez's Constitutional rights and should not be accepted by this Court.

28

3.  **The Government's Proposed Guidelines Range and the Guidelines Range Calculated by the Court Violates the Terms of the Colombian Extradition Order.**

Notwithstanding its previously expressed agreement not to seek enhancements for firearms, the use of commercial aircraft, and role in the offense, the government now asserts that Mr. Rios Suarez is properly at either a Guidelines level 42, with a corresponding sentencing range of 360 months to life imprisonment, or a level 43, with a corresponding range of life imprisonment.  The Court's Order following the *Fatico* hearing similarly finds that a Guidelines level of 43 is appropriate.

A sentencing range of 42 or 43 violates the terms of the extradition order pursuant to which Mr. Rios Suarez appears before this Court and the Court should, therefore, disregard the calculated sentencing Guidelines range when determining the appropriate sentence for Mr. Rios Suarez and impose a non-Guidelines sentence, giving Mr. Rios Suarez the benefit of the negotiated plea agreement.

As the Court is aware, Mr. Rios Suarez is a citizen of Colombia who appears before this Court pursuant to an extradition order from the Colombian government granting his extradition to face the indictment in the Southern District of New York under certain conditions.

On January 31, 2014, the Consulate of Colombia sent a letter to the Court with copies to counsel restating the terms of the extradition order —Resolution 382 dated October 2, 2012, and Resolution 453 dated December 14, 2012[36]—in which the Colombian court permitted Mr. Rios Suarez's extradition only on the condition that "a

---

[36] **Exhibit R**. Resolution 453 is effectively the appellate decision affirming Resolution 382.

29

sentence of life imprisonment will not be sought or imposed"[37] and that he "will not be subject to forced disappearance, torture or cruel and unusual punishment, degrading or inhumane treatment, or exile."[38]  Because of the particular facts of this case, the government's proposed Guidelines range and the Guidelines range calculated by the Court violate the terms of the Colombian extradition order.

The life expectancy of a Colombian male born in 1967, such as Mr. Rios Suarez, is 58.3 years.[39]  Mr. Rios Suarez is currently 46 years old.  As detailed below, he is in poor health.  The youngest of 14 siblings who survived infancy, Mr. Rios Suarez has already had the misfortune of experiencing the deaths of several of his older siblings.  A minimum sentence of 360 months, or 30 years, such as that sought by the government, would effectively guarantee that Mr. Rios Suarez would die in jail.  As such, the government's proposed minimum sentence would violate the terms of the Colombian extradition order pursuant to which Mr. Rios Suarez appears before this Court and subject to the jurisdiction of the United States because that order specifically prohibits a sentence of life imprisonment.  It goes without saying, although the defense reiterates for emphasis, that a life sentence would likewise violate the Colombian extradition order.

---

[37] In passing, the defense respectfully notes that based on the text of the Colombian Resolutions, the Court erred at the plea hearing in stating that, "while the government may not, pursuant to treaty, seek a life sentence for you, that does not prevent the Court from imposing a life sentence on you." **Exhibit Q**, Plea Hearing Trans. at p. 23, lines 10-13.

[38] See also **Exhibit P**, Letter to the Honorable Katherine B. Forrest from Elsa Gladys Cifuentes Aranzazu, Consul General, dated Jan. 31, 2014.

[39] See http://countryeconomy.com/demography/life-expectancy/colombia (accessed April 24, 2014).

Therefore, the Court should disregard the government's proposed sentencing Guidelines range and the Court's own calculated sentencing range or, in the alternative, if the Court finds it appropriate to credit any of the government's Guidelines calculations, the Court should vary downward sufficiently to comply with the Colombian extradition order.

**B.   The Court Should Hold Mr. Rios Suarez Accountable Only for the Quantity of Narcotics Reasonably Foreseeable to Him.**

The Court should hold Mr. Rios Suarez accountable only for the quantity of narcotics that the government has proven was reasonably foreseeable to him.

**1.   Factual Basis for Mr. Rios Suarez's Plea: Mr. Rios Suarez Pled Guilty to Conspiracy to Import At Least Five Kilograms of Cocaine and the Government Failed to Prove His Knowledge of a Greater Quantity.**

Mr. Rios Suarez pled guilty to the Indictment in this case, which charged him with a conspiracy to import "five kilograms and more of mixtures and substances containing a detectable amount of cocaine . . ."[40]  At his change of plea hearing on February 4, 2014, Mr. Rios Suarez, in his own words, admitted that, "[f]rom 1992 until September 2011, I conspired with others to import at least 5 kilos of cocaine from Col[o]mbia to the U.S., specifically, the Southern District of New York."[41]  He stated that his role in the conspiracy had been "to fill the planes with fuel.  I knew that those planes were filled with cocaine.  I knew that those planes were flying between

---

[40] **Exhibit V**, Indictment at ¶ 2.

[41] Based on the decision of the Criminal Cassation Division of the Supreme Court of Justice in Colombia, Mr. Rios Suarez's extradition was granted "only in relation of acts committed after December 17, 1997."  See **Exhibit P**, Letter to the Honorable Katherine B. Forrest from Elsa Gladys Cifuentes Aranzazu, Consul General, dated Jan. 31, 2014, ¶ 6.  Therefore, any calculation of quantity should disregard evidence of any involvement with a narcotics conspiracy in any respect prior to December 17, 1997, for purposes of selecting the appropriate Guidelines range.

Col[o]mbia and Venezuela.  I knew that the cocaine was manufactured in laboratories in Col[o]mbia."[42]

In contrast to Mr. Rios Suarez's statement under oath as to his involvement in the instant offense, the government now asserts that Mr. Rios Suarez should be held responsible for thousands of kilograms of cocaine.[43]  The government has failed to prove Mr. Rios Suarez's actual involvement in the transportation of this vast amount of cocaine.  Moreover, the government has not proved beyond a reasonable doubt that anything more than the five kilograms to which Mr. Rios Suarez allocuted was reasonably foreseeable to him.  Therefore, the Court, under the case law in this Circuit, cannot hold him responsible for more than five kilograms of cocaine.

> ### 2. Applicable Law: The Quantity for Which Mr. Rios Suarez Is Held Responsible Must Have Been Reasonably Foreseeable to Him.

As the Second Circuit recently reiterated, "'the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the law of conspiracy."  *United States v. Geto*, 729 F.3d 221, 234 n.11 (2d Cir. 2013) (quoting *United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991)).

Conviction of a conspiracy to distribute drugs under 21 U.S.C. § 841(b)(1)(A) requires that a jury find the drug-quantity element.  *United States v. Gonzalez*, 420 F.3d

---

[42] **Exhibit Q**, Plea Hearing Trans. at p. 26, lines 12-21.

[43] At the change of plea hearing on February 4, 2014, the government took the position that Mr. Rios Suarez was responsible for "more than 150 kilograms of cocaine"—far less than the "thousands" that the government now argues is the correct amount. **Exhibit Q**, Plea Hearing Trans. at p. 5, lines 11-12.  Because the 2013 Guidelines treat any amount over 150 kilograms as a base level 38 offense and the 2014 Guidelines will treat any amount over 450 kilograms as a base level 38 offense, the government's proffer of "thousands" of kilograms is an inflammatory assertion that does not lead to an enhanced legal consequence.

111, 125 (2d Cir. 2005). "Our case law is clear that an individual defendant in a drug conspiracy may only be held responsible, under 21 U.S.C. § 846, for the drug quantity which was reasonably foreseeable to that defendant." *United States v. Feliciano*, 26 Fed. Appx. 55, 58 (2d Cir. 2001) (citing *United States v. Martinez*, 987 F.2d 920, 925-26 (2d Cir. 1993)); *see also United States v. Conon-Solis*, 354 F.3d 101, 103 (1st Cir. 2004). Accordingly, the factfinder must make a twofold finding: not only that the conspiracy as a whole was involved in the distribution of the quantity, but also that the co-conspirator defendant himself either knew of the quantity, or that the quantity was reasonably foreseeable to him.  *Feliciano*, 26 Fed. Appx. at 58; *see also United States v. Hernandez-Santiago*, 92 F.3d 97, 100 (2d Cir. 1996) (the government must establish "the scope of the criminal activity the particular defendant jointly agreed to undertake"). A defendant's mere "knowledge" of "criminal acts" by others, or even his "aware[nesss]" of the operation's "overall" scope, does not satisfy this threshold burden. *United States v. Studley*, 47 F.3d 569, 574-75 (2d Cir. 1995).

In *Gonzalez*, the defendant pleaded guilty to a violation of 21 U.S.C. § 841(b)(1)(A), while stating on the record that he disagreed with the government's calculation of the amount of crack cocaine for which he was responsible, that he had intended only to distribute the small sample (a 21 U.S.C. § 841(b)(1)(C) amount that he actually sold to the government's informant), and that he had not intended to subsequently sell the informant a kilogram of crack, but had planned to sell him a counterfeit substance instead.  *Gonzalez*, 420 F.3d at 116-18.  After a hearing pursuant to *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978), the District Court found by a preponderance of the evidence that Gonzalez should be held responsible for the higher

33

amount and, therefore, was exposed to the sentencing range of a 21 U.S.C.

§841(b)(1)(A) violation.  *Gonzalez*, 420 F.3d at 118.  The District Court subsequently

sentenced Gonzalez to the 20-year mandatory minimum sentence applicable to a second-

time felony offender.  *Id.* at 119-20.

On appeal, the Second Circuit applied *United States v. Thomas*, 274 F.3d 655 (2d

Cir. 2001), which held that "'because the quantity of drugs involved in a crime *may*

*raise* a defendant's sentence above the statutory maximum established in 21 U.S.C. §

841(b)(1)(C), quantity is an element of the offense charged under 21 U.S.C. § 841.'"

*Gonzalez*, 420 F.3d at 123 (quoting *Thomas*, 274 F.3d at 663) (emphasis in *Gonzalez*).

The *Gonzalez* court explained, "*Thomas* construed drug quantity as an element needing

to be pleaded and proved beyond a reasonable doubt in every prosecution seeking

conviction on an aggravated § 841 offense. . . .  Thus, because Gonzalez did not admit

the drug quantity element of an aggravated § 841 offense, his guilty plea was insufficient

to support conviction on a § 841(b)(1)(A) charge."  *Gonzalez*, 420 F.3d at 125.[44]

Similarly, in *United States v. Culbertson*, 670 F.3d 183 (2d Cir. 2012), as

amended (Feb. 16, 2012), the Second Circuit extended *Gonzalez* to convictions under 21

U.S.C. § 963 which require the government to prove (or the defendant to admit) that the

defendant "'knew of his co-conspirator's illicit activities or [that] the activities were

---

[44] Similarly, see *United States v. McLean*, 287 F.3d 127, 134 (2d Cir. 2002) (holding
that where defendant "admits only the non-quantity elements" of a drug offense "and
disputes quantity," a district court may accept a guilty plea "only on the lesser-included
offense of the § 841 crime involving an *unspecified* drug quantity" (emphasis in
original)); *United States v. Yu,* 285 F.3d 192, 197 (2d Cir. 2002) (holding it "error" to
permit a defendant "to plead guilty to quantity-specific charges while refusing to
allocute to quantity"); *United States v. Doe,* 297 F.3d 76, 90, 93 (2d Cir. 2002) (holding
that plea allocution that did not settle issue of drug quantity required that defendant be
sentenced pursuant to penalty provision applicable to indeterminate quantity offenses).

reasonably foreseeable by him.'" *Culbertson*, 670 F.3d at 190 (quoting *United States v. Jackson,* 335 F.3d 170, 181 (2d Cir. 2003)).  In *Culbertson*, the defendant allocuted to an agreement to transport cocaine, but asserted that the agreement had involved three kilograms, an amount lower than the five kilogram threshold for a 10-year mandatory minimum sentence.  *Culbertson*, 670 F.3d at 190.  The Second Circuit held that Culbertson's "persistent disavowal of responsibility for any amount in excess of three kilograms of cocaine compels us to conclude that the District Court lacked a factual basis for his plea."  *Id*.

In this case, the Court should hold Mr. Rios Suarez responsible only for the quantity of narcotics to which he allocuted at his change of plea hearing or which the government has proved beyond a reasonable doubt was reasonably foreseeable to him. Mr. Rios Suarez admitted at his change of plea hearing that he conspired to import five kilograms of cocaine and that he had specifically fueled planes that he knew to contain cocaine, and which were traveling between Colombia and Venezuela.[45]

The government's letter in anticipation of the *Fatico* hearing asserted that the government would prove that "[t]he conspiracy involved thousands of kilograms of cocaine, which would result in a base offense level of 38 pursuant to U.S.S.G. § 2D1.1(c)(1)."[46]  The defense respectfully notes that level 38 concerns offenses involving of 150 kilograms or more of cocaine.  *See* U.S.S.G. § 2D1.1(c)(1).  The government's inflammatory proffer of "thousands" of kilograms is unnecessary and unsupported by

---

[45] **Exhibit Q**, Plea Hearing Trans. at p. 26, lines 12-23.
[46] **Exhibit W**, Letter from AUSA Adam Fee to the Honorable Katherine B. Forrest dated March 28, 2014 at p. 1.

the factual record of this case including the negotiated plea agreement in which the parties agreed that a base level of 38 was appropriate.

At the *Fatico* hearing on May 2 and 7, 2014, the government failed to prove beyond a reasonable doubt what quantity of cocaine was reasonably foreseeable to Mr. Rios Suarez. Instead, the government elicited broadly generalized testimony that thousands of kilograms of heroin left Colombia between 2001 and 2010. For instance, Garzon testified that, from 2001 to 2002, "Eighty-seven planes left loaded with cocaine during the entire period when I worked in that area."[47] Each plane contained between 100 and 350 kilograms and "there was an average of 250 to 350 kilos per flight."[48] However, Garzon offered no testimony as to the foreseeability of that actual amount to Mr. Rios Suarez. To the contrary, Garzon stated that he had only seen Mr. Rios Suarez once at the landing strips, indicating that Mr. Rios Suarez would not have had knowledge of the actual amounts of cocaine involved in any particular flight.[49]

Additionally, the defense notes that it is factually impossible for Mr. Rios Suarez to have been involved in the narcotics conspiracy during the majority of the period about which Garzon testified because, as set forth above, Mr. Rios Suarez was incarcerated from 1998 through 2001.[50]

Similarly, Ramirez-Pajon testified that, between 2006 and 2010, he was involved in the transportation of "approximately 20 loads" of between 400 and 500 kilos each.[51] Although he testified generally that Mr. Rios Suarez was involved in "[g]et[ting] the

---

[47] *Fatico* Hearing Transcript at p. 58, ln. 13-14.
[48] *Id.* at p. 59, ln. 6-7, 9.
[49] *Fatico* Hearing Trans. at p. 49, ln. 21.
[50] See **Exhibit Y**.
[51] *Fatico* Hearing Trans. at p.127, ln. 14; p. 128, ln. 1-2.

cocaine from the different labs that provide the drugs," he also stated broadly only that Mr. Rios Suarez would "facilitate the landing strip so that Didier and his planes could land there to pick up the drugs."[52]  Thus, again, there is no direct testimony as to the amount of cocaine that was either known or reasonably foreseeable to Mr. Rios Suarez.

The defense respectfully notes that the Court's Order of May 15, 2014, does not consider the issue of what quantity of cocaine was known to or reasonably foreseeable to Mr. Rios Suarez.  The Order states that, "The Court finds by a preponderance of the evidence that the conspiracy involved thousands of kilograms of cocaine."[53]

Because the Court made no particular finding as to the quantity of cocaine either known to or reasonably foreseeable to Mr. Rios Suarez, under the case law of the Second Circuit, he should not be held responsible for an amount greater than that to which he admitted in his plea allocution.

### C.  The Court Should Not Apply the Enhancements Requested by the Government.

On May 2 and 7, 2014, the Court held a *Fatico* hearing concerning Mr. Rios Suarez and the conduct for which he should be held responsible at sentencing.  Although the defense acknowledges that the Court has already determined that these enhancements apply, the defense nevertheless maintains that the Court cannot, in accordance with the Colombian extradition order, impose a sentence as high as that sought by the government or calculated by the Court through the application of the government's requested enhancements.

---

[52] *Id.* at p. 130, ln. 6-7.
[53] Memorandum Decision & Order dated May 15, 2014 at p. 5.

1. **The Court Should Reconsider its Decision and Should Not Apply the Two-Point Enhancement for Use of an Aircraft in the Importation of a Controlled Substance (U.S.S.G. § 2D1.1(b)(3)).**

As argued above, the defense respectfully submits that Mr. Rios Suarez should be given the benefit of the previously negotiated plea, in which the Guidelines calculation did not include this enhancement, because the government failed to prove that any of the cocaine that came to the United States arrived in an aircraft other than a regularly scheduled commercial aircraft, as required by the Guidelines Manual language.

The Guidelines provide for a two-level increase "[i]f the defendant unlawfully imported or exported a controlled substance under circumstances in which (A) an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance . . ." U.S.S.G. § 2D1.1(b)(3). However, no testimony demonstrated that any cocaine from the conspiracy arrived in the United States in any manner other than by commercial aircraft. Garzon testified that, "What the pilots would represent to us was that the final destination for those routes usually was the United States, but also the routes that would go to Brazil and to other parts of Europe, according to what the pilots told us, in a certain way some of that cocaine also had a final destination of the United States."[54]

In his July 26th proffer session[55], Garzon stated that "some" of the cocaine, once it arrived Brazil, Guyana, and various locations throughout Europe, was sent to the United States on commercial flights.[56]

---

[54] *Fatico* Hearing Trans. at p. 62, ln. 2-7.
[55] Year unknown
[56] See 3502-F proffer session, handwritten notes, p. 5.

Ramirez-Pajon did not testify that any cocaine came to the United States at all. Additionally, as set forth in Section III(D), below, Mr. Rios Suarez should not be held responsible for conduct that did not affect the United States, that is, for cocaine that was transported exclusively from one location outside the United States to another location outside the United States.  Therefore, because there is no evidence that the cocaine that reached the United States did so in an aircraft "other than a regularly scheduled commercial air carrier," the requested enhancement does not apply.

### 2. The Court Should Reconsider its Decision and Should Not Apply the Two-Point Enhancement for Use of a Firearm During the Offense (U.S.S.G. § 2D1.1(b)(1)).

The Court should not apply the two-point enhancement under U.S.S.G. § 2D1.1(b)(1) because the Court's Order does not find that the requirements of the enhancement are met.  The Court's Order found that "the defendant caused members of the conspiracy, including individuals guarding the laboratories at which the cocaine was manufactured (and as to which the defendant had supervisory responsibility) to carry weapons."[57]  However, this finding does not mirror the language of the enhancement, which provides for a two-level increase "[i]f a dangerous weapon (including a firearm) was possessed."  U.S.S.G. § 2D1.1(b)(1).

Moreover, none of the testimony established that Mr. Rios Suarez possessed a firearm or dangerous weapon that he used during the course of or in furtherance of the conspiracy.  Garzon testified that Mr. Rios Suarez almost always carried a weapon with him.[58]  However, Garzon did not testify that the weapon was possessed as part of the conspiracy.  On information and belief, it is very common for individuals in Colombia to

---

[57] Memorandum Decision & Order dated May 15, 2014, at p. 5.
[58] *Fatico* Hearing Trans. at p. 56, ln. 11.

possess weapons for their own safety, given the volatile security situation. That an individual possessed a weapon in Colombia cannot, therefore, be equated to the possession of a weapon in connection with a narcotics conspiracy as intended by this enhancement.

Ramirez-Pajon testified that he had seen Mr. Rios Suarez with a rifle once. "That was a house he had in El Safari, Venezuela, he took out a big weapon. He showed it to us and said that was for his safety."[59] Ramirez-Pajon did not testify that Mr. Rios Suarez owned the alleged rifle or provide the time period during which this "showing" occurred. Ramirez-Pajon did not testify that Mr. Rios Suarez used or possessed the weapon in furtherance of the drug trafficking conspiracy or for any reason other than for his personal safety and to protect his home. Moreover, Ramirez-Pajon's statement cannot be believed because he never mentioned this alleged rifle in the course of his cooperation with the government before his testimony on May 7, 2014.

Therefore, the Court cannot reasonably find by a preponderance of the evidence that the testimony established that Mr. Rios Suarez possessed a firearm during the course of the conspiracy within the meaning of the Guidelines enhancement.

### 3. The Court Should Reconsider its Decision and Should Not Apply the Two-Point Enhancement for the Direction of the Use of Violence (U.S.S.G. § 2D1.1(b)(2)).[60]

The government has requested, and the Court has found that the enhancement "[i]f the defendant used violence, made a credible threat to use violence, or directed the

---

[59] *Fatico* Hearing Trans. at p. 134, ln. 2-9.

[60] The defense respectfully notes that the government's intention to seek this enhancement appears for the first time in its letter concerning the *Fatico* hearing dated March 28, 2014 (see **Exhibit W**), and that the government never indicated during plea negotiations or at any other time during the pendency of this case that it believed this enhancement to be appropriate.

use of violence," should be applied and Mr. Rios Suarez's Guidelines range should be enhanced by two levels accordingly.  U.S.S.G. § 2D1.1(b)(2).  However, U.S.S.G. § 2D1.1 Application Note 11(B) instructs that, "in a case in which the defendant merely possessed a dangerous weapon but did not use violence, make a credible threat to use violence, or direct the use of violence, subsection (b)(2) would not apply."

The defense respectfully submits that the *Fatico* hearing testimony that Mr. Rios Suarez had been involved in acts of violence was fabricated and is simply not credible or plausible.  Garzon, who had been cooperating with various authorities since 1991, never mentioned Mr. Rios Suarez's involvement in any violence until a proffer session with the government on January 24, 2014.  At the *Fatico* hearing, he mentioned numerous murders that he asserted Mr. Rios Suarez had been involved in or had ordered. However, he had never discussed these murders in his 23 years of cooperation with various authorities, *including his 2002 proffer sessions in which he stated that he was afraid of the defendant but did not accuse him of being involved in murders*, and therefore his 2014 testimony concerning Mr. Rios Suarez's involvement in acts of violence cannot be believed.

First, Garzon testified that, as to the alleged murder of the two watchmen (which in any event occurred well before the start of the charged conspiracy), "[s]omeone from the Tenth Front of the FARC," *not* Mr. Rios Suarez, had ordered them killed.[61]  Second, Garzon never mentioned the 1994 or 1995 murder of Jaime Huergos (which also occurred outside the relevant timeframe) until January 24, 2014.[62]  Third, Garzon's testimony about the two farmers, whose deaths, he asserted on January 24, 2014, had

---

[61] *Fatico* Hearing Trans. at p. 27-28, ln. 21-1.
[62] *Fatico* Hearing Trans. at p. 29, ln. 9-15; 30 ln. 4-5, 10-12, 15-18.

been the cause of his leaving to seek the protection of the Colombian authorities, is implausible.

Although he testified at length about the supposed murder of the farmers, Garzon never stated that Mr. Rios Suarez had ordered the men to be killed.[63]  Garzon's testimony as to this murder contradicted his prior, arguably more reliable testimony.  In his January proffer session, Garzon testified that the murder of the farmers had been the reason that he had fled from his position with Didier Rios.[64]  However, all of his prior proffer testimony stated that he had fled because of the imminent attack on the Eighteenth Brigade.  Moreover, when Garzon fled and had his first substantial debriefing with the Colombian prosecutors' office on May 3 and 4, 2002, he ended the testimony with a statement that he was asking for protection from the Colombian authorities, *but did not state that he was afraid because he had seen people murdered* or mention Mr. Rios Suarez's involvement in any murder *at all*.[65]

If Garzon had been truly afraid for his life based on having seen Mr. Rios Suarez's involvement in these alleged murders, he would undoubtedly have stated this fear and accused Mr. Rios Suarez of the crime when it was in his immediate past; he would not have waited for 12 years to mention it for the first time when, coincidentally, the government was seeking information against the person Garzon now accuses.

Therefore, the Court should disregard Garzon's implausible testimony and not apply the requested enhancement for the use or direction of violence.

---

[63] *Fatico* Hearing Trans. at p. 86, ln. 2-26.
[64] See 3502-H proffer session handwritten notes p. 3.
[65] See 3502-B; 3502-I.

### 4. The Court Should Reconsider its Decision and Should Not Apply the Four-Point Organizer/Leader Enhancement (U.S.S.G. § 3B1.1).[66]

The Court should not apply the four-point enhancement for an organizer or leadership role in the charged conspiracy, which is appropriate for an individual who acted as an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).  To impose this adjustment, the Court must find "(i) that the defendant was 'an organizer or leader,' and (ii) that the criminal activity either 'involved five or more participants' or 'was otherwise extensive.'"  *United States v. Teyer*, 322 F. Supp. 2d 359, 363 (S.D.N.Y. 2004) (quoting *United States v. Zagari,* 111 F.3d 307, 330 (2d Cir. 1997) (internal quotation marks omitted)).[67]

For Mr. Rios Suarez to qualify as an organizer or leader under case law in this District, the Court would have to find Mr. Rios Suarez satisfied the criteria in U.S.S.G. § 3B1.1 Application Note 4:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of

---

[66] As with the "direction of violence" enhancement, the defense respectfully submits that the government never signaled that it would take the position that a four-point enhancement would be appropriate.  Instead, the government consistently argued that a three-point managerial role enhancement would be proper (a point the defense also contests).

[67] *See* also *Teyer*, 322 F. Supp. 2d at 364 (quoting *United States v. Payne,* 63 F.3d 1200, 1212 (2d Cir.1995) ("A defendant acts as a manager or supervisor of a criminal enterprise involving at least five participants if he exercises some degree of control over others involved in the commission of the offense or plays a significant role in the decision to recruit or to supervise lower-level participants.") (internal citations, brackets and quotation marks omitted)). Distinguishing a "manager or supervisor," U.S.S.G. § 3B1.1(b), from an "organizer or leader," *id*. § 3B1.1(a), may well be more of an art than a science.

decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

Therefore, "In enhancing a defendant's sentence based on his role in the offense, a district court must make specific factual findings as to that role." *United States v. Stevens*, 985 F.2d 1175, 1183-84 (2d Cir. 1993) (referencing *United States v. Lanese*, 890 F.2d 1284, 1294 (2d Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990)). *See also Teyer*, 322 F. Supp. 2d at 365 (finding a four-level enhancement proper where "Torres–Teyer quite literally organized the Belizean trans-shipment operation, which itself qualifies as a highly complex criminal activity and a major part of the overall importation scheme. He did not act as a mere manager or supervisor, but as a high-level operative who recruited, supervised, and directed dozens of individuals and organized their activity.").

In this case, the government has provided no evidence sufficient for the Court to make a determination that Mr. Rios Suarez was a leader or an organizer.  At the *Fatico* hearing, Garzon testified that he witnessed Mr. Rios Suarez in the laboratory "giv[ing] orders regarding the work that was being done in that area."[68]  However, Garzon did not elaborate exactly what kind of orders Mr. Rios Suarez was giving and can only remember one specific instance he was personally given an order in the laboratory. He testified, "I can remember one maybe where I had to stand guard at one of the

---

[68] *Fatico* Hearing Trans. at p. 55, ln. 6-7.

laboratories in that area for a while."[69]  In contrast, Garzon's testimony suggests that the true leaders and organizers of the laboratories were members of the FARC. He stated that it was "very common" to see FARC around the area of the laboratory[70], and that they were present in the laboratory "[b]ecause they also had the control over or they administered the laboratory and what was done there, and on some occasions they needed to be present there and they also lent security to the lab."[71] Therefore, Garzon's testimony did not lead to the conclusion that Mr. Rios Suarez was a leader or organizer.

To the contrary, Ramirez-Pajon testified that Didier Rios, Mr, Rios Suarez's nephew, was Ramirez-Pajon's partner.[72]  He testified that Mr. Rios Suarez was "in charge of providing the fuel, providing the security on the landing strips, and setting up the cocaine, preparing it."[73]  He did not testify as to the number of individuals that Mr. Rios Suarez supervised or controlled.

In contrast to the government's depiction, Mr. Rios Suarez has always steadfastly accepted responsibility for his actual role in the conspiracy, which was much more limited in scope than the government has asserted.  At his plea hearing on February 4, 2014, Mr. Rios Suarez admitted that he had knowingly provided fuel to aircrafts that were transporting cocaine.  The government has not provided evidence to contradict his assertions that he did not recruit others, did not organize large-scale schemes or direct the actions of other individuals, or claim to be owed more than any of

---

[69] *Id*. at p. 55, 10-11.

[70] *Id*. at p. 56, ln. 21.

[71] *Id*. at p. 57, 8-11.

[72] *Fatico* Hearing Trans.  at p. 126, ln. 6-7.

[73] *Id*. at p. 128, ln. 9-10.  In contrast, Garzon testified that he had only seen Mr. Rios Suarez at a landing strip one single time. When asked if he ever saw Mr. Rios Suarez at any of these landing strips, Garzon responded, "I recall mainly one time."  *Fatico* Hearing Trans. at p. 49, ln. 21.

the other members of the alleged conspiracy.  Therefore, a four-point enhancement for a

leadership role would be improper.

> **5. The Court Should Reconsider its Decision and Should Not Apply
> the Two-Point Criminal Livelihood Enhancement (U.S.S.G. §
> 2D1.1(b)(14)).**

The enhancement for "criminal livelihood" pursuant to U.S.S.G. §

2D1.1(b)(14)(E) should not apply.  Application Note 29(c) to U.S.S.G. § 2D1.1 provides

that, "For purposes of subsection (b)(14)(E), 'pattern of criminal conduct' and 'engaged

in as a livelihood' have the meaning given such terms in §4B1.3 (Criminal Livelihood)."

In turn, U.S.S.G. § 4B1.3 Application Note 2 provides that:

> "Engaged in as a livelihood" means that (A) the defendant derived
> income from the pattern of criminal conduct that in any twelve-month
> period exceeded 2,000 times the then existing hourly minimum wage
> under federal law; **and** (B) **the totality of circumstances shows that
> such criminal conduct was the defendant's primary occupation
> in that twelve-month period (e.g., the defendant engaged in criminal
> conduct rather than regular, legitimate employment**; or the
> defendant's legitimate employment was merely a front for the
> defendant's criminal conduct).

U.S.S.G. § 4B1.3 Application Note 2 (emphasis supplied).

Therefore, in order for this enhancement to apply, the government would had to

have proven both that Mr. Rios Suarez's total income derived from narcotics was greater

than 2,000 times the existing federal minimum wage in the period in question and that

the same criminal conduct had been Mr. Rios Suarez's primary occupation.  The

government failed to meet its burden on either of these points, offering no evidence of

the income attributable to Mr. Rios Suarez personally from his alleged narcotics dealing.

Therefore, the two-point enhancement for "criminal livelihood" pursuant to U.S.S.G. §

2D1.1(b)(14)(E) should not be applied.

**D. The Court Should Reconsider its Decision and Should Not Include Narcotics Sent from One Country Outside the United States to Another Country Outside the United States When Calculating the Appropriate Quantity and Resulting Guidelines Range.**

In calculating the appropriate drug quantity for which Mr. Rios Suarez should be held accountable, the Court should not consider those narcotics sent from one country outside the United States to another country outside the United States because that conduct is not conduct affecting the United States or a crime against the United States.

"The Guidelines section on base offense levels is broadly worded to include "all such acts and omissions that were part of the same course of conduct or common scheme or plan," but does not explicitly address the issue of foreign crimes and activities." *United States v. Azeem*, 946 F.2d 13, 17 (2d Cir. 1991) (citing U.S.S.G. § 1B1.3(a)(2)).

The Second Circuit has distinguished between conduct that affects the United States and conduct that is entirely foreign. *See United States v. Azeem*, 946 F.2d 13, 16-17 (2d Cir. 1991) (finding that the defendant's importation of three kilograms of heroin from Pakistan to Egypt "should not have been included in the base offense level calculation because it was not a crime against the United States."). Moreover, criminal conduct that is unrelated to the charges in the United States indictment should not be counted. *See United States v. Chunza–Plazas*, 45 F.3d 51, 56 (2d Cir. 1995) (district court erred in granting an upward departure based on defendant's "alleged prior acts of homicide, terrorism, and drug trafficking in Colombia," when the defendant had been convicted in the United States only of the possession of false immigration documents.

At the *Fatico* hearing on May 2 and 7, 2014, the government presented evidence that Mr. Rios Suarez had been involved in the transportation of cocaine out of Colombia.

47

However, as Mr. Rios Suarez testified in his plea hearing on February 4, 2014, the planes went first to Venezuela.[74]  Although Mr. Rios Suarez may have been aware that some of the cocaine was destined for the United States, the government has not produced any reliable means by which to calculate the amount of cocaine *of which Mr. Rios Suarez was aware or which should have been reasonably foreseeable to him* that was ultimately destined for the United States.

Moreover, the government has not provided the defense or the Court with an itemized statement purporting to calculate the amount of cocaine that actually entered the United States as a result of Mr. Rios Suarez's conduct.  At the *Fatico* hearing, Garzon testified only that, "What the pilots would represent to us was that the final destination for those routes usually was the United States, but also the routes that would go to Brazil and to other parts of Europe, according to what the pilots told us, in a certain way some of that cocaine also had a final destination of the United States."[75] Ramirez-Pajon testified that the cocaine went to Haiti, the Dominican Republic, Puerto Rico, Guatemala, and Honduras.[76]  He did not testify that *any* cocaine was transported by the co-conspirators or with Mr. Rios Suarez's knowledge to the United States. It should be noted that the planes that Mr. Garzon testified about could not fly directly into the United States, as they could not fly for such that duration of time. Therefore, the Court should reconsider his testimony regarding the actual importation into the United

---

[74] **Exhibit Q**, Plea Hearing Trans. at p. 26, ln. 17-20.

[75]*Fatico* Hearing Trans. at p. 62, ln. 2-7.  Further, even if Garzon was aware that cocaine was going eventually to the United States, there is nothing in the record that demonstrates that Mr. Rios Suarez shared that knowledge or that it was reasonably foreseeable to him what percentage, if any, of the exported cocaine would enter the United States.

[76] *Fatico* Hearing Trans. at p. 127, ln. 20-21.

States as unreliable. The factual impossibility of these planes flying directly from Colombia into the United States warrants reconsideration of the Court's finding as to quantity based on *Azeem*.

Therefore, the Court should not include the government's proffered "thousands" of kilograms of cocaine in its offense level calculation or in determining whether an upward departure would be appropriate.  Indeed, for all of the reasons set forth in this memorandum and based on the history of this case, a base offense level of 36 (38, as was negotiated by the parties, minus the two-level Guideline reduction) would be more than sufficient.

### IV. The Court Could Appropriately Consider the Pending Smarter Sentencing Act and the Proposed Two-Point Guidelines Reduction and Consider These Proposals Indicative of the Changing Attitudes Toward Excessive Sentences.

As the Supreme Court has recognized, the District Court has discretion to determine when that punishment would be sufficient under the Sentencing Guidelines and 18 U.S.C. § 3553(a).  In addition, we respectfully note that the Attorney General of the United States has recently called the growth in the federal prison population "both ineffective and unsustainable," "with human and moral costs that are impossible to calculate."[77]  Attorney General Holder emphasized that, "It's clear – as we come together today – that too many Americans go to too many prisons for far too long, and for no truly good law enforcement reason."[78]  Indeed, "As a society, we pay much too high a price whenever our system fails to deliver outcomes that deter and punish crime,

---

[77] Attorney General Eric Holder's Remarks at the Annual Meeting of the American Bar Association's House of Delegates on Aug. 12, 2013.  Accessible at http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html
[78] *Id.*

49

keep us safe, and ensure that those who have paid their debts have the chance to become productive citizens."[79]

The Court is respectfully requested to consider Attorney General Holder's remarks in the context of the pending Smarter Sentencing Act and the United States Sentencing Commission's recent two-level reduction of the narcotics Guidelines levels, and to determine that, especially because Mr. Rios Suarez will be deported at the conclusion of his sentence, there are valid public policy and humanitarian reasons why a sentence far lower than that requested by the government would be sufficient but not greater than necessary to meet the goals of 18 U.S.C. § 3553(a).

### A. The Court Should Consider the Proposed 5-Year Mandatory Minimum Sentence for a Violation of 21 U.S.C. § 960(b) in the Smarter Sentencing Act.

As of the date of this memorandum, the defense respectfully notes, and the Court is no doubt well aware, that there is currently pending legislation in both the House and the Senate tentatively entitled the "Smarter Sentencing Act" ("SSA"), which, if enacted, would reduce the mandatory minimum sentence for a violation of Section 1010(b) of the Controlled Substances Import and Export Act, 21 U.S.C. § 960(b), to five years.

Although the defense does not ask the Court to impose a prospective sentence of five years on Mr. Rios Suarez, the Court is respectfully asked to consider that the fact of the SSA's negotiation is powerful evidence of the changing attitudes towards excessive terms of incarceration for narcotics offenses.

In light of the pending SSA, courts in this District have granted several sentencing adjournments of various lengths.[80] While the defense does not request an

---

[79] *Id.*

adjournment of Mr. Rios Suarez's sentencing, the Court is respectfully requested to

consider resentencing Mr. Rios Suarez if the SSA is eventually passed. In the

alternative, the defense respectfully requests that the Court withhold its filing of the

judgment for a period of time deemed sufficient by the Court, in the event that the SSA

is passed in the near future.

### B. The Court Should Grant Mr. Rios Suarez a Two-Level Guidelines Reduction in Accordance with the Sentencing Commission's Proposal.

Concurrently, the United States Sentencing Commission has approved a two-

point reduction in the applicable Guidelines levels for all narcotics offenses.  As

discussed above, Attorney General Holder has instructed the Assistant United States

Attorneys not to oppose requested reductions in Guidelines calculations for defendants

who are sentenced between now and November 1, 2014, when the reductions will

become effective.  Therefore, because Mr. Rios Suarez has requested the benefit of the

---

[80] For example, in January and February 2014 alone:

- In *United States v. Medina*, 09-CR-983 (DAB), Judge Deborah A. Batts adjourned the sentence of Mr. Medina for 11 months *sine die*, based on the anticipated Guidelines amendment and pending the outcome of the SSA votes.
- In *United States v. Tingham*, 11-CR-1040 (SHS), Judge Sidney H. Stein stayed Mr. Tingham's sentence for three months.
- In *United States v. Suarez*, 12-CR-71 (ADS) (EDNY), Judge Arthur D. Spatt adjourned sentencing for three months based on the SSA.
- In *United States v. Larry*, 13-CR-75 (ILG), Judge I. Leo Glasser adjourned the sentence for three months.
- In *United States v. England*, 13-CR-18 (SRU) (D. Ct.), Judge Stefan R. Underhill adjourned the sentencing pending the outcome of the SSA.
- In *United States v. Maicor Hernandez Bones*, 11-0444 (RRM) (E.D.N.Y.), Judge Roslynn R. Mauskopf adjourned sentencing for 60 days for a status conference to update the court on the SSA.

two-level reduction, a corresponding decrease in his ultimate offense level should be granted.

### C. Mr. Rios Suarez Should Be Afforded the Three Points for Acceptance of Responsibility.

The defense respectfully submits, and the government does not contest, that Mr. Rios Suarez should be credited with the full three points for acceptance of responsibility pursuant to U.S.S.G. §3B1.1.[81]

### V. The Court Could Appropriately Consider Mr. Rios Suarez's Foreign Conviction and the Previously Imposed Colombian Sentence in Calculating an Appropriate Sentence.

"Congress, while it has not remained entirely silent, has chosen to assign to foreign crimes a rather limited role." *United States v. Turner*, 624 F. Supp. 2d 206, 212-13 (E.D.N.Y. 2009) (citing *Azeem*, 946 F.2d at 17). Nonetheless, the defense respectfully submits that, in this case, calculation of a just sentence for Mr. Rios Suarez includes an awareness of, and adjustment for, his previously imposed and undischarged 100-month sentence in Colombia.

### A. Facts of the Previous Colombian Conviction

On September 16, 2010, Mr. Rios Suarez was convicted in Colombia of drug manufacturing and trafficking and sentenced to 200 months of imprisonment. Mr. Rios Suarez was not present for these proceedings and was convicted *in absentia*. On September 19, 2011, he was extradited from Venezuela to Colombia. On December 19, 2011, that sentence was reduced to 100 months of imprisonment. While he was serving that sentence, on February 1, 2012, he was notified that he would be extradited to the

---

[81] **Exhibit Q**, Plea Hearing Trans. at p. 5, lines 1-7.

United States to face the indictment in this case.  Nearly 15 months later, on April 25, 2013, he was extradited to the United States.

      As in the instant matter, the Colombian government alleged that Mr. Rios Suarez conspired to manufacture and transport cocaine out of the country through clandestine landing strips. The Colombian court noted the FARC's involvement in the infrastructure of the conspiracy but did not determine that Mr. Rios Suarez was a member of the FARC.  Cooperating witness Yon Pelayo Garzon Garzon testified against Mr. Rios Suarez in that proceeding about the same facts to which he testified before this Court at the *Fatico* hearing.

### B. The Court Should Consider the Current Conviction to Be Related Conduct Under U.S.S.G. § 1B1.3.

      Conduct that is part of the instant offense is "conduct that is relevant conduct to the instant offense under the provisions of section 1B1.3."  U.S.S.G. § 4A1.2 Application Note 1.  "Relevant conduct" includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" that "were part of the same course of conduct or common scheme or plan as the offense of conviction."  U.S.S.G. §§ 1B1.3(a)(1)(A), (a)(2).

      In Mr. Rios Suarez's case, it appears that the Colombian conviction for which he received the 100-month sentence is relevant conduct to this case for which he was extradited to the jurisdiction of this Court not least because, as in the Colombian case, the government has expressed its position that Mr. Rios Suarez was involved in the transportation and importation of "thousands" of kilograms of cocaine.

      Further, it appears that the Colombian courts that allowed Mr. Rios Suarez to be extradited to the United States did so under the impression that, because of the time

periods at issue in the Colombian case and in this indictment, Mr. Rios Suarez was not exposed to problems of double jeopardy.[82]  Nonetheless, with the exception of the timeframe difference, the conduct at issue in each case can accurately be characterized as a "common scheme or plan," namely, the manufacture and distribution of cocaine via clandestine landing strips.

The substantial similarity between the cases with respect to everything but the timeframe merits consideration in order to calculate a just incremental punishment for the instant offense.

### C. The Court Should Credit Mr. Rios Suarez With the 100 Months That He Will Serve in Colombia Under 18 U.S.C. § 3553(a), U.S.S.G. § 5G1.3, and Case Law in this Circuit.

The Court should credit Mr. Rios Suarez with the 100 months that he will serve in Colombia based on the sentencing factors in 18 U.S.C. § 3553(a), the United States Sentencing Guidelines, and case law in this Circuit and calculate the sentence to be imposed accordingly.  Although foreign convictions are not counted in the computation of criminal history category (see U.S.S.G. § 4A1.2(h)), the defense nonetheless respectfully submits that the circumstances under which Mr. Rios Suarez appears before this Court for sentencing are appropriate considerations for this Court and should have an impact on the Court's sentencing determination.

Under U.S.S.G. § 5K2.0(a)(1)(A):

The sentencing court may depart from the applicable guideline range if . . . the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance . . . of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set

---

[82] See **Exhibit R**, Resolution 382 of October 2, 2012 at ¶ 8.

forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described.[83]

A "district court's decision to depart pursuant to U.S.S.G. § 5K2.0 . . . is discretionary." *United States v. Fuller*, 426 F.3d 556, 562 (2d Cir. 2005). Courts in this Circuit have granted downward departures for foreign terms of imprisonment. For example, in *United States v. Hilario*, 449 F.3d 500, 501 (2d Cir. 2006), the district court's 26-month downward departure, which credited the defendant with the length of his term of imprisonment in Belgium, was upheld by the Circuit.

In this case, given the unique factual and procedural circumstances pursuant to which Mr. Rios Suarez appears before this Court for sentencing, the Court should consider a downward departure in order to fully account for Mr. Rios Suarez's previously imposed 100-month sentence.

---

[83] Moreover, the sentencing court may also depart downward for a completed term of imprisonment under certain circumstances:

> A downward departure may be appropriate if the defendant (1) has completed serving a term of imprisonment; and (2) subsection (b) of § 5G1.3 (Imposition of a Sentence on a Defendant Subject to Undischarged Term of Imprisonment) would have provided an adjustment had that completed term of imprisonment been undischarged at the time of sentencing for the instant offense. Any such departure should be fashioned to achieve a reasonable punishment for the instant offense.

U.S.S.G. § 5K2.23 (Policy Statement).

In the instant case, Mr. Rios Suarez served three years in Colombia from 1998 to 2001—a period covered by the Indictment in this case. On April 9, 1998, Mr. Rios Suarez was taken into custody by Colombian authorities and charged with two crimes, drug trafficking and rebellion. The drug trafficking charge was subsequently dismissed several months later, and he proceeded to trial on the rebellion charge. The trial proceeding is colloquially referred to as "justice without a face," because Mr. Rios Suarez was placed in a separate room and unable to see the judge. He was acquitted of the rebellion charge and released from custody on May 10, 2001. The defense respectfully suggests that Mr. Rios Suarez could be credited with the time that he spent awaiting trial on the drug trafficking charges.

### 1.   A Reduced Sentence Is Appropriate Based On the 3553(a) Factors.

"[I]f a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively . . ." 18 U.S.C. § 3584(a).  "The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)." 18 U.S.C. § 3584(b).

> In determining an appropriate sentence, the sentencing court is directed to:
>
> impose a sentence sufficient but not greater than necessary, to comply with . . . the need for the sentence to: (A) reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense, (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts are directed to consider the advisory Sentencing Guidelines and its policy statements, the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a); *Cavera*, 550 F.3d at 189-190; *Crosby*, 397 F.3d at 111-12.

Giving due consideration to the factors set forth in 3553(a), the defense respectfully submits that a sentence that departs from the Guidelines and takes the previously imposed Colombian sentence into consideration would be sufficient but not greater than necessary to achieve a just result.

With regard to the seriousness of the offense, there is no doubt that narcotics importation is a grave offense and that a not-insignificant punishment should be imposed.  Indeed, the Colombian government has already spoken, and has imposed a sentence of 100 months of incarceration on Mr. Rios Suarez for substantially the same conduct as that for which he now appears before this Court. Given that Mr. Rios Suarez is guaranteed to return to Colombia to serve that sentence at the conclusion of whatever sentence Your Honor imposes, a sentence that departs from the calculated Guidelines range and accounts for those 100 months would be sufficient.

With respect to factors 18 U.S.C. § 3553(a)((2)(B) and (C), the Court can rest assured that Mr. Rios Suarez will not again appear before it or, indeed, remain in the United States after the conclusion of whatever sentence the Court imposes. Mr. Rios Suarez is a citizen of Colombia.  He had never been to the United States before this case, in which he was brought to the United States in the custody of the United States Marshals pursuant to an extradition order signed by the Colombian government.  At the conclusion of any sentence imposed by this Court, he will inevitably be transferred to the custody of Immigration and Customs Enforcement (ICE) and deported to Colombia. Therefore, he has never been, and will never be, at liberty in the territory of the United States, and poses no personal danger to the American public. Moreover, because he has already been sentenced to a term of 100 months of imprisonment to be served in Colombia at the conclusion of the sentence imposed by this Court and immediately upon his return to Colombia, the Court can rest assured that Mr. Rios Suarez will not soon (if ever) be in a position from which his conduct could potentially threaten the American public.

Finally, with respect to the need to provide "the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner," 18 U.S.C. § 3553(a)(2)(D), a non-Guidelines sentence would certainly provide sufficient time to meet any and all of those stated objectives.

Therefore, for all of these reasons, a non-Guidelines sentence that accounts for the previously imposed 100-month sentence and takes into consideration all of the facts and circumstances pursuant to which Mr. Rios Suarez appears before this Court and subject to the jurisdiction of the United States, would be sufficient but not greater than necessary.

### 2.   A Reduced Sentence Is Appropriate Based on Section 5G1.3 of the Sentencing Guidelines.

Federal courts generally "have discretion to select whether the sentences they impose will run concurrently or consecutively with respect to other sentences that they impose, or that have been imposed in other proceedings, including state proceedings." *Setser v. United States*, 132 S. Ct. 1463, 1468 (2012); 18 U.S.C. § 3584(a).

Section 5G1.3 of the Sentencing Guidelines provides:

(b) If . . . a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct) **and** that was the basis for an increase in the offense level for the instant offense under Chapter Two (Offense Conduct) or Chapter Three (Adjustments), the sentence for the instant offense shall be imposed as follows:

(1) the court **shall** adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and

58

> **(2) the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment**.
>
> (c) (Policy Statement) In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.

U.S.S.G. § 5G1.3(b)-(c) (emphasis supplied).

As set forth in Section V(B), above, the previously imposed Colombian sentence and consequent term of imprisonment is relevant conduct to the instant offense. Moreover, although the government has conceded that Mr. Rios Suarez is in Criminal History Category I because his foreign convictions are not counted in the criminal history computation, the government has sought, and the Court has found applicable, an enhancement pursuant to U.S.S.G. § 2D1.1(b)(14) for criminal livelihood.  Therefore, "the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment."  U.S.S.G. § 5G1.3(b).

Moreover, even if the Court evaluates the relationship between the two cases differently and finds that U.S.S.G. § 5G1.3(c) applies, we respectfully submit that a concurrent term of imprisonment would be "a reasonable punishment for the instant offense."  "In order to achieve a reasonable incremental punishment for the instant offense and avoid unwarranted disparity, the court should consider:

(i)      the factors set forth in 18 U.S.C. § 3584 (referencing 18 U.S.C. § 3553(a));

(ii)      the type (e.g., determinate, indeterminate/parolable) and length of the prior undischarged sentence;

(iii)      the time served on the undischarged sentence and the time likely to be served before release;

     (iv)     the fact that the prior undischarged sentence may have been imposed in state court rather than federal court, or at a different time before the same or different federal court; and

     (v)     any other circumstance relevant to the determination of an appropriate sentence for the instant offense."

U.S.S.G. § 5G1.3 Application Note 3(A).

     Here, Mr. Rios Suarez was convicted in Colombia for substantially similar, if not the exact same, conduct as that for which he now stands before this Court for sentencing. Because the two cases arise out of the same course of conduct and are, therefore, related cases within the Guidelines definition, Mr. Rios Suarez should be afforded credit for the sentence already imposed upon him, which he will be required to serve immediately on his return to Colombia. As discussed immediately above, consideration of the factors under 18 U.S.C. § 3553(a) favors this result. In addition, it is extremely likely, if not guaranteed, that Mr. Rios Suarez will serve the entire (determinate) 100-month sentence in Colombia. Indeed, he was already serving that sentence when he was extradited to this Court in April of 2013. The defense is not aware of any provision of Colombian law under which Mr. Rios Suarez would be eligible for parole or other forms of leniency (such as good time credit) that would diminish the period of his undischarged sentence.

     Because Mr. Rios Suarez cannot be subject to the jurisdiction of the Colombian and the American authorities at the same time, a request for concurrent time is, the defense acknowledges, slightly impractical. Nonetheless, the Court has discretion to impose a reduced sentence that achieves the same result as a concurrent sentence, given the advisory nature of the Guidelines and the Court's substantial sentencing discretion. Therefore, a non-Guidelines sentence that adequately departs downward to account for

the 100-month Colombian sentence would be appropriate and sufficient but not greater than necessary in this case.

### 3. A Reduced Sentence Is Appropriate Based on Case Law In This Circuit.

"A district court's sentencing decision under § 5G1.3 will not be overturned absent an abuse of discretion." *United States v. Matera*, 489 F.3d 115, 124 (2d Cir. 2007) (citing *United States v. Livorsi*, 180 F.3d 76, 82 (2d Cir. 1999)).

Section 5G1.3 exists in order to ensure that "punishments approximate the total penalty that would have been imposed had the sentences for the different offenses been imposed at the same time (i.e. had all of the offenses been prosecuted in a single proceeding)." *Witte v. United States*, 515 U.S. 389, 404-05, 115 S. Ct. 2199 (1995). The Second Circuit has interpreted § 5G1.3 strictly:

> In order to trigger the application of § 5G1.3(b), an offense other than the one for which a defendant is being sentenced (a "separate offense") must not only (1) be taken into account "in the determination of the offense level for the instant offense [of conviction]," but it must also (2) be "fully taken into account" . . . in that determination. . . . In fact, the Guidelines calculation of a defendant's offense level may take into account separate offenses through a number of different mechanisms-for instance, offense-specific enhancements such as § 2L1.2(b)(1)(A), consideration of the prior offense as "relevant conduct" under § 1B1.3, and application of career offender provisions, see §§ 4B1.1-2. But all such mechanisms trigger application of § 5G1.3(b) if and only if they take into account the separate offense(s) fully. . . . We therefore read the modifier "fully" to restrict § 5G1.3(b) to a particular sub-set of all those circumstances in which a separate offense is, in some way, considered in determining the Guidelines offense level.

*United States v. Garcia-Hernandez*, 237 F.3d 105, 108-09 (2d Cir. 2000) (internal citations omitted).  Thus:

> We believe that § 5G1.3(b)'s prohibition of consecutive sentences is aimed at situations in which separate, non-offense conduct could, absent operation of this sub-section, otherwise be the basis both (1) for

> sentencing defendant as if that conduct had been part of the offense(s) of conviction, and (2) for additional punishment of that same conduct in another, and separate, criminal proceeding. . . . [W]hen (for whatever reason) such a separate offense has, in fact, been criminally punished in another proceeding, § 5G1.3(b) applies.  This approach is consistent with what little guidance the Guidelines and the cases provide in understanding the concept of a "full" taking into account. Thus, we have recognized that, generally speaking, consideration of separate offenses as relevant conduct does meet the "fully taken into account" requirement of § 5G1.3(b). . . .

*Garcia-Hernandez*, 237 F.3d at 109-10 (some internal citations omitted).

As later interpreted by this Circuit, however, *Garcia-Hernandez* requires that:

> [I]n order for a prior offense to be "fully taken into account" by the sentencing court, the conduct underlying that offense must play a role in the determination of the defendant's offense level. **Generally, this will mean that the prior offense will be considered as "relevant conduct."** More recently, in *United States v. Williams*, 260 F.3d 160, 166-68 (2d Cir. 2001), we further clarified that the prior offense conduct must not only qualify theoretically as relevant conduct, but must actually be considered by the sentencing court in its Guidelines calculations.

*United States v. Sencion*, 38 Fed. Appx. 638, 640 (2d Cir. 2002) (emphasis supplied)

(upholding partially concurrent sentence where sentencing court "could have considered the prior drug conduct as relevant conduct, but it did not").

Similarly, in *United States v. Leo*, 706 F. Supp. 2d 544 (S.D.N.Y. 2010), the Honorable Richard J. Holwell, Jr. imposed a concurrent sentence, finding that the defendant's prior conviction was "relevant conduct" under the Guidelines.  In *Leo*, the defendant pled guilty in 2007 to "two counts of conspiracy to commit extortion based on allegations of loansharking and gambling-related conduct" despite being warned by the government that additional charges were pending.  *Leo*, 706 F. Supp. 2d at 545.  He was sentenced to 60 months in prison on February 28, 2008 and, on February 4, 2009, the government re-indicted Leo for "more loansharking and gambling-related conduct.

Along with additional counts of extortion and illegal gambling, the new indictment

stated charges under the Racketeer Influenced and Corrupt Organization Act ("RICO")-

one for a substantive RICO violation and one for a RICO conspiracy. . . ." *Leo*, 706 F.

Supp. 2d at 545.

Finding that "the extortion conspiracies from the first case could have been

charged as predicate RICO acts in the second indictment," Judge Holwell sentenced Leo

to a concurrent sentence of 78 months, imposed as an 18-month consecutive sentence to

the 60 months imposed in 2008. *Leo*, 706 F. Supp. 2d at 545, 551.

Judge Holwell reasoned that "the prior conviction for conspiracy to extort

constituted 'relevant conduct' for purposes of Leo's criminal history level (meaning the

conviction would not count as criminal history) and his offense level (meaning that the

conviction would increase the offense level)." *Leo*, 706 F. Supp. 2d at 546-47.

Applying U.S.S.G. § 5G1.3(b), Judge Holwell credited Leo with the time served on the

2008 sentence. *Leo*, 706 F. Supp. 2d at 550-51.

The Court reasoned that:

[T]he prior conviction was . . . "relevant conduct" under subsection
[1B1.3](a)(1), which covers "all acts and omissions . . . that occurred
during the commission of the offense of conviction." Because Leo's
"offense of conviction" was a RICO conspiracy, and because the
extortion conspiracies underlying the prior conviction were predicate acts
of the RICO conspiracy (indeed, the government never disputed this
point), those extortion conspiracies occurred "during the commission of
the offense of conviction" under subsection (a)(1). They are therefore
relevant conduct to be used in calculating the proper offense level.

*Leo*, 706 F. Supp 2d at 548-59.[84]

---

[84] *See also Witte*, 515 U.S. at 393 ("Under the Sentencing Guidelines, the sentencing
range for a particular offense is determined on the basis of all 'relevant conduct' in
which the defendant was engaged and not just with regard to the conduct underlying the

Because Judge Holwell found the prior conviction to be "relevant conduct," he applied the mandatory concurrency instruction of § 5G1.3(b), which "requires district courts to, first, adjust the sentence to reflect time already served on a related sentence, and second, to impose the sentence to run concurrently to the time remaining on the related sentence." *Leo*, 706 F. Supp. 2d at 549-50.

Similarly, in this case, the Court should consider the Colombian case to be relevant conduct and should grant a departure sufficient to permit the imposition of a "reasonable incremental punishment."

### D. Calculation Of A Reduced Sentence.

If the Court agrees that a reduced sentence is warranted, the defense respectfully requests that the Court follow the procedure used by Judge Holwell in *Leo*, in order to ensure that the Bureau of Prisons will calculate the sentence in the manner the Court intends.

In *Leo*, Judge Holwell found that the defendant's prior conviction was "relevant conduct" and that, therefore, U.S.S.G. §5G1.3(b) applied, mandating imposition of a concurrent sentence.[85] *Leo*, 706 F. Supp. 2d at 548-550. Leo was already serving a 60-month sentence, and the Court determined that the appropriate sentence for Leo would be 70 months—in the middle of the Guidelines range of 63-78 months. Leo had already served 34 months, which would have indicated that a sentence of 36 months to be served

_____

offense of conviction."); U.S.S.G. § 1B1.3 Background, at 30 ("Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range.").

[85] Again, recognizing that the sentence imposed by this Court and the sentence previously imposed by the Colombian court cannot actually be served concurrently unless this Court orders Mr. Rios Suarez's immediate deportation to Colombia, the defense argues that a reduced sentence that adequately accounts for the Colombian sentence would reach the same result as a concurrent sentence in other cases.

concurrently with the undischarged portion of the 60-month sentence would yield the desired result. *Leo*, 706 F. Supp. 2d at 550.

However, because of the Bureau of Prisons' rules for calculating concurrent sentences, the parties requested that the Court instead "clearly state the sentence in terms of the number of months that [the defendant is] to serve consecutive to [his] existing sentence." *Leo*, 706 F. Supp. 2d at 550. The Court granted this request, calculated the time that Leo was expected to serve on the 60-month sentence (52 months, including credit for good time), and imposed a term of 18 months to run consecutive to the prior undischarged sentence, for a total term of imprisonment of 70 months. *Leo*, 706 F. Supp. 2d at 551.

Further support for the approach taken in *Leo* comes from U.S.S.G. §5G1.3(c) Application Note 3(E), which provides for an adjusted sentence "to ensure that the combined punishment is not increased unduly by the fortuity and timing of separate prosecutions and sentencings" in order to ensure "a reasonable incremental punishment for the instant offense of conviction." U.S.S.G. § 5G1.3(c) Application Note 3(E).[86]

If the Court determines that a reduced sentence is appropriate in this case, the defense respectfully submits that a similar method of calculation of Mr. Rios Suarez's sentence would assure the Court that the Bureau of Prisons' calculation matches the Court's intention.

---

[86] *See also* U.S.S.G. § 5G1.3 Application Note 2(C) Imposition of Sentence.—If subsection (b) applies, and the court adjusts the sentence for a period of time already served, the court should note on the Judgment in a Criminal Case Order (i) the applicable subsection (e.g., §5 G1.3(b)); (ii) the amount of time by which the sentence is being adjusted; (iii) the undischarged term of imprisonment for which the adjustment is being given; and (iv) that the sentence imposed is a sentence reduction pursuant to § 5G1.3(b) for a period of imprisonment that will not be credited by the Bureau of Prisons.

In addition, if the Court agrees with the defense's position that a reduced sentence is appropriate in this case, the defense notes that an additional presentence study and report by the Bureau of Prisons could appropriately be requested by the Court pursuant to 18 U.S.C. § 3552(b) in order to inform the Court and the parties of how the Bureau of Prisons would calculate the sentence's duration.   Because Mr. Rios Suarez has been incarcerated for approximately 13 months in the United States, 19 months in Colombia, and 3 months in Venezuela, we respectfully submit that additional information from the Bureau of Prisons as to its calculation of the relationship between the two sentences and the total time already served is merited to assist the Court in formulating the sentence to ensure that the Bureau of Prisons effectuates the Court's intention.

### VI. The Court Should Credit Mr. Rios Suarez With the 14 Months that He Spent in Colombian Custody Awaiting Extradition.

According to the official extradition decree, Mr. Rios Suarez "is entitled to recognition by the States Requiring [i.e., the United States] of the time he has spent detained by reason of the extradition proceedings."[87]  Mr. Rios Suarez was notified of the extradition proceedings while in custody of the Colombian authorities on February 1, 2012, and he was transferred to the custody of the United States on April 25, 2013.[88] Therefore, under the international agreement pursuant to which he was extradited to face the charges in this District, Mr. Rios Suarez is entitled to credit for the nearly 15 months that he was incarcerated during the extradition proceedings in this case.  *See also United*

---

[87] **Exhibit R**, Republic of Colombia Ministry of Justice and Law Resolution 382 of October 2, 2012 Deciding on a Request for Extradition page 6, § 11.
[88] **Exhibit X**, Letter and copy of Communication DAI 20131700032321, dated June 18, 2013.

*States v. Torres*, 01 CR. 1078 (LMM), 2005 WL 2087818 (S.D.N.Y. Aug. 30, 2005)

("Defendant will be given credit for the time he spent in Columbian custody prior to

extradition in relation to the present case.").

**VII.    The Court Should Consider the Need to Avoid Sentencing Disparities.**

In addition to the foregoing considerations, the Court is tasked with evaluating

each sentence in order to avoid sentencing disparities under 18 U.S.C. §3553(a).  In

order to achieve this goal, the defense respectfully submits that a sentence of 10 years

would be sufficient.

In *United States v. Phanor Arizabaleta,* 03-CR-331 (CKK) (DC), the defendant

was described as the "Fifth Man" in the infamous Cali Cartel, responsible for 80% of the

cocaine imported to the United States during the 80's and a portion of the 90's. The

defendant was captured in Colombia on September 16, 2010, extradited to United States

on June 25, 2011. This drug kingpin was sentenced and deported back to Colombia in

March of 2012, after serving approximately eight months in a United States jail. The

extremely lenient sentence raised eyebrows throughout the criminal justice community

and highlighted the, at times, ridiculous sentencing disparities that have developed.

Importantly, the defendant was also facing a long prison sentence in Colombia.

News reports surrounding the defendants return to Colombia reported that a sentence of

20-years awaited this defendant upon his return to Colombia. To this day, he remains

incarcerated in Colombia.[89]

---

[89] *See* < http://www.insightcrime.org/insight-latest-news/item/2460-colombia-weighs-
importance-of-extradition- in-anti-drug-fight >.

In *United States v. Juan Carlos Sierra Ramirez*, 02-CR-388 (ESH) (DC), the defendant was the organizer of large transport operations for Autodefensas Unidas de Colombia (AUC—United Self-Defense Forces of Colombia) members that involved worldwide shipment of cocaine by aircraft and boat. The cocaine traveled from Colombia to Guatemala and Mexico with the ultimate destination being the United States.  In short, this defendant directed the cocaine transportation arm of the AUC that funneled hundreds of thousands of kilograms of cocaine into the United States. He served approximately seven years.

In *United States v. Cabrera Cuevas, et al.*, Case No. 03-CR-554 (JR) (D.D.C.), after an approximately six-week trial, the defendant was convicted of conspiring to distribute cocaine intending or knowing that it would be unlawfully imported into the United States. One of the defendants, Anayibe Rojas Valderama, aka "Sonia," was alleged to have been a member of a United States designated terrorist organization, the Revolutionary Armed Forces of Colombia (FARC). At sentencing, the government argued that the amount of cocaine attributable to each defendant was "enormous" and requested sentences in excess of 40 years. Also highlighted was the civil war prosecuted by the FARC and how the drug trafficking was used to finance that war. "Sonia" was sentenced to 200 months (16 years and 8 months).

In *United States v. Ignacio Leal Garcia*, Case No. 04-CR-446 (TFH) (D.D.C.), the defendant (also referred to as "Camilo" throughout Mr. Rios Suarez's *Fatico* hearing) was convicted of conspiracy to import five kilograms or more of cocaine and to manufacture and distribute five kilograms or more of cocaine intending and knowing that such cocaine would be unlawfully imported into the United States.  He was alleged

to have been the financiero, or financial officer, of the Tenth Front of the FARC.  After Mr. Leal Garcia was convicted at trial, he was sentenced to 24 years of imprisonment. By any standard, Mr. Leal Garcia's involvement with the narcotics conspiracy was more extensive and chronologically longer than that of Mr. Rios Suarez. Furthermore, unlike Mr. Garcia, Mr. Rios Suarez chose to accept responsibility and did not elect to go to trial. Therefore, Mr. Rios Suarez's sentence should be lower than the 24-year sentence of Mr. Garcia.

Therefore, based on the foregoing, a term of imprisonment of ten years for Mr. Rios Suarez would be sufficient but not greater than necessary to meet the goals of sentencing and to avoid sentencing disparities.

## VIII.    The Court Should Impose a Non-Guidelines Sentence

As the Supreme Court has recognized, the District Court has discretion to determine when that punishment would be sufficient under the Sentencing Guidelines and 18 U.S.C. § 3553(a).  In addition, we respectfully note that the Attorney General of the United States has recently called the growth in the federal prison population "both ineffective and unsustainable," "with human and moral costs that are impossible to calculate."[90]  In this case, a non-Guidelines sentence would appropriately account for the particular facts and circumstances of Mr. Rios Suarez's history and of this case.

### A.  A Downward Departure Based on Prison Conditions Is Warranted.

A downward departure based on the harsh prison conditions, including torture, that Mr. Rios Suarez faced before his extradition is warranted.

---

[90] Attorney General Eric Holder's Remarks at the Annual Meeting of the American Bar Association's House of Delegates on Aug. 12, 2013.  Accessible at http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html

### 1. Facts of Mr. Rios Suarez's Prior Incarceration.[91]

Mr. Rios Suarez was extradited to the United States after a long and arduous legal journey from Venezuela, to Colombia, and then finally to the Southern District of New York. During this process, Mr. Rios Suarez was detained in prisons in both Venezuela and Colombia. The conditions in both prisons were deplorable. Mr. Rios Suarez was the victim of torture, bribery, and cruel and unusual punishment as defined under the Eighth Amendment of the United States Constitution. In light of Mr. Rios Suarez's horrendous experiences in both the Colombian and Venezuelan prisons, and the brutality and torture he suffered, we respectfully submit that his pre-sentence confinement conditions are a permissible basis for a downward departure, or in the alternative, a factor that should be considered under 18 U.S.C. § 3553(a).

On June 24, 2011, Mr. Rios Suarez was living in Venezuela when he was arrested in relation to the instant case. He was held in a Venezuelan jail called *El Heliocoide* until September 19, 2011, when he was extradited to Colombia. At *El Heliocoide,* Mr. Rios Suarez was tortured and extorted by prison guards. He was hung from the ceiling by his wrists for twelve days. Because the guards believed him to be an extensive drug trafficker, as erroneously argued by the government in this case as well, they demanded large sums of money from Mr. Rios Suarez. In a further attempt to coerce him into paying, the prison guards brought his wife, Emildre, to the jail to witness her husband's condition. Unable to pay the large sum the guards demanded, the torture continued. The guards placed a plastic bag filled with powder over Mr. Rios Suarez's head, which nearly suffocated him. Eventually, the guards accepted a much

---

[91] The facts in this section were provided to counsel by Mr. Rios Suarez personally and confirmed by his Colombian attorney, Luis Ricardo Anselmi Roca.

lower sum of money from Emildre, after she scraped today their savings and borrowed money from family and friends. The total amount extorted by the guards was approximately $12,000 in U.S. dollars.

Mr. Rios Suarez was routinely tortured and subjected to other deplorable treatment and conditions while at *El Heliocoide.* He was kept isolated in a small 4x4 cell with no heat or hot water and slept on the floor. The conditions were filthy and the prison routinely suffered from vermin infestations. Mr. Rios Suarez was systematically kept in darkness for long periods of time, causing him temporary blindness when he was finally exposed to sunlight.

The poor conditions, violence, and torture in Venezuelan jails have been well documented, particularly in the U.S. Department of State's Country Reports on Human Rights Practices. As stated in the 2013 report:

> Although the [Venezuelan] constitution states that no person shall be subjected to cruel, inhumane, or degrading punishment, there were credible reports that security forces tortured and abused detainees…Press and NGO [nongovernmental organizations] reports of beatings and humiliating treatment of suspects during arrests were common and involved various law enforcement agencies and the military. Torture and other cruel, inhumane, or degrading treatment or punishments of prisoners were reported during the year. A common method of torture or degrading treatment was the denial of medical care by prison authorities.[92]

In light of the corruption plaguing Venezuela's police and security forces, these incidents of torture and degrading treatment largely go unchecked.

> Corruption, inadequate police training and equipment, and insufficient central government funding…reduce the effectiveness of the security forces. There were continued reports of police abuse and involvement in

---

[92]Country Report on Human Rights Practices for 2013 in Venezuela at 4-5. Available at http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2013&dlid=220479#wrapper

crime, including illegal and arbitrary detentions, extrajudicial killings, kidnappings, and the excessive use of force.[93]

Furthermore, police and security forces are rarely indicted for their illegal actions. In 2012, while the Office of Fundamental Rights handled 19,526 cases of security force abuses, only "1 percent resulted in indictments; the remainder were either dismissed or suspended."[94]

In regard to prison conditions, the report further states:

Prison conditions were harsh and life threatening due to poorly trained and allegedly corrupt prison staff; violence and alleged extortion by guards and inmates, some of which was gang related and fueled by trafficking in arms and drugs; severe overcrowding in most prisons; lack of adequate medical care; and shortages of food and potable water.[95]

In 2013, 289 prisoner deaths in Venezuelan prisons were reported, a slight decrease from the 304 deaths reported in 2012.[96] "Most deaths and injuries resulted from prisoner-on-prisoner violence, riots, fires, and generally unsanitary and unsafe conditions."[97]

Unfortunately for Mr. Rios Suarez, the Venezuelan prison system would not be the last time he was subjected to cruel, inhumane, and degrading treatment. On September 19, 2011, Mr. Rios Suarez was extradited back to Colombia where he remained until his extradition to the United States on April 25, 2013. For approximately one year and seven months, Mr. Rios Suarez was detained in Colombia's *Penitenciaria Central La Picota* ("Picota") where he endured conditions even worse than those suffered at *El Heliocoide.*

---

[93] *Id.* at 10.
[94] *Id.*
[95] *Id.* at 6.
[96] *Id.*
[97] *Id.*

Picota suffered from severe overcrowding, with over 100 inmates in one room. Once he was transferred to the extradition unit, Mr. Rios Suarez was locked in a cell from 4:30 pm to 5:30 am. He did not have access to a toilet or hot water. Access to water (for drinking, showering etc) was limited to only three times per day. As a result of such inhumane conditions, Mr. Rios Suarez was frequently sick. Medical attention was routinely denied, and he knows of several people that have died there from lack of medical attention. In 2012, he suffered from an event (which is unknown because it was never officially diagnosed) that resulted in temporary paralysis of one side of his body.

Like Venezuelan prisons, the conditions of Colombian prisons have been well documented in the Department of State's Country Reports on Human Rights Practices. Currently, the Colombian jails and prisons operate 56 percent over capacity.[98]

> Many prisoners continued to face difficulties receiving adequate medical care. Nutrition and water quality were deficient and contributed to the overall poor health of many inmates. On May 31, in accordance with the Ministry of Justice, INPEC [National Prison Institute] declared a state of emergency in the country's prisons due to overcrowding, problems with infrastructure, and poor sanitary conditions that threatened the health of the inmate population.[99]

In addition to the poor conditions in Colombian prisons, there have been allegations of abuse by prison guards. The Inspector General's Office has investigated allegations that some prison guards routinely used excessive force and treated inmates brutally. It reported that through October it registered 89 investigations, implicating 159 guards, but only reached one disciplinary verdict.[100]

---

[98] Country Report on Human Rights Practices for 2013 in Colombia at 6. Available at http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2013&dlid=220431
[99] *Id.* at 7.
[100] *Id.* at 6.

> INPEC's Internal Affairs Office investigated 47 reports of physical abuse and one case of sexual abuse. Between January and October, there were 88 prison deaths: 67 attributed to natural causes, 11 attributed to suicide, seven to fighting among inmates, two to accidents, and one to intoxication. INPEC registered 997 violent prison disturbances through August.[101]

Mr. Rios Suarez's own personal experiences, coupled with the concrete evidentiary support articulated by our own government, indicate that torture, cruel and unusual punishment, and otherwise deplorable living conditions are real issues pervading the prison systems in both Colombia and Venezuela. In light of said conditions, we respectfully request that the Court grant Mr. Rios Suarez a downward departure, or in the alternative, consider such factors under 18 U.S.C. § 3553(a).

### 2. Legal Authority: A Downward Departure for Harsh Prison Conditions Is Warranted.

In *United States v. Carty*, 264 F.3d 191 (2d Cir. 2001), the Second Circuit recognized that confinement conditions may be a factor considered at sentencing. "The Sentencing Commission has not categorically proscribed consideration of this factor, and we cannot say that conditions of pre-sentence confinement may not be so severe as to take a particular case 'outside the heartland of the applicable Guideline.'" *Id.* at 196 (citing *Koon v. United States*, 518 U.S. 81, 109 (1996)). Furthermore, the Second Circuit in *Carty* acknowledged that the Sentencing Commission might not have anticipated the detention of federal defendants in facilities outside of federal jurisdiction.

> No evidence exists to show that the Sentencing Commission took the conditions of a pre-sentence detainee's confinement into account in creating the Guidelines. Indeed, there is no indication that the Commission contemplated that federal pre-sentence detainees would be kept in any detention facilities other than federal facilities. *See United States v. Francis,* 129 F.Supp.2d 612, 616 (S.D.N.Y.2001). Accordingly,

---

[101] *Id.* at 7.

we hold today that pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures.

*Id.*

When assessing the whether a defendant's prison conditions should be a factor considered at sentencing, courts evaluate the general conditions of confinement and whether said conditions affect the defendant in a particular and imbalanced way.

> In recognizing the offender's pre- or post-sentence conditions of confinement as permissible grounds to warrant downward departures, the courts have granted relief generally where the conditions in question are extreme to an exceptional degree and their severity falls upon the defendant in some highly unique or disproportionate manner.

*United States v. Mateo,* 299 F.2d 201, 208 (S.D.N.Y. 2004).

In *Mateo,* Judge Marrero recognized that there are reasonably foreseeable deprivations that are a part of prison life.

> Within the bounds of what ordinary custodial conditions encompass is the inmate's endurance of some degree of known and expected, and even necessary indignities, humiliations, inadequacies and harsh conditions. Given the character of the prison population, and the strict regimen and tensions under which it is housed, the penal system must accommodate, within fair limits, tolerance for a normal level of shortcomings in the quality of certain services, as well the vulnerability of some individuals to incidental inmate-to-inmate and guard-to-inmate victimization that is not uncommon in a custodial environment.

*Id.* at 210-211.

However, there are conditions that fall short of this imprecise standard of treatment and go beyond the reasonably foreseeable deprivations that are associated with prison. In *Mateo*, the Court granted a downward departure based on two incidents suffered by a pregnant defendant while in federal custody. The defendant had given birth in the facility without receiving the proper medical attention for over fifteen hours. Furthermore, she was sexually abused by a prison guard. *Id.* at 211. Therefore, the Court

held that "the presentence misconduct Mateo endured at the hands of custodial officials is qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case." *Id.* at 212.

Like the defendant in *Mateo,* Mr. Rios Suarez suffered extraordinary abuse that was not reasonably foreseeable in relation to the average experience in federal custody. The physical abuse and torture sustained by the Venezuelan prison guards, namely, hanging Mr. Rios Suarez by his wrists for twelve days in an attempt to extort him for financial gain, is deplorable and cruel by any standard of prison conditions. The physical abuse did not end in Venezuela, however, as Mr. Rios Suarez was routinely denied medical attention, water, and sunlight in the Colombian jail. Taken together, these conditions rise to the level of extraordinary and warrant a substantial deviation from the Guidelines range at sentencing.

In *United States v. Francis,* 129 F.Supp.2d 612 (S.D.N.Y. 2001), the Court granted a downward departure based on the defendant's extraordinary confinement conditions at the Hudson County Correctional Center. At a hearing, the defendant testified to a number of problems with the facility, including by not limited to, overcrowding, inadequate hygiene, spoiled and unsanitary food, rampant weapon use and the increase presence of gangs. *Id.* at 616-617. The defendant was the victim of threats and an attempted stabbing. During his confinement, he lost between twenty and twenty-five pounds. *Id.* Similar to the defendant in *Francis*, Mr. Rios Suarez suffered from unsanitary conditions, overcrowding, and severe hygienic issues at both prisons, such as limited access to water and toilets. Also, both prisons suffered from gang violence and were generally unsafe places.

76

This Court has recognized the harsh prison conditions present in Colombia. In *United States v. Torres*, 2005 WL 2087818 (S.D.N.Y. 2005), the Court granted defendant a one level downward departure due to the harsh conditions of his pretrial detention in Combita, a Colombian prison. *Id.* at *2. The conditions in Combita were deemed "harsh by any American standard" and consisted of concrete cells with no heat or hot water. *Id.* Similar to the conditions in *Torres*, Mr. Rios Suarez was also denied access to hot water (and at times, access to any water) and heat. In fact, his confinement conditions in Colombia were worse, as he was also denied basic needs such as a bed, toilet, sanitary food, and medical attention.

It is understood that most prisons suffer from a reasonable degree of inadequacies. *See Rickenbacker v. United States*, 365 F.Supp.2d 347, 351 (E.D.N.Y. 2005) (holding that unsanitary food preparation and an inadequate library did not warrant a downward departure). However, Mr. Rios Suarez suffered from harsh and deplorable prison conditions not reasonably foreseeable in the ordinary prison context, beginning with the torture and extortion he sustained at El Heliocoide in Venezuela and then the further deprivation of water, food, and light he suffered at La Picota in Colombia. Taken together, the conditions of confinement he experienced while awaiting extradition are sufficiently severe in nature and extraordinary to a degree that warrants a downward departure, or in the alternative, consideration by the Court under 18 U.S.C. § 3553(a).

### B.  A Downward Departure Based on Duress and Coercion Is Warranted.

Without minimizing the severity of the offense and the extent of Mr. Rios Suarez's involvement in drug trafficking, we respectfully submit that insofar as any of

his actions related to the FARC, such actions were done so under duress and coercion

caused by the stronghold the FARC has had on many Colombian civilians. In light of the

unique circumstances under which Mr. Rios Suarez committed the instant offense, we

respectfully request that the Court depart downward or in the alternative, consider Mr.

Rios Suarez's particular situation under 18 U.S.C. § 3553(a).

Under U.S.S.G. § 5K2.12, the Court may depart downward "if the defendant

committed the offense because of serious coercion, blackmail or duress, under

circumstances not amounting to a complete defense…"

> The extent of the decrease ordinarily should depend on the
> reasonableness of the defendant's actions, on the proportionality of the
> defendant's actions to the seriousness of coercion, blackmail, or duress
> involved, and on the extent to which the conduct would have been less
> harmful under the circumstances as the defendant believed them to be.
> Ordinarily coercion will be sufficiently serious to warrant departure only
> when it involves a threat of physical injury, substantial damage to
> property or similar injury resulting from the unlawful action of a third
> party or from a natural emergency.

*See* U.S.S.G. § 5K2.12.

As the Court is aware, the FARC is a guerilla group that has a strong presence in

Colombia, specifically in Mr. Rios Suarez's town of Arauca. The FARC uses a variety

of illegal tactics to finance their organization. The FARC targets anyone – civilian or

drug trafficker alike – that they believe has money and can afford to pay ransom or

extortionate "taxes" (also referred to as a *vacuna*).

As documented in the Department of State's Country Report on Human Rights

Practices for 2013 in Colombia:

> Illegal armed groups—including the terrorist organizations Revolutionary
> Armed Forces of Colombia (FARC) and the National Liberation Army
> (ELN), as well as organized crime groups that contained some former
> paramilitary members—committed numerous abuses, including the

78

following: political killings; killings of members of the public security forces and local officials; widespread use of land mines and improvised explosive devices (IEDs); kidnappings and forced disappearances; subornation and intimidation of judges, prosecutors, and witnesses; infringement on citizens' privacy rights; restrictions on freedom of movement; widespread recruitment and use of child soldiers; attacks against human rights activists; violence against women, including rape and forced abortions; and killings, harassment, and intimidation of teachers and trade unionists. Illegal armed groups continued to be responsible for most instances of forced displacement in the country.[102]

As Garzon testified at the *Fatico* hearing, as a citizen of Colombia and a resident of Arauca, it is difficult to avoid interactions with the FARC. "I refer to the fact that the FARC group, they control the roads, who came, who went, everything concerning what we could call here a checkpoint."[103]  As a civilian and government cooperator for over twenty years, even Garzon could not avoid the influence of the FARC when, while working for an oil company, he would frequently be forced to provide them with fuel. As Garzon stated, "I would gladly give them what they wanted and that which was within my reach." [104] Garzon gave away fuel "[b]ecause it was necessary. Otherwise you could – one could become an enemy of theirs."[105]

Mr. Rios Suarez has had his own personal experiences with the FARC, none of which were accurately described at the *Fatico* hearing by the testimonies of either Garzon or Ramirez Pajon. For many years, Mr. Rios Suarez and his family were victimized by the FARC. In 1995, Mr. Rios Suarez's brother, the then-mayor of Arauca, Amos Rios Suarez, was killed.  Upon information and belief, the murder was committed

---

[102] Country Report on Human Rights Practices for 2013 in Colombia at 1-2.
Available at
http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2013&dli
d=220431
[103] *Fatico* Hearing Trans. at p. 13, ln. 7-9.
[104] *Fatico* Hearing Trans. at p. 8, ln. 19-20.
[105] *Fatico* Hearing Trans. at p. 8, ln. 24-25.

by FARC members or by individuals posing as FARC members. Another of Mr. Rios Suarez's brothers, Carlos, was later kidnapped by the FARC in an attempt to extort the family for ransom. Throughout all pertinent time periods, the FARC continually extorted Mr. Rios Suarez for anything that they could.

As corroborated at the January 15, 2014 proffer session of government witness and former FARC member, ███████████, on one occasion, she accompanied another FARC member to Mr. Rios Suarez's farm to collect an alleged outstanding debt of $3.5 million.[106] Unable to pay such a figure and to avoid having to go before FARC Commander Grannobles, **Mr. Rios Suarez began to cry, and offered his 200 dairy cows, two farm tractors, two trucks, two horses, water tanks, and construction equipment.[107]** This is an example of one of many incidents where Mr. Rios Suarez was alleged to have owed money to the FARC, and was extorted and intimidated into paying. Mr. Rios Suarez was **never** a FARC member, but rather, was a victim. In fact, ████ ███████, a FARC member since the age of 13, stated that she "didn't consider El Nenguere[108] to be a real FARC member."[109]

As a resident of a FARC-controlled area, Mr. Rios Suarez, much like Mr. Garzon and countless other Arauca residents, learned to coexist with the guerrillas, through what can be loosely categorized as understandings or agreements.[110] But undoubtedly, any

---

[106] See 3501-D proffer session, p. 4.
[107] See 3501-D proffer session, p. 5-6 (emphasis supplied).
[108] Though "El Nenguere" is the nickname for Didier Rios, ███████████ refers to Mr. Rios Suarez as "El Nenguere" throughout her proffer. (See 3501-D proffer session, p. 3, "Analyst Note**:** During the debriefing the SOI kept referring to Yesid Rios as Yesid Rios and Yesid Nenguere.")
[109] See 3501-D proffer session, p. 12.
[110] During her testimony in *United States v. Ignacio Leal Garcia*, Case No. 04-CR-446 (TFH) (D.D.C.), when asked if the Rios family were members of the FARC, ████

agreements entered into between Mr. Rios Suarez and FARC members throughout the course of the narcotics conspiracy were done out of extreme fear for his life. The connection between the FARC, drug trafficking, and local farmers is intertwined and complex, and as explained by Mr. Garzon during his July 20, 2011 proffer session, an individual engaging in drug trafficking most certainly does not indicate that person's voluntary involvement in the FARC.

> [Mr. Garzon] was familiar with the FARC involvement in cocaine trafficking since 1995 because at that time GRANNOBLES had instituted a "No Deforestation" campaign which involved a covert cocaine cultivation program utilizing legitimate cattle raising areas and agricultural farms to avoid detection. In addition, the utilization of "testaferros" or straw men as false owners of FARC properties has allowed the FARC to expand its cocaine-trafficking activities. The FARC leadership instructed farmers to plant coca alongside agricultural products, thus preventing the military from conducting fumigation activities. The FARC also lends money to the farmers to help finance coca growing and in turn the FARC settles the debt with the money lent to them.[111]

On numerous occasions throughout his life, including the timeframe of the narcotics conspiracy, Mr. Rios Suarez was the victim of violent and extortionate attacks by the FARC, not to mention his brother's murder. As someone engaged in a drug trafficking conspiracy, Mr. Rios Suarez was taken advantage of, not unlike ordinary civilians, by the FARC and used for their benefit. However, any "agreements" or acts of compliance with the FARC do not signify that Mr. Rios Suarez was a member or a

---

████ answered a definitive, "no," and regarded their involvement as limited to drug trafficking:

> Q:    And were some of the [Rios] family members of the FARC?
> A:    No. They worked in drug trafficking, and they made a lot of agreements with the FARC.

3501-C, *Garcia* Trans., p. 178, lines 8-10.
[111] 3502-D proffer session, p 2-3.

willing affiliate with them. Rather, his limited engagements with the FARC were done for the same reason that Mr. Garzon cited, to avoid becoming an "enemy" of theirs.

To reiterate, Mr. Rios Suarez takes full responsibility for his role in the narcotics conspiracy. However, the contention that he is a FARC member, or voluntarily engaged in any behavior associated with FARC killings, bombing plots, kidnappings, or extortion was presented for the sole purpose of inflaming the evidentiary record and vilifying Mr. Rios Suarez's character. Insofar as any of Mr. Rios Suarez's actions overlapped with the FARC, we respectfully request that Court consider the historical context of Colombia during the relevant time period, and the massive stronghold of intimidation that the FARC had on Colombian citizens. Therefore, a downward departure, or in the alternative, consideration of the duress and coercion aspect of the case under 18 U.S.C. § 3553(a) would be appropriate.

### C.  A Downward Departure Based on Family Circumstances Is Warranted.

Mr. Rios Suarez's case warrants compassion from this Court and merits a non-Guidelines sentence due to his extraordinary family circumstances under 18 U.S.S.C. § 3553(a).

Although "family ties and responsibilities are not ordinarily relevant," to a sentencing decision, U.S.S.G. § 5H1.6 Policy Statement, "'[n]ot ordinarily relevant' is not synonymous with 'never relevant' or 'not relevant.'" *United States v. Monaco*, 23 F.3d 793, 801 (3d Cir. 1994). It is well settled that the federal courts have imposed non-incarceration sentences on individuals whose imprisonment would create exceptional and devastating consequences for their families. *United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997).

In determining whether a downward departure is warranted based on family ties and responsibilities, the Court shall consider the following non-exhaustive list of circumstances: "(i) the seriousness of the offense; (ii) the involvement in the offense, if any, of members of the defendant's family; (iii) the danger, if any, to members of the defendant's family as a result of the offense." U.S.S.G. § 5H1.6 Policy Statement, Application Note 1(A).

In addition, when considering the loss of caretaking or financial support, the Court shall also consider whether:

(i)     The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

(ii)    The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant.  For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

(iii)   The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

(iv)    The departure effectively will address the loss of caretaking or financial support.

U.S.S.G. § 5H1.6 Policy Statement, Application Note 1(B).

In consideration of both § 5H1.6 and the case law governing this Court, Mr. Rios Suarez respectfully requests a downward departure in light of his family circumstances. As described above, he is the father of three minor children. His youngest son, age six,

suffers from Perthes Disease which affects his hipbones, stunts his growth, and causes him great pain. This disease is an emotional and financial burden on the family. Though Mr. Rios Suarez's wife Emildre works and supports her children, it has been exceptionally difficult for her to financially support the children, particularly in light of the youngest child's illness. Prior to his incarceration, Mr. Rios Suarez was the sole financial supporter of the family. Although any period of imprisonment would be detrimental to the children's upbringing, a relatively shorter sentence would potentially help preserve their relationship with their father and mitigate the harm caused by incarceration.

Mr. Rios Suarez's son writes, "I ask you to understand that every child, every young person needs a father figure, but due to my father's mistakes, when I finally had him close and was able to hug him, justice sent him to another country without taking into account that his children needed him."[112]  A sentence that takes into consideration the needs of Mr. Rios Suarez's young children would be appropriate, especially because they are unlikely to be able to visit him during his incarceration in the United States.

### D.  A Downward Departure Based on Age and Health Is Warranted.

Mr. Rios Suarez suffers from a variety of physical illnesses, exasperated by the harsh living conditions and acts of violence that he had sustained over the years. Mr. Rios Suarez has 70% hearing loss in one ear, the effect of experiencing bomb detonations without wearing the proper protective equipment in his military days. He suffers from ██████████, ██████, ████████████, and ██████████. He is currently taking daily medication to treat his ██████████ and ████████████, and is on an

---

[112] **Exhibit F**.

███████ to treat his ███████. We respectfully request that the Court consider his particular circumstances, health, age, and genetic history in imposing a sentence that would allow Mr. Rios Suarez to live his final days outside of a prison.

Though only 46 years old, Mr. Rios Suarez does not have the benefit of the average life expectancy of an ordinary male in the United States. As explained above, the average life expectancy for a Colombian male born in 1967 is a mere 58.13 years.[113] Therefore, a sentence significantly above the mandatory minimum of 120 months' imprisonment would effectively ensure Mr. Rios Suarez's passing while incarcerated. In light of his age, health, and extraordinary life history[114], including but not limited to, being the victim of torture and its lingering consequences, we respectfully submit that a downward departure, or in the alternative, consideration of these factors under 18 U.S.C. § 3553(a), are warranted.

### E. Mercy Is An Appropriate Sentencing Consideration.

Mercy is an appropriate sentencing consideration.  *See* 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes [of sentencing]"); *United States v. Johnson*, 964 F.2d 124, 125 (2d Cir. 1992) ("the United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom."); *United States v. Blarek*, 7 F. Supp. 2d 192, 210-211 (E.D.N.Y. 1998) ("The notion that undue harshness should be avoided by those sitting in judgment has long been a part of the human fabric and

---

[113] Data available at http://countryeconomy.com/demography/life-expectancy/colombia.
[114] Though never diagnosed, we submit to the Court that Mr. Rios Suarez witnessing his father's death at the tender age of three is an extremely adverse childhood experience that, according to the most recent psychological research, is a trauma that has had and continues to have innumerable effects on his adult life.

spirit.  Lenity is often the desirable route. . . . To impose the harsh sentence suggested by

Probation and the government under the Guidelines without appropriate downward

departures would amount to an act of needless cruelty given the nature of the crimes

committed and the personal circumstances of the defendants.").  *See also* U.S.S.G. §

5H1.6 Policy Statement, Application Note 1(B)(i) (instructing that the Court may

consider whether "The defendant's service of a sentence within the applicable guideline

range will cause a substantial, direct, and specific loss of essential caretaking . . . to the

defendant's family.")'.

     In this case, Mr. Rios Suarez faces a Guidelines sentence that, if imposed, will

effectively guarantee that he dies in jail.  He has three minor children, each of whom

suffers daily because of his absence.  Moreover, Mr. Rios Suarez will serve an

additional 100-month sentence in Colombia after he has completed the sentence that

Your Honor imposes.

     The Court is respectfully urged to consider that justice does not require Mr. Rios

Suarez to serve a sentence that is "greater than necessary" and that rehabilitation, not

only retribution and punishment, are goals of sentencing.  The previously negotiated

plea agreement that the government has now refused to honor omitted the enhancements

that now drive Mr. Rios Suarez's Guidelines range to the top of the chart.  As the

defense has already argued, there is no reason that Mr. Rios Suarez should not be given

the benefit of this negotiated agreement and the far lower sentencing range that it

outlines as proper.

     Imposing a sentence that will allow Mr. Rios Suarez to return to Colombia

sooner rather than later in order to be near his family while he serves his Colombian

sentence would appropriately temper justice with mercy and would be sufficient in this case.

## **CONCLUSION**

Wherefore, based on all of the facts and circumstances and the legal arguments set forth above, the Court is respectfully urged to impose a non-Guidelines sentence that is sufficient but not greater than necessary to meet all of the goals of 18 U.S.C. § 3553(a) and takes Mr. Rios Suarez's unique situation into consideration.

We respectfully request a sentence of 120 months' imprisonment, the current mandatory minimum.

Dated: New York, NY
      May 23, 2014

                              _____/s/_____
                                John Meringolo, Esq.
                                Meringolo Law
                                375 Greenwich Street, 7th Floor
                                New York, NY 10013
                                (212) 941-2077
                                *Attorney for Yesid Rios Suarez*

## INDEX OF EXHIBITS

**Exhibit A**, Letter from Jose Edin Olivares Real ................................................................ 5

**Exhibit B**, Letter from Ana Myriam Sarmiento Rivera .................................................... 6

**Exhibit C**, Letter from Irma Leonor Arenas .................................................................. 6

**Exhibit D**, Letter from Maria Elcy ................................................................................ 8

**Exhibit E**, Letter from Emildre Rodriguez Arenas ........................................................ 8

**Exhibit F**, Letter from ███████████████████ (minor child) ........................... 9, 85

**Exhibit G**, Letter from Faviola Andrea Diaz Rios ........................................................ 9

**Exhibit H**, Letter from Elsa Rohas de Fernandez .......................................................... 9

**Exhibit I**, Letter from Katherine Arenas Madrid .......................................................... 10

**Exhibit J**, Letter from Marcela Acosta ........................................................................ 10

**Exhibit K**, Letter from Mavvy Rodriguez Arenas ........................................................ 11

**Exhibit L**, Letter from Nohora Lucelly Reina Arenas .................................................. 11

**Exhibit M**, Letter from Yaneth Rios ............................................................................ 11

**Exhibit N**, Letter from ███████████ (minor child) .................................................. 12

**Exhibit O**, Letter from Leonel de Jesus Ramos Bedoya and Gloria Ines Grisales de Ramos ................................................................................................................... 12

**Exhibit P**, Letter to the Honorable Katherine B. Forrest from Elsa Gladys Cifuentes Aranzazu, Consul General, dated Jan. 31, 2014 ............................................... 1, 30, 31

**Exhibit Q**, Transcript of Plea Hearing held February 4, 2014 ................................................................. 13, 18, 19, 23, 30, 31, 32, 35, 48, 52

**Exhibit R**, Resolution 382 of October 2, 2012, Deciding on a Request for Extradition, and Resolution 453 of December 14, 2014, Deciding on a Request for Revocation of Executive Resolution 382 of October 2, 2012 .......................................... 13, 29, 54, 66

**Exhibit S**, Department of Justice, "Attorney General Holder Urges Changes in Federal Sentencing Guidelines to Reserve Harshest Penalties for Most Serious Drug Traffickers," Mar. 13, 2014 ........................................................................................ 19

**Exhibit T**, Plea Agreement presented to current counsel dated January 31, 2014 ... 19, 23

**Exhibit U**, Plea Agreement presented to prior counsel dated January __, 2014 ........................................................................................... 17, 20, 21

**Exhibit V**, *United States v. Rios Suarez*, 11-CR-836 (KBF), Indictment ............... 12, 31

**Exhibit W**, Letter from AUSA Adam Fee to the Honorable Katherine B. Forrest dated March 28, 2014 ................................................................................. 35, 40

**Exhibit X**, Letter and copy of Communication DAI 20131700032321, dated June 18, 2013 ...................................................................................................... 66

**Exhibit Y**, Affidavit of Luis Ricardo Anselmi Roca ……………………………  6, 36