UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

       - v. -                                        :          11 Cr. 836 (KBF)

YESID RIOS SUAREZ,                            :

               Defendant.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney
Southern District of New York
for the United States of America

Adam Fee
Sean S. Buckley
      Assistant United States Attorneys
      - Of Counsel -

## **INTRODUCTION**

Yesid Rios Suarez devoted his life to producing and transporting drugs, and directing violence against those people – including innocent civilians – who posed threats to his drug organization. In over two decades of close coordination with members of the Fuerzas Armadas Revolucionarias de Colombia (the "FARC"), the defendant, along with his nephew and co-defendant, Didier Rios Galindo, assisted the FARC in gaining control over much of the global cocaine trade.   The defendant also worked closely with other drug traffickers to transport and to protect multi-hundred kilogram loads of cocaine being transported to various locations, including the United States.

Put simply, to look back at the defendant's life is to look at a man devoted to using fear, intimidation, violence, and power to enrich himself and his drug organization. This defendant allied himself with terrorists and drug traffickers, caused the murder of innocents, and did harm to countless drug users and their loved ones – and he did so for one reason: profit.   This is the rare case where the Court has before it an individual who stood at the very center of the international drug trade for decades, and who was responsible, along with his nephew and their allies in the FARC, for much of the cocaine that ended up in the streets of American cities. Now is the time where the defendant must be called to account for his many transgressions – the tons of cocaine produced and sold, the terrorists aided in his own country, and the lives he caused others to take solely to protect his criminal organization.   For the reasons set forth below, the defendant should receive a sentence of a term of imprisonment well in excess of 360 months' imprisonment.

## BACKGROUND

### I.     The Defendant's Offense Conduct

The following offense summary is based on the allegations in the indictment ("Indictment") to which the defendant pled guilty, the facts outlined in the Pre-Sentence Report ("PSR") prepared by the Probation Office, and the testimony and evidence adduced at the *Fatico* hearing on May 2 and 7, 2014 (the "Hearing").

From in or about the early 1990s through his arrest in Venezuela in 2011, Yesid Rios Suarez worked with his nephew and co-defendant, Didier Rios Galindo, to produce and distribute tons of cocaine, much of which was transported to the United States.   During this time period, the defendant's criminal conduct fit within several broad categories.

First, he was a major drug trafficker.   From in or about 1990 or 1991, through 2011, the defendant worked with the FARC and with other drug traffickers in Colombia and, later, Venezuela, to transport cocaine out of South America to Central America and/or the Caribbean and, on many occasions, for delivery to the United States.   The defendant's focus in the organization headed by him and his nephew (hereinafter, the "Rios Organization") was procuring cocaine and overseeing the physical security of labs, airstrips, and airplanes being used by the Rios Organization to produce and transport cocaine.   (Indictment ("Ind.") ¶ 4; *see, e.g.*, Hearing Transcript ("Hrg. Tr.") at 50-51, 55, 128, 131-33, 149).

The second category of the defendant's criminal conduct was working with the FARC, a U.S.-designated terrorist organization engaged in violence against the Colombian government and funded by drug trafficking, to further the Rios Organizaton's drug-trafficking business.   (*See* Hrg. Tr. 12-13, 19-20, 26, 64-74, 130).   This included, among other tasks, the defendant being

responsible for meeting with FARC leadership, working on behalf of the FARC to extract extortion payments from civilians, purchasing cocaine from the FARC, and coordinating with the FARC about the murders of civilians who appeared to pose threats to the Rios Organization's drug trafficking work.   (Ind. ¶ 4; *see, e.g.*, Hrg. Tr. at 13, 25-27, 38, 68-73, 85-86, 135-36).

The final category of the defendant's criminal conduct was his use of guns and violence to secure and to further the Rios Organization's drug trafficking business.   As detailed at length at the Hearing, the defendant was involved in (i) directing others to transport ransom payments from the families of civilians kidnapped by the FARC to FARC guerillas (Tr. at 18-20); (ii) ordering the murder of civilian employees of oil companies operating in FARC-controlled territory in Colombia in the early 1990s (*id.* at 24); (iii) working with the FARC to bomb Colombian military personnel engaged in anti-narcotics operations in or about 2001 (*id.* at 78-81); and (iv) directing his co-conspirators – including employees of the Rios Organization and FARC guerillas – to murder two innocent farmers who happened upon the defendant and others preparing to engage in this bombing attack (*id.* at 82-90).    In addition, throughout this time, the defendant himself carried firearms, and worked with others carrying firearms, which they used and possessed in furtherance of their work producing and transporting cocaine.   (Tr. at 39, 56, 134).

## II.      The January 7, 2014 Conference

In his sentencing submission, defense counsel makes certain arguments about his client's rejection of a plea offer.    A plea offer was first extended to the defendant on December 3, 2013. That offer was initially scheduled to expire on December 11, 2013, and was extended and revised at the request of the defendant through January 7, 2013.

At a conference before the Court on January 7, 2014, the defendant requested a change of

counsel from his prior counsel (Aubrey Lees) to his current counsel.    At that conference, after

the defendant had affirmed that he wished to switch counsel, the following exchange occurred:

| | |
|---|---|
| The Court: | I note that the government has made a plea offer to Mr. Rios-Suarez. |
| Mr. Fee: | That's correct, Your Honor. |
| The Court: | Has that plea offer been conveyed to Mr. Rios-Suarez? |
| Ms. Lees: | Oh, yes. We've had extensive negotiations probably since early December, when we first got an offer and we have had many meetings.    Everything has been translated.    There has been a series of adjustments made by the government or concessions to the benefit of the defendant.    So, yes, he was also advised and I spoke about that today after this hearing that the plea offer was going to be withdrawn.    I know that the government isn't in plea negotiations with new counsel, that the offer will be withdrawn after this appearance. |
| The Court: | …. My issue is I want to be sure that Mr. Rios-Suarez has had the plea offer presented to him in Spanish. |
| Ms. Lees: | Oh, absolutely. . . . Everything has been translated and discussed a lot. |
| The Court: | The Court's understanding is that at this time Mr. Rios-Suarez is not currently inclined to accept that offer. |
| Ms. Lees: | That's correct, Judge. |

(Transcript of January 7, 2014 Conference ("Jan. 7 Tr.") at 10-11).

Following the January 7 conference, neither the defendant nor his current counsel made

any claim that he was somehow denied the opportunity to consider or accept the plea, or that his

prior counsel had somehow erred in providing assistance to the defendant in that regard.    Only

after the Court ruled adversely to the defendant on the sentencing issues contested at the *Fatico*

hearing did the defense make any claims relating to this issue.    In any event, the defense's

claims in this regard – conveyed via the unsworn statements of defense counsel in the defense

sentencing submission – are addressed further below.

4

### III.     The Defendant's Guilty Plea

On March 18, 2014, the defendant pled guilty to the single count in the Indictment. The defendant pled guilty without the benefit of a plea agreement.

### IV.   The *Fatico* Hearing

As set forth in the Government's March 28, 2014 letter, the sentencing enhancements in dispute at the *Fatico* hearing (the "Hearing") consisted of the following:

- The conspiracy involved thousands of kilograms of cocaine, which would result in a base offense level of 38 pursuant to U.S.S.G. § 2D1.1(c)(1);

- The defendant both carried, or caused other members of the conspiracy to carry dangerous weapons (*e.g.*, firearms) in furtherance of the charged conspiracy, which results in a two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(1);

- The defendant directed the use of violence, which results in a two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(2);

- The defendant was an organizer and/or leader of a criminal activity that involved five or more participants and was otherwise extensive, which results in a four-level enhancement pursuant to U.S.S.G. § 3B1.1;

- Finally, because the defendant was directly involved in the importation of a controlled substance, and the defendant committed the offense as part of a pattern of criminal conduct engaged in as livelihood, which results in a further two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(14).

In addition, although defense counsel (Mr. Meringolo) initially indicated that he was not disputing the application of the enhancement for importing a controlled substance under circumstances in which an aircraft other than a regularly scheduled commercial carrier was used, *see* Govt.'s March 28, 2014 Ltr., n.1 (Dkt. Entry # 50), the Government presented testimony establishing the application of this enhancement pursuant to Section § 2D1.1(b)(3).

At the Hearing, the Government called two witnesses: Yon Pelayo Garzon-Garzon ("Garzon"), and Luis Ramirez-Pajon ("Pajon").   The defendant did not call any witnesses.

5

On May 15, 2014, the Court issued an order finding that each of the enhancements listed above applied, and that the corresponding Guidelines range was life imprisonment.   (*See* May 15, 2014 Order, at 3-7).

## DISCUSSION

I.   **The Court and the Probation Office Properly Calculated the Applicable Guidelines Range**

There is no dispute that, based on the findings made by the Court, the Court and the Probation Office have properly calculated the applicable Guidelines range in this case.   As the Court held in the May 15 Order, the evidence adduced at the Hearing firmly established the application of the enhancements outlined by the Court and in the PSR.   (*See* May 15 Order, Pre-Sentence Report ("PSR") at ¶¶ 27-32).

The defendant does, however, argue that the Guidelines range calculated here "violates the terms of the extradition order."   (Def. Mem. at 29).   This is incorrect.   The Court is required by statute and binding precedent to calculate the applicable Guidelines range.   18 U.S.C. § 3553(a)(4). The contents of the extradition order – and any limits it places on the ability to request or impose a sentence of "life imprisonment" (*see* Def. Ex. R) – are not relevant to the calculation of the appropriate Guidelines range.

With respect to the extradition order, it notes that the U.S. has made a "commitment" as part of its request for the defendant's extradition, to not subject him to "life imprisonment."   (Def. Ex. R. at 6).   That limitation means what it states: the defendant should not be subject to a sentence pronounced as "life imprisonment"; the remaining provisions of the extradition order, and all other relevant treaties entered into between the United States and Colombia, place no other limitations on the sentence that may be imposed on the defendant.   Notably, neither the

6

extradition order nor any other agreement impose any restriction on the length of a sentence of a term of months or years of imprisonment.

## II.     The Defendant Should Receive A Sentence of a Term of Imprisonment Far In Excess of 360 Months' Imprisonment

There can be no serious dispute at this time based on the record before the Court: this defendant, as one of two leaders of the Rios Organization, spent decades at the very center of the international drug trade, during which time he worked with others to produce and transport tons of cocaine out of Colombia and Venezuela to other countries, including the United States.   The defendant was a key part of the process by which cocaine moves from hillside farms in rural Colombia to plastic baggies filled with powder cocaine or crack being sold for a few dollars on the streets of New York and other U.S. cities.   And as one would expect of a man who spent decades working with terrorists and major drug traffickers, the defendant used violence – extreme violence – to secure his drug business and his relationship with the FARC.

Given this defendant, and the detailed record of his crimes, all of the relevant sentencing factors weigh overwhelmingly in favor of imposing an extremely serious sentence on the defendant.   Applying the factors in this case highlights both the singular nature of this defendant's criminal career and the particular importance of having the sentence in this case reflect the severity of his crimes.

First, the nature and the circumstances of the offense make clear that it would be difficult to conceive of a more serious drug crime than the conspiracy in which this defendant participated prior to his arrest in 2011.   For nearly two decades, the defendant worked with terrorists to build and profit from the global trade in cocaine.   The defendant's organization, which he led along with his nephew, was complex and far-reaching: they built laboratories and airstrips over a broad

7

swath of territory in Colombia and, later, in Venezuela, and worked with hundreds of other criminals over the years, including FARC guerillas and non-FARC traffickers (including men like Mr. Pajon).   The defendant's criminal conduct served both to enrich himself and other members of the Rios Organization, and to destabilize the system of law and order in Colombia. As Mr. Garzon testified, from the early 1990s through at least early 2002, the Rios Organization and the FARC effectively exercised control over travel and trade in the Arauca Department of Colombia; and their control often extended to matters of life and death, including instances where the defendant himself caused others to be killed for transgressions against the defendant or his co-conspirators.   And the defendant's crimes in this regard continued even after he left Colombia: as Mr. Pajon testified, in Venezuela between approximately 2004 and 2011, the defendant and his co-conspirators continued to move huge quantities of cocaine via an extensive system of airstrips located in FARC-controlled territory. (*See, e.g.*, Tr. at 130, 137-38).

Second, the history and characteristics of the defendant weigh strongly in favor a very substantial sentence.   In this case, the Court has ample evidence that reflects the defendant's history as a drug trafficker as well as his casual us of in connection with his role as a leader of a major drug trafficking organization.   This is not a defendant who made one bad decision in an otherwise law-abiding life, or someone who was led astray by other powerful wrongdoers; the defendant, as the evidence made clear, chose the life of a major and violent drug trafficker.   As the Court heard, this defendant sought out ways to ingratiate himself with the FARC and to assert his power over civilians living in Arauca in the 1990s.   Among other things, he caused two security guards to be killed "because of the strict way that they did their jobs . . . [a]nd because . . . they were able to find people" – such as the defendant's criminal associates – "who were entering

and leaving the oilfield with stolen goods."   (*See* Hrg. Tr. at 25).   In addition, he directed others to murder two innocent farmers, who just happened to come upon the defendant as he prepared, along with FARC guerillas, to drop bombs on Colombian military personnel.   (*See id.* at 82-90). The defendant engaged in the most serious crimes, in the most callous manner, and he did it over and over and over again during the decades of his criminal career.

The defendant also worked tirelessly to establish a drug empire, along with his nephew, Didier Rios Galindo.   In the early 2000s, the two men controlled a network of drug laboratories and air strips in Colombia.   Through these facilities, and by reason of their alliance with the FARC, the Rios Organization produced and transported thousands of kilograms of cocaine out of Colombia.   And when the defendant was forced to relocate to Venezuela, he and his nephew again found a way to establish themselves as major drug traffickers.   By working with men like Mr. Pajon and his associates, the Rios Organization funded the transportation of large loads of cocaine out of Venezuela, and on to various countries, including the United States.   And once again, the defendant's key contribution was his close partnership with members of the FARC; as in Colombia, the defendant's role for the Rios Organization in Venezuela was, principally, (i) to provide security for drug-laden planes departing jungle airstrips, and (ii) to do business with the FARC, including handling the purchase of cocaine directly from the guerillas.   (*See* Hrg. Tr. at 130-33).

The defendant's history and characteristics make clear that he was a calculating and persistent drug trafficker; and a casually violent criminal, who used murder to further his illicit business.   There is nothing to indicate that this defendant is anything other than an unrepentant career criminal, who even now is attempting to evade responsibility for the true nature of his

crimes.

Third, the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense is the most compelling factor in favor of imposing a very substantial sentence in this case.   The defendant spent decades at the top of an organization responsible for producing and transporting tons and tons of cocaine throughout the world, including to the Southern District of New York, as the defendant admitted during his plea allocution before this Court.   (*See* Def. Ex. Q at 26).   As part of this criminal career, the defendant repeatedly caused the murders of good and innocent men – such as security guards who did their work too diligently, or farmers who could not be trusted to stay quiet after seeing the defendant and terrorists training for an attack.

The defendant's crimes constitute the most serious type of narcotics offense – involving massive quantities of cocaine, the production and international transport of drugs into the United States, and the use of violence against innocent persons uninvolved in the drug trade to further the drug organization's goals. As such, the defendant's crimes merit an extremely serious response.

Finally, the need for the sentence to afford deterrence to criminal conduct weighs strongly in favor of the Court sending a clear message to the world's large-scale drug traffickers: if you are caught, as this defendant was, you will be held to account for the full extent of your crimes in the United States. Put simply, men like the defendant – who stood at the center of the international drug trade for decades, and built their drug empire on alliances with terrorists and murders – are rare.   And rarer still are the opportunities when such a person stands before a U.S. court and is called to account for his part in moving millions of dollars of cocaine out of Colombia and on to destinations for ultimate delivery to the United States.   As such, this sentencing presents the

singular opportunity to make clear that the most serious drug offenses merit extremely serious punishments. This is especially the case where, as here, the defendant's criminal conduct reflected a particularly brutal and extensive career spent producing and distributing tons of cocaine throughout the world.

### III.    The Defendant's Arguments For Leniency Reflect An Attempt to Evade Responsibility for His Crimes and Lack Merit

The defendant's sentencing submission is an extended exercise in seeking to avoid responsibility for the egregious crimes he has committed.   The defendant put the Government to its proof at the *Fatico* hearing, and that proof exposed the defendant for what he truly is: a major drug trafficker, a criminal ally of terrorists and other drug traffickers, and a man who used horrific and casual violence to protect and secure his drug business.   Nevertheless, in his sentencing submission, the defendant fails to address his criminal conduct in any meaningful way; instead, he offers tone-deaf platitudes about his "good character" and the "positive impact that he has had on the lives of those around him."   (Def. Mem. at 12).

The defendant also seeks to minimize his role in the charged offense. Specifically, the defendant now claims that the evidence does not support holding the defendant responsible for any amount of drugs in excess of "5 kilograms."   This is an outrageous assertion.   The defendant's claims – which are not accompanied by any additional evidence, other than the unsworn statements of his attorney – are directly and entirely contradicted by the evidence presented to this Court at the Hearing.

Put simply, none of the arguments made by the defendant offer a compelling reason to show leniency to him in this case.   If these arguments have any impact upon the Court, it should only be to highlight the degree to which the defendant has not accepted responsibility for the scope

11

of his criminal activity, and that he continues to mislead the Court in the hopes of escaping responsibility for his criminal career.

### A.    The Defendant Rejected All Prior Plea Offers In This Case

First, the defendant argues that he should receive the benefits of a prior plea offer.   This argument should be rejected because the defendant rejected all plea offers made by the Government.   The defendant does not, and cannot, plausibly suggest that the Government somehow breached an agreement with the defendant.   Rather, by the defense's own account, the Government set a deadline for the expiration of that agreement of January 7, 2014 – a date that was less than six weeks before the commencement of trial. And at the conference on January 7, 2014, the defendant – through his counsel – advised the Court that he was rejecting the plea offer. Further, as the defense concedes, and as the transcript of the proceeding makes clear, "[d]uring the hearing, the government stated that the plea offer would expire that day." (Def. Mem. at 21).

Notably, at no point following January 7, 2014, has the defendant made any argument, or even any statement, suggesting that he was somehow entitled to the benefit of that initial plea offer, or that his "right to counsel" was in any way implicated by the defendant's own decision to reject a plea offer.   Only now, after the defendant has lost in his attempt at the *Fatico* hearing to minimize his sentencing exposure, has the defendant asserted this argument.[1]

In any event, it is a legally and factually unsupported argument.   Indeed, the defendant cannot cite any case to support the proposition that the Government must re-extend a plea offer

---

[1]  Nor has the defense submitted any competent evidence – such as a sworn affidavit from the defendant – to support the assertion that his prior counsel somehow committed an error while representing the defendant.   He relies entirely, and inappropriately, on the unsworn assertions of his counsel in a memorandum.

nearly five months after it was rejected by the defendant simply because the defendant is unhappy with the resolution of litigation that ensued.

**B.      The Defendant Is Properly Being Held Responsible For Trafficking Tons of Cocaine Over the Course of His Criminal Career**

Second, the defendant argues that he should only be held responsible for trafficking "five kilograms of cocaine" because that is the amount he specified in his plea allocution, and because the higher quantity of cocaine found by the Court was not "legally foreseeable" to him.   (Def. Mem. at 31-37).   This is an outrageous assertion.   The Court heard testimony over two days from two witnesses that proved beyond any doubt that (i) the defendant was one of two leaders of a massive cocaine production and transportation business, which was sending cocaine throughout the world, including to the United States; and (ii) the defendant was deeply involved in the transportation of that cocaine, including supervising the manufacture of cocaine base at jungle laboratories, visiting air strips under his and his nephew's control, and attending meetings with senior FARC leadership that were used to discuss the transport of the cocaine by the defendant's organization.   Based on this evidence, the Court ruled that the conspiracy involved thousands of kilograms of cocaine.   This same evidence makes absolutely clear that the scale and scope of the defendant's drug organization was known to and under the control, at least in part, of the defendant.

The defendant now seeks to evade responsibility for the Court's ruling, and to grossly minimize his conduct.   The proposition that the defendant should be held "responsible only for the quantity of narcotics to which he allocuted at his change of plea hearing" – five kilograms of cocaine – is a request for this Court to ignore the evidence in this case and its own rulings, and to reward the defendant's false attempts to downplay his criminal conduct.   (*See* Def. Mem. at 34). As a factual matter, as described above, and as already held by the Court, the defendant was at the

core of a conspiracy to import tons of cocaine to the United States, and it was "reasonably foreseeable" to him that this quantity of cocaine would be imported over the decades in which he was engaged in this conspiracy.

As a legal matter, the defendant grossly mischaracterizes the holdings in the cases he cites in making this argument. The law is well-settled that a drug quantity which may raise a defendant's mandatory minimum sentence must be proven beyond a reasonable doubt. *See, e.g.*, *United States* v. *Gonzalez*, 420 F.3d 111, 129 (2d Cir. 2005) (holding that drug quantity is an element of the offense that must be charged in the indictment and proven to a jury beyond a reasonable doubt or admitted by the defendant where the quantity triggers a change in both a mandatory minimum sentence and a maximum sentence because "mandatory minimums operate in tandem with increased maximums"). That is exactly what happened here, when the defendant *admitted* to being involved in a conspiracy to import 5 or more kilograms of cocaine.

The Second Circuit has made clear, however, that beyond a quantity that may increase a mandatory minimum sentence, a district court may increase the applicable Guidelines range based on drug quantity findings made by a preponderance of the evidence. *See, e.g.*, *United States* v. *Lighten*, 525 Fed.Appx. 44, 2013 WL 2150796, at *3 (2d Cir. May 20, 2013) ("A district court may make factual findings at sentencing about the drug quantity involved in the offense as long as those findings do not raise the sentence above the otherwise applicable statutory maximum."). Indeed, even where a jury has found beyond a reasonable doubt a drug quantity higher than that necessary to trigger a mandatory minimum sentence, a district court could permissibly "make its own preponderance finding of a higher drug quantity than the amount found by the jury." *United States* v. *Florez*, 447 F.3d at 148-49, 156.

Accordingly, the defendant's suggestion that, because the Court only made findings by "a preponderance of the evidence" at the *Fatico* hearing, the Court is now unable to impose a Guidelines level for any amount of cocaine in excess of 5 kilograms, is legally and factually incorrect, and constitutes a disingenuous attempt by the defendant to evade responsibility for his crimes.

### C.    The Court's Rulings On the Guidelines Calculation Were Proper

The defendant seeks to re-litigate the Court's order resolving the issues disputed at the *Fatico* hearing.   This request for reconsideration should be denied.   The Court's order was premised on overwhelming evidence and a sound application of the relevant Guidelines provisions. In addition, nearly all of the defendant's arguments seeking reconsideration fail based solely on a plain reading of the relevant guidelines provision.

First, the defendant plainly was involved in a conspiracy in which aircraft other than regularly scheduled commercial aircraft were used both to export drugs out of Colombia and Venezuela (*see* Hrg. Tr. at 48-49), and to import drugs into the United States, such as those flights that led to cocaine being delivered to Puerto Rico (*see* Hrg. Tr. at 127).   Thus, the enhancement under Section 2D1.1(b)(3) applies, as the Court held in the May 15 Order.

Second, the defendant's arguments seeking reconsideration of the Court's rulings on the enhancements relating to the use of firearms, the direction of the use of violence, and the defendant's role as an organizer and leader should be rejected.   Each of these arguments is premised on the conclusory assertion that the Court misjudged the credibility of the Government's witnesses at the Hearing. The defendant's unsupported plea to disregard the plainly credible testimony of the Government's witnesses – which was corroborated by the evidence offered by

the Government and, at least in part, by the defendant's own plea allocution – should be rejected, along with his requests to reconsider the application of these three enhancements under the Guidelines.

Finally, the defendant is plainly subject to the enhancement for committing this offense "as part of a pattern of criminal conduct engaged in as a livelihood."   Even taking judicial notice of the *current* federal minimum wage, the requisite income that the defendant had to "derive" from this pattern was $14,500 USD over a one-year period.   *See* U.S.S.G. § 4B1.3, appl. note 2.   And the evidence clearly supports the finding that the defendant derived an income from his crimes wildly exceeding that figure.   Mr. Garzon testified that, while working for the Rios Organization at their airstrips, he often was charged with counting the cash being delivered by returning planes after they had delivered cocaine loads.   (*See* Hrg. Tr. at 62-63).   Mr. Garzon testified that the money always consisted of U.S. dollars, and that the highest amount he could recall counting from just one plane load was "an amount of $2 million."   (*Id.*)   Even if the defendant received only a small percentage of that one delivery of cash proceeds of narcotics trafficking, he would vastly exceed the minimum requisite amount in Section 4B1.3.

### D.   The Smarter Sentencing Act

The defendant's arguments relating to certain proposed amendments to federal sentencing provisions should be rejected because the proposed amendments offer no benefit to the defendant. First, the defendant's observation that the Smarter Sentencing Act ("SSA") may reduce the applicable mandatory minimum offers no compelling basis in this case to reduce the sentence to be imposed, given the seriousness of this defendant's crimes and the massive quantities of cocaine involved in the offense.   Second, even assuming that the proposed amendments to the drug

quantity table in Section 2D1.1 applied in this case, the defendant's offense level would remain unchanged because the offense involved a quantity of cocaine far in excess of 450 kilograms – the drug quantity specified in the amended table for the top offense level of level 38.

**E.      The Defendant's Arguments to Reduce His Sentence Based On Other Convictions and Prison Terms Lack Merit**

The defendant asks this Court to reduce his sentence based on other convictions he has sustained or time he has spent in prison in Colombia and/or Venezuela.   These arguments lack merit and should be rejected as a basis for the Court to reduce the defendant's sentence. First, the defendant's conviction *in absentia* in Colombia in 2010 was, as the defense notes, for conduct during an entirely different – and older – time period than the period at issue here.   (*See* Def. Mem. at 53-54).   Accordingly, the defendant should not receive "credit" for the time he has not yet served in Colombia for that conviction.[2]

---

[2]  The Court should also reject the defendant's argument that the conditions of his confinement in Venezuela and/or Colombia merit a downward departure.   First, "inasmuch as 'pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures,' *United States* v. *Carty*, 264 F.3d 191, 196 (2d Cir. 2001), the burden [is] on the defendant to prove, by a preponderance of the evidence, that a downward departure or reduction of his sentence was appropriate, *see United States* v. *Valdez*, 426 F.3d 178, 184 (2d Cir. 2005)." The defendant – who offers only the unsworn, unsupported statements of counsel in support of this argument – has failed to present any competent evidence in support of this argument and thus cannot carry his burden.   Second, even if the defendant had carried his burden, the conditions about which he complains fall far short of those which have been found to justify a reduced sentence. *See, e.g., United States* v. *Carty*, 264 F.3d 191, 193 (2d Cir. 2001) (remanding for consideration of defendant's request for downward departure for pre-sentence conditions of confinement where defendant had been held eight months in a Dominican prison in an unlit four-by-eight-foot cell with three or four other inmates; he had no light in his cell; he had 10 to 15 minutes per day outside his cell to bathe; he had no running water in his cell; he had no paper, pens, newspaper, or radio; and was allowed only one phone call a week); *United States* v. *Pressley*, 345 F.3d 1205, 1219 (11th Cir. 2003) (concluding length and conditions of defendant's pre-sentence confinement – for six years, five of which were in a 23–hour–a–day lock down and

Nor should the Court "credit" the defendant for time he spent in custody in Colombia prior to his extradition to the United States.   (*See* Def. Mem. at 67).   Binding precedent mandates that the Bureau of Prisons ("BOP") is responsible for making this "prior custody credit" determination. *United States* v. *Wilson*, 503 U.S. 329, 333 (1992) ("The United States argues that it is the Attorney General who computes the amount of the credit after the defendant begins his sentence and that the Court of Appeals erred in ordering the District Court to award credit to Wilson. Wilson counters that § 3585(b) authorizes the District Court to compute the amount of the credit at sentencing. We agree with the United States."); *see Reno* v. *Koray*, 515 U.S. 50, 60–61 (1995) (noting that the BOP is the agency charged with administering 18 U.S.C. § 3585(b), which governs credit for prior custody, and that its interpretation is therefore entitled to deference); *see also United States* v. *Waters*, 84 F.3d 86, 90 (2d Cir. 1996) ("[In Wilson,] the Court held that the authority to calculate or determine credit for time served lies exclusively with the Bureau of Prisons and that such determinations can only be made after a sentence is imposed by the district court.").

**F.      The Defendant Is A Poor Candidate for This Court's Mercy**

The defense argues for a drastic departure from the Guidelines range to a sentence of 120 months' imprisonment – the statutory minimum.      The defense argues that this large downward departure would allow the defendant "to return to Colombia sooner rather than later" to be with his family, and give the defendant the benefit of a plea offer that, in the words of defense counsel, the Government has "now refused to honor."   (Def. Mem. at 85-86).   It is troubling that, at this

---

where defendant had not been outside in five years – were not insufficient as a matter of law to support a downward departure).

18

point in this case, the defendant has chosen not to address the substance of his extremely serious crimes but, instead, tries to improperly deflect and diffuse responsibility onto others.    The defendant now points to the impact of his absence from his family – which, while unfortunate, is certainly not an unusual factor which merits a drastic reduction in the defendant's sentence; he makes entirely false claims about the purported failure to "honor" an agreement that, in truth, the defendant himself rejected; and he asserts that his decades of violent criminal alliances with the FARC can somehow be explained away by the "historical context of Colombia during the relevant time period."    (Def. Mem. at 82).

The defendant's implicit suggestion that his conduct – his efforts to traffic massive amounts of cocaine and to use violence against innocents as a means of securing his drug business – merits leniency based on factors like prior plea discussions or "historical context" suggests that he has not fully grasped the scope and seriousness of his actions, and that he has failed to understand the importance of "just punishment" and general deterrence concerns, specifically in this case.    By seeking a 120-month sentence based on a mixture of unsupported conjecture and conclusory denials of witness testimony that this Court has already credited, the defendant simply asks this Court to overlook his decades of drug trafficking, the murders carried out at his direction, the terrorists who profited from his crimes, and the harm that has come not only to those who suffered violence as a result of the defendant's actions but those individuals whose access to cocaine was made possible by the defendant's work.    The defendant admitted to participating in the charged cocaine importation conspiracy.    He has been revealed as a long-term and violent drug trafficker in Colombia and, later, Venezuela, who ruthlessly carried out his duties as part of the Rios

19

Organization.   This defendant is a poor candidate for this Court's mercy.   He should instead be subject to an extremely serious sentence of imprisonment based on his extremely serious crimes.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the Court sentence the defendant to a term of imprisonment well in excess of 360 months' imprisonment.   .

Dated:          New York, New York
                June 9, 2014


                                    Respectfully submitted,

                                    PREET BHARARA
                                    United States Attorney


                    By:        /s/ _____
                                    Adam Fee
                                    Sean S. Buckley
                                    Assistant United States Attorneys
                                    (212) 637-1589