E6RMSUAS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          11 Cr. 836 (KBF)

5    YESID RIOS SUAREZ,

6                   Defendant.

7    ------------------------------x

8                                          New York, N.Y.
                                           June 27, 2014
9                                          3:10 p.m.

10

     Before:
11
                       HON. KATHERINE B. FORREST,
12
                                           District Judge
13

14                        APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     ADAM FEE
17   SEAN BUCKLEY
          Assistant United States Attorneys
18
     JOHN MERINGOLO
19   ANJELICA CAPPELLINO
          Attorneys for Defendant
20

21
     ALSO PRESENT:  MIRTA HESS, Interpreter (Spanish)
22

23

24

25

E6RMSUAS

```
 1          (Case called)
 2          MR. FEE:  Good afternoon, your Honor.  For the
 3   government, Adam Fee, and with me is AUSA Sean Buckley.
 4          THE COURT:  Good afternoon, both of you.
 5          MR. MERINGOLO:  Good afternoon, your Honor, John
 6   Meringolo and Anjelica Cappellino for Yesid Rios Suarez.
 7          THE COURT:  Good afternoon to both of you.  The Court
 8   notes that Mr. Rios Suarez is present and here in court this
 9   afternoon.  Good afternoon, sir.
10          We are assisted today with the services of a Spanish
11   interpreter and I see, Mr. Rios Suarez, that you are using the
12   equipment.  If at any point in time that equipment is not
13   functioning right, then let Mr. Meringolo know or just make a
14   motion to the Court and we will get it fixed.  Sometimes the
15   batteries can run out.  And we want to make sure that you are
16   able to hear every word.  All right?
17          THE DEFENDANT:  Okay.  Yes.
18          THE COURT:  We are here today for the sentencing of
19   Mr. Yesid Rios Suarez and I want to first start out by reciting
20   for the record the materials that I have received in connection
21   with this proceeding.  I have read them thoroughly and they
22   were extensive, but I do think that it laid out a variety of
23   issues that are useful to have laid out, and we will go through
24   them, but I warn you all, this may take a little while.
25          I received a copy of a defense submission, it was 87
```

E6RMSUAS

1    pages, dated May 23, 2014, and attached to that submission was

2    a compendium of a number of exhibits, a couple of dozen

3    exhibits, including letters from family and friends, as well as

4    some additional supportive material to which Mr. Meringolo

5    referred in his submission.

6            He also sent the Court a copy of his objections to the

7    PSR, which is a letter dated June 11, 2014.  A number of those

8    objections had not been reflected in changes by probation,

9    though probation refers to that letter and explains their

10   rationale, and we will go through those as well.  And Mr.

11   Meringolo also made a third submission, which is a reply to the

12   government's submission, and that's dated June 16, 2014, and

13   there are an additional seven exhibits attached to that.  I've

14   got all of those, and we are going to go through those in a

15   little bit.

16           Separately the Court has received a copy of a

17   presentence investigation report.  That is referred to as a

18   PSR.

19           Mr. Meringolo, did you have an opportunity to review

20   the PSR with your client?

21           MR. MERINGOLO:  Yes, I did.

22           THE COURT:  And do you have objections to the PSR

23   apart from those which you set forth in your submissions?

24           MR. MERINGOLO:  None other than them.

25           THE COURT:  We will go back over that in a moment.

E6RMSUAS

1    The PSR notes an offense level of 43 and a criminal history

2    category of I.  The PSR will be made part of the record in this

3    proceeding.  It will be filed under seal.  If an appeal is

4    taken, counsel on any appeal may have access to the PSR without

5    further application to the Court.

6           The government also made a submission dated June 9,

7    2014.  Now, I've thought about procedurally how we ought to

8    proceed.  And what I thought may make the most sense is to

9    first take Mr. Meringolo's letter of June 11, go through it.

10          Then what I would like to do is, I will explain to you

11   which factual findings I'm adopting in the PSR.  Then what I'd

12   like to do is to go through a number of the other issues which

13   relate to the offense level calculation before we get to

14   statements because my view is many of the arguments that people

15   may want to make may be embedded in what the Court determines

16   as to whether the evidence is supportive or not supportive of

17   some of those facts.  So rather than having ships passing in

18   the night, I'd like us all to be on the same page in terms of

19   where my head is.

20          That's my plan.  I will let counsel then respond to

21   the offense level calculation first.  We will then reach

22   resolution on that.  Then go to statements of counsel and then

23   to Mr. Rios Suarez, if he would like to address the Court

24   before sentence is imposed.

25          Does that seem like a reasonable way to proceed?

E6RMSUAS

1          MR. FEE:  It does, your Honor.  Certainly seems the

2     most efficient.

3          MR. MERINGOLO:  Yes.  Thank you, your Honor.

4          THE COURT:  Let me just take Mr. Meringolo's letter

5     first.

6          MR. FEE:  Your Honor, I'm sorry.  I will just note and

7     apologize.  The government submitted a letter to probation

8     responding to Mr. Meringolo's letter.  It did not copy the

9     Court.  It should have.  It really will add nothing.  It mostly

10    cited your prior order, just so the Court knows.

11         THE COURT:  That's fine.

12         If you want to make some comments, we will take the

13    letter first.  If you want to make comments afterwards, before

14    we get to the other matters, then you can.

15         Several of the objections were supported by the

16    Court's factual findings which were made by a preponderance of

17    the evidence in the Fatico.  But certain statements were not.

18    Paragraph 8, I believe, should remain unchanged because it's

19    supported by factual findings and testimony, not only findings

20    in my decision, but can be supported and I do find that it's

21    supported by a preponderance of the evidence based upon

22    testimony and other evidence adduced at the Fatico.

23         This is also true for paragraph 9, as well as for

24    paragraph 10 and 11.  There are facts which were adduced during

25    the Fatico hearing which are supportive of those statements by

E6RMSUAS

1    a preponderance of the evidence and I so find.

2         However, I do find that paragraph 12 and the next

3    paragraph, which is labeled 13, which is, in fact, a piece of

4    12, and so I have noted, that's not actually paragraph 13.

5    It's a paragraph 12, I believe.  So 12 and 12.

6         I do agree that those two are not directly supported

7    in the manner in which they are worded in the PSR.  We are

8    going to talk about other facts which get at many of the same

9    points and these, frankly, do not affect the offense level

10   calculation and we will talk about that.  This is really, I

11   think, more of a wording issue in terms of how probation

12   decided to refer to certain facts.  But I do agree that those

13   two should come out.  And then I similarly find the same for

14   what's referenced on page 2 of Mr. Meringolo's letter as

15   paragraph 14, which should be changed to paragraph 13.  That's

16   a reference to paragraph 13 in the PSR.

17        It is possible that the PSR changed numbers between

18   the first draft and what I have seen and that Mr. Meringolo's

19   letter may have referred to a prior draft.  In any event, it is

20   the second, third, and fourth paragraph on the pages where I

21   will agree to strike the referenced language.  That will be

22   noted for probation and that should be -- Ryan, you should make

23   sure that Joe knows that, to put that on the equivalent of a

24   blue card.

25        Paragraph 15 and paragraph 16, those are supported by

E6RMSUAS

1     the facts adduced at the Fatico hearing.  That's the Court's

2     findings as to Mr. Meringolo's letter.

3           Mr. Fee, is there anything in particular that you want

4     to say about the Meringolo letter?  Let me suggest, it's

5     possible that you may want to hear the rest of what I have to

6     say to figure out if it changes in any way your view.  In other

7     words, I think we come to the same point in terms of the

8     overall conduct, whether it's worded in terms of a particular

9     person or not.

10          MR. FEE:  I have nothing to add right now, your Honor.

11    Thank you.

12          THE COURT:  So the Court does adopt the factual

13    findings of the PSR with those amendments as stated.

14          Moving on to the next point, what I want to do now, as

15    I said, is go through certain aspects of Mr. Meringolo's filing

16    and give you my rulings on the various points raised.  But I

17    want to also state that I would like to hear comments from you,

18    if you want to make comments afterwards.  And it's not that I'm

19    suggesting that I wouldn't change my mind if counsel raised

20    something that suggests that I have erred in some way.

21          These are my rulings in the absence of you folks

22    convincing me otherwise.  First, I want to deal with the burden

23    of proof issue, which is one that goes through a number of

24    different pages of Mr. Meringolo and is particularly relevant

25    to the quantity argument.

E6RMSUAS

1          Mr. Meringolo suggests that the burden of proof is

2     beyond a reasonable doubt versus preponderance of the evidence.

3     I do not agree.  I believe that that it is taking the Gonzalez

4     case, which is 420 F.3d 111, and the Apprendi case too far.

5     There have been arguments similar, frankly to that which Mr.

6     Meringolo makes, and I don't fault him for making the argument.

7     But it is no longer supportable in the case law.

8          The argument is that a court which makes a finding

9     relating to an offense level that increases the offense level

10    to a point which raises a statutory maximum or even a statutory

11    minimum must be found by a beyond a reasonable doubt standard.

12    In the pre Booker world that was obviously much more important

13    because if the offense level changed as a matter of statutory

14    equivalence, that would change the range within which a

15    defendant had to be sentenced.  It is nonetheless still

16    important to the extent that there are statutory minimums, for

17    instance, in our situation attached to certain crimes.

18          If it were the case that the evidence relating to the

19    imposition of the statutory minimum or maximum was something

20    which had not been allocuted to, as it has here, or otherwise

21    in a trial with respect to, there could be an issue as to

22    whether it is by a reasonable doubt, beyond a reasonable doubt

23    or preponderance.  In such a case it may well be a beyond a

24    reasonable doubt standard.

25          Here, however, the only statutory minimum issue that

E6RMSUAS

1    we have has been allocuted to, which is the five kilos, which

2    provides the basis for the imposition of the statutory minimum.

3    We don't get to a statutory maximum here and so, therefore, the

4    other aspect is not relevant.

5         The law is clear that where the facts which are at

6    issue are simply going to the offense level calculation and is

7    not otherwise impacting a statutory minimum or maximum, that

8    that is proven by a preponderance of the evidence.  There are

9    two cases which actually deal with arguments very like Mr.

10   Meringolo's from the Second Circuit directly on point.  One is

11   the Lighten case, 525 Fed. App. 44 pin cite 48, (2d Cir. 2013),

12   and also the Vaughn case, 430 F.3d at 518 at pin 525 (2d Cir.

13   2005).

14        The calculation of the offense level for Mr. Suarez in

15   this situation, the facts that we are dealing with for the

16   enhancement and for the quantity are facts which we find by a

17   preponderance of the evidence.  Mr. Rios Suarez himself

18   allocuted to five kilos or more.  He allocuted to the minimum.

19   And, therefore, there is no debate as to that.  That's not

20   contested.  That's the first issue I wanted to deal with.

21        The second issue that I wanted to deal with is the

22   calculation that we are going to get through.  It's going to be

23   several different pieces that will go to the quantity.  The

24   quantity actually in many of the arguments in the defense

25   submission stem from arguments about the defendant's role.  And

E6RMSUAS

```
 1    I did find in the Fatico decision by a preponderance of the
 2    evidence that the defendant, his role was of a leader.
 3         Now, the defendant has argued, based upon his
 4    allocution at the plea, that his role in the conspiracy was
 5    really a relatively minor role.  In fact, he is given two
 6    different examples or characterizations of his role.  I would
 7    note that his allocution went into his role when it didn't have
 8    to.  It wasn't an element of the offense.  He chose to do so.
 9    He was under oath at the time.  And he allocuted to simply
10    filling the plane with fuel, actually planes because he also
11    stated that planes, in the plural, went to the Southern
12    District of New York.
13         He separately then, in his defense submission and also
14    in the PSR, stated that he sold fuel to a drug trafficking
15    organization from which he made 10 to $20,000 a month.  So
16    those are the two different roles.
17         I actually find that neither of those roles are
18    credible based upon a preponderance of the evidence.  However,
19    if one credited his view of his role, then he would have been a
20    low member of the conspiracy to whom the quantities might be
21    different and the various enhancements might well not apply.
22         So his arguments as to enhancements in quantity really
23    flow ultimately from, in large part, but not exclusively, the
24    Court's determination as to his role.  Again, it's not an
25    element of the offense and, therefore, his role the Court can
```

E6RMSUAS

1    find by a preponderance of the evidence, and I do find that he

2    was a leader in this drug trafficking organization.

3        I make that finding based upon the evidence adduced at

4    the two-day Fatico hearing which we had.  The Court heard at

5    that time from two credible witnesses whose testimony I

6    actually credit in all respects.  That is Mr. Garzon Garzon,

7    and Mr. Ramirez-Pajon.  I think that's right.  And that those

8    individuals both testified credibly that Mr. Rios Suarez was a

9    leader of the drug trafficking organization and they gave some

10   details relating to their interactions with him in that regard.

11       I don't intend right now to go back all over the

12   factual findings which I made in the Fatico.  I would note that

13   those findings were all made by a preponderance of the

14   evidence, as I stated in that decision itself.

15       I find, in addition, when Mr. Rios Suarez was a leader

16   of that drug trafficking organization that he was involved in

17   essentially all aspects of that conspiracy.  He was

18   knowledgeable by inference, by reasonable inference drawn from

19   his role and drawn from the role which was testified to by

20   these two credible witnesses to have any knowledge of the

21   various activities of the conspiracy and, in particular, of the

22   manufacturing and distribution operations of that organization.

23       The Court does find by a preponderance of the evidence

24   that he would have understood that there was cocaine being

25   manufactured in the laboratories on site in substantial

E6RMSUAS

1   quantities, that there were armed guards who were present in

2   and around that facility, that there were airplanes which were

3   used and filled with the cocaine which then flew to various

4   destinations, including, among others, the United States, but

5   as to which even as to the others, the United States was

6   typically a destination.  As Mr. Garzon testified, the vast

7   majority of the cocaine was destined for the United States.

8           So I do find that Mr. Rios Suarez was not, in fact,

9   telling the truth during his allocution.  That does present

10  some issues in terms of a potential obstruction of justice

11  enhancement which has not been raised.  Under the guidelines

12  for enhancements, obstruction of justice can be imposed for not

13  telling the truth, for lying to the Court in the context of

14  either a sentencing submission or otherwise.

15          I decline, though I think I could, to impose an

16  obstruction of justice enhancement.  I just note it as a

17  possibility.  It's a cautionary tale for those individuals who

18  put more facts into their allocutions than they need to to

19  establish the elements of the offense to which they are

20  allocuting.  If the Court later determines that there was a

21  statement under oath with which it does not agree and it was

22  not necessary to establish an element of the offense, then that

23  fact can be used in the manner that I have described to support

24  an obstruction of justice enhancement.

25          Let me move on to the quantity.  This brings us now to

E6RMSUAS

1    the quantity and there is quite a bit of argument, as there

2    should be in this kind of case, because the quantity really

3    drives the base offense level.  So I think, by the way, that

4    these arguments are appropriate.  I think they are suggestive

5    of Mr. Meringolo having raised a number of issues, which this

6    case is all about the appeal.  This case is all about

7    establishing the appropriate record for Mr. Rios Suarez if he

8    wants to take an appeal.  And so I think that Mr. Meringolo, I

9    don't fault him at all for having raised these arguments.  I

10   say that because I know this is going to take a while, again.

11   I'm smiling.

12          In the Fatico decision I found that the defendant had

13   been involved in a conspiracy that involved thousands of kilos

14   of cocaine, and I laid out the facts in that Fatico decision.

15   I confirm those now, but I want to confirm something else.  I

16   want to confirm foreseeability in particular by this defendant

17   of the thousands of kilos.  I went back into the Fatico

18   decision and did not find a particular reference to

19   foreseeability by the defendant.

20          Quantity can be determined in two ways.  It can be

21   determined both by foreseeability of an individual who is

22   participating in a conspiracy.  It can also be established by

23   direct participation.  Here we have evidence of both and it

24   matters really not at all whether we do one or the other.  Even

25   based on Mr. Rios Suarez's own allocution to having filled

E6RMSUAS

1    planes with fuel, the planes were testified to credibly here

2    during the Fatico by Mr. Garzon Garzon to hold several hundred

3    kilos apiece.  So even filling one plane with fuel that had

4    several hundred kilograms of cocaine would be sufficient to

5    establish the base offense level that we are talking about,

6    even with the guideline amendments that will occur in

7    potentially September of 2014.

8             However, there is more than that.  I make the further

9    determination that because the defendant was directly involved

10   and it was reasonably foreseeable to him as a leader of this

11   drug trafficking organization that the drug trafficking

12   organization would have manufactured and distributed more than

13   150 and indeed more than 500 kilograms of cocaine.

14            As I stated, I base that finding on his role.  He was

15   one of two primary leaders.  I think that his nephew was

16   probably the bigger leader of the two.  That's only based on

17   the characterization of the evidence.  You can have one big

18   leader and you can have another leader, or you can have two

19   leaders of the same level.  He was a leader, nonetheless.  All

20   evidence is supportive of him having been involved.  He was

21   responsible for manufacturing aspects of the cocaine.  He

22   certainly would have known how much they would have

23   manufactured.  I find by a preponderance of the evidence that

24   he was involved in the manufacturing of the cocaine.

25            There was credible evidence that he was involved in

E6RMSUAS

1    deals with Mr. Ramirez Pajon that involved thousands of kilos

2    of cocaine.  He himself allocuted to there being planes, not

3    one plane, but many planes.  And all of the evidence, again,

4    points by a preponderance of the evidence to there being

5    thousands of kilos and I so find.

6             The defendant also argues that he should have only

7    attributed to him the amount of cocaine as to which the

8    evidence supports U.S. distribution.  And I found this as a

9    somewhat interesting issue.

10            So it turns out that the Second Circuit has carefully

11   discussed the Azeem case, 946 F.2d 13 (2d Cir. 1991) in a

12   manner in which they determines did not overrule it, but, in

13   fact, suggested it's not really the law as they see it.

14            In any event, I find that the case here, the situation

15   here is sufficiently distinguishable from Azeem that Azeem

16   would not apply.  Let me know go back over that.  As an initial

17   matter the Court does not think and no party has raised that

18   there is any question that it has jurisdiction over this case.

19   This is a conspiracy, the conduct of which involved directly

20   involved the United States.  It involved bringing cocaine into

21   the United States.  The defendant himself allocuted

22   specifically to distribution in the United States.  There also,

23   of course, was testimony as to the conspiracy.

24            But the question goes, I think, to whether or not,

25   under the Azeem case, somehow the quantity of drugs which are

E6RMSUAS

1    outside of the United States can be attributed to the defendant

2    for purposes of calculation of amount.

3            Now, under 2D1.1, application note 5, if there is no

4    seizure, then the Court is to approximate the amount of drugs.

5    I would also say see also U.S. v. McLean, 287 F.3d 127, 133 (2d

6    Cir. 2002).  The Court does that as set forth there by a

7    preponderance of the evidence.

8            Now, in Azeem there was an indication there and it was

9    an odd case because it happened while the defendant had had

10   some conduct preguidelines, and then he was arrested and

11   suddenly the guidelines were in place and there was one set of

12   conduct in the United States that occurred at one time frame

13   and another set of conduct that was outside of the U.S. at

14   another time frame.  One can reasonably wonder how those

15   particular circumstances impacted the Court's determination.

16   But there there was language which indicated that distributions

17   which were not found to have been in the United States may not

18   be attributable to the overall quantity calculation.

19           That, however, has been specifically clarified in the

20   U.S. v. Greer case, which is 285 F.3d 158, 179 (2d Cir. 2002).

21   There, in U.S. v. Greer, the Second Circuit made it clear that

22   the Azeem case is really limited to "foreign crimes" and that

23   is the language with the Azeem case stated.

24           In U.S. v. Greer, indeed the Second Circuit found that

25   in a conspiracy where there was a defendant being prosecuted in

E6RMSUAS

1  the United States, it was, in fact, error requiring

2  resentencing to fail to include quantities that were

3  distributed in foreign jurisdictions.

4          Here, the Court notes this precedent and I, therefore,

5  suggest that irrespective of where the cocaine was distributed,

6  whether in the U.S. or whether outside of the U.S., it is all

7  part of the overall conspiracy here and, under U.S. v. Greer,

8  is includable.

9          Nevertheless, the Court makes the alternative finding

10  that there is a sufficient amount, in any event, to reach the

11  same base offense level if one is to take only the

12  approximation under 2D1.1, application note 5, which allows the

13  Court to approximate the quantity based upon the testimony, for

14  instance, of Mr. Garzon, which would be itself in the thousands

15  of kilos.  He said the vast majority reached the United States.

16  If one takes even 51 percent and so takes a mere majority of

17  that quantity, one reaches, let's just say that thousands of

18  kilos equals only 3,000 kilos and one takes only something over

19  1500 kilos.  One is nonetheless well north of either 150 kilos

20  for a base offense level of 38, or 480 kilos or 500 kilos, or

21  perhaps revised quantity tables under the Smarter Sentencing

22  Act, which would increase the quantity to get to a base level

23  of 38.

24          Whether the U.S. only quantity is included or whether

25  the U.S. plus foreign quantity is included, we end up at the

E6RMSUAS

same place because the quantities are so vast that we end up,
however we divide it, still north of that which is required to
reach the base offense level.

          Also, Mr. Ramirez-Pajon himself talked about various
loads and, of course, he talked about Puerto Rico being one of
the destinations of that.  So I find by a preponderance of the
evidence that under any determination there are over 500 kilos
attributable and, in fact, thousands.

          Let's go on to the enhancements.  The defendant argues
that the Court should not impose enhancements relating to
leadership role, use of an airplane other than a
regularly-scheduled commercial flight, use of a firearm,
direction of the use of violence, criminal livelihood.  And the
Court dealt with these issues in the Fatico decision.  I
reiterate that I found that each of these was appropriately and
sufficiently supported by facts which I found by a
preponderance of the evidence.

          Now, the defendant also argues that he should obtain
the two-level downward adjustment based upon the potential
Smarter Sentencing Act and the potential downward adjustment
and quantities.  But this is often something taken into
consideration during plea negotiations.  And here, of course,
that's a whole other issue, but that is not something which has
resulted in it.

          However, given where we are with the overall offense

E6RMSUAS

1     level, that two-level downward adjustment would be applied to

2     the overall calculation prior to the Section 5, application

3     note 3, I think it is, which says that you have an offense

4     level that is higher than 43, you bring it down to 43.  Here we

5     end up at 50, or you can say we end up at 48, or you can say we

6     end up at 46.  Either way, once you take off the two points, no

7     matter what happens, you never end up north or at 43.  The

8     Holder two-level adjustment doesn't actually affect in any way

9     the overall offense level.

10            I am going to go to the calculation based upon those

11     findings and tell you about the calculation.

12            The defendant argues strongly that the calculation

13     that the Court imposes should be based upon that which was

14     extended to the defendant during an earlier plea offer set of

15     negotiations, that the defendant, on the day that the plea was

16     to expire, changed counsel.  Mr. Meringolo came in.  These are

17     CJA appointed counsel in both instances, that Mr. Meringolo did

18     not have sufficient time to acquaint himself with the facts.

19     He moved with alacrity but was unable to recommend to his

20     client that his client take the plea agreement before the

21     period of time in which he did so.

22            I'm not suggesting that Mr. Mention's actions should

23     have been different than they were, but I would suggest that

24     the premise of ineffective assistance up until that point is

25     inaccurate.  Let me describe for you why that is so.  As an

E6RMSUAS

1    initial matter it's important to note that even if there had

2    been a plea agreement here and even if that plea agreement had

3    been one which Mr. Rios Suarez had pled to, the Court always

4    retains its own discretion to make a sentencing determination

5    that it deems appropriate under the various factors of 3553(a).

6    The Court is not bound by a plea agreement.  The Court is not

7    bound by the stipulated-to offense level.  The Court is not

8    bound by the stipulation between the parties as to what

9    enhancements do or do not apply.  This Court has found in the

10   past and then affirmed by the Second Circuit government on the

11   application of enhancements, which neither party has sought and

12   which the defense has specifically objected to in the context

13   of the Court applying enhancements not agreed to as part of the

14   plea agreement.

15          The Second Circuit in cases in which I have been

16   involved and also in a number of other cases has reaffirmed the

17   very basic proposition that the Court is not bound by a plea

18   agreement and the Court has an independent obligation to

19   calculate the offense level and otherwise to make both an

20   objectively and substantively reasonable determination as to

21   the appropriate sentence.

22          I say that because irrespective of the plea agreement

23   arrived at, it would not have placed the defendant in any

24   position other than that in which he is placed today.

25   Therefore, he suffers no prejudice because the Court would have

E6RMSUAS

1    gone through the same analysis today that it is, in fact, going

2    to go through as it would have under either the current set of

3    circumstances, where defendant pled to the indictment and that

4    in which the defendant had the benefit of a plea agreement,

5    which suggested to the Court a stipulated offense level and did

6    not have enhancements included.

7            In addition, let me just say that according to

8    3553(a), even today, the sentence will be determined based upon

9    the Court's decision as to a sufficient but not greater than

10   necessary sentence, and that is done, frankly, irrespective of

11   the guidelines.  It's done taking the guidelines into account.

12   They are advisory only.  I do not assume that the guidelines

13   are necessarily reasonable for any particular defendant.  I use

14   them as a guidepost and I consult them as I need to do, but

15   ultimately what the plea agreement says about the guidelines is

16   only one of several factors that the Court takes into

17   consideration in its 3553(a) analysis.

18           Getting to the plea discussions, the defendant

19   concedes that a plea offer was extended to him.  Typically,

20   when ineffective assistance of counsel is raised in the context

21   of plea issues, it's a situation in which a plea offer has not

22   been extended or the terms of a plea offer have not been fully

23   explained or in which a counsel has, for whatever reasons,

24   determined not to recommend one way or another the acceptance

25   or rejection of a plea offer.

E6RMSUAS

1          Those are the typically the three bases on which

2     ineffective assistance of counsel claims are based in the

3     context of plea discussions, and I refer you to U.S. v. Brown,

4     623 F.3d 104 at pin 114.  It's the Second Circuit case, 2010.

5          In cases with respect plea discussions and ineffective

6     assistance of counsel claims are found to have been joined,

7     that issue has been joined, the Second Circuit indicates that

8     the appropriate remedy is to ensure the defendant is placed

9     back into a position which he would have been in had the plea

10     offer been extended.

11          I have suggested to counsel now that, frankly, the

12     defendant is in no worse position today because of the 3553(a)

13     analysis driving my determination in the fact that I would have

14     and would always consider the very same enhancements that we

15     have and we will discuss today, irrespective of the plea

16     agreement, so the defendant is in no worse position.

17          In any event, putting that aside, the chronology here

18     does not support, in the Court's view, ineffective assistance

19     of counsel.  It's clear that a plea offer was made, but the

20     terms of the plea offer were translated into Spanish.  That was

21     discussed specifically on the record and that the defendant,

22     for whatever reason, chose not to take the plea offer at that

23     time.

24          Indeed, Ms. Aubrey Lees, who was counsel at that time,

25     indicated that it had been discussed a number of times with

E6RMSUAS

1    Mr. Suarez.  So this is not a situation in which the offer was

2    not extended, where the terms of it were conveyed.  It's that

3    Mr. Meringolo was more persuasive than Ms. Lees or, for

4    whatever reason, the defendant himself decided to take it at

5    one point but not at another.  That's not ineffective

6    assistance.  That's not the basis for an ineffective assistance

7    claim.  That's the basis to suggest that for whatever reason

8    the defendant made a determination at one point in time and not

9    at the other.

10           But the government has every right to set deadlines.

11   They had every right to stand by the deadline.  And the fact

12   that Mr. Rios Suarez had not accepted the agreement by a

13   particular point when the deadline expired, that does not an

14   ineffective assistance of counsel argument make, even though

15   counsel changed.  That was known on that day.  He could have

16   accepted it before Ms. Lees transferred off.  She was not

17   replaced because of any kind of incompetence.  She was replaced

18   for all of the reasons that were set forth on the record that I

19   won't go over now.  I do believe that she was competent and

20   responsible in her conduct as the legal representative of

21   Mr. Rios Suarez.

22           There is the further issue of the public policy

23   implications of the Court finding that a defendant by merely

24   switching counsel can get the benefit of an extension of a plea

25   offer.  That would be the Court imposing itself into the plea

E6RMSUAS

1    negotiations in a way that would have broad policy implications

2    for the U.S. Attorney's Office.  It's not appropriate for the

3    Court generally ever to participate in the plea negotiations,

4    so I decline to find that I should have in any way here.

5         Let me address acceptance of responsibility.  The

6    defendant argues he should be entitled to a three-level

7    reduction, which includes both a two-level reduction under

8    3E1.1(a) and (b).  As we all know, you only get the 3E1.1(b)

9    reduction if you get the 3E1.1(a) reduction.  I do not find

10   that the defendant gets a 3E1.1(a) reduction and, therefore,

11   he's not entitled to the (b) reduction.

12        The reason for that is the fact of a plea does not

13   ipso facto in and of itself guarantee that a defendant will get

14   an acceptance of responsibility adjustment.  There has to be a

15   clear acceptance of responsibility.

16        Here, the defendant has himself come up with a couple

17   of different reasons, different explanations as to his role

18   and, in fact, has spent quite a bit of time both at the Fatico

19   and his very extensive submissions here arguing as to why he

20   doesn't have the kind of responsibility that he has.

21        So there is ample reason, extensive reasons why he is

22   not entitled to any acceptance of responsibility under

23   3E1.1(a).  So he doesn't get not only the one, but he doesn't

24   get any of the three.  I find that fact by a preponderance of

25   the evidence.  He simply didn't truthfully admit his conduct.

E6RMSUAS

1       He also argues for departures based on his age and

2   family.  In fact, he doesn't have particularly unusual

3   circumstances as to age or family.  The defendant is 46 years

4   old.  That's not particularly old.  He has got a family.  It's

5   no doubt tragic that he is not there for them.  He has got a

6   son who has got some health issues.  That unfortunately, while

7   sad, is not particularly unusual, and I decline to depart for

8   those reasons.

9       Based upon all of the above and everything that I have

10  said so far, the calculation as to offense level is as follows:

11  The base level I find is under 2D1.1(c)(1) is 38.  That is 150

12  kilograms or more.  I would note that as I found under a

13  preponderance of the evidence, even with the proposed

14  adjustments under the Smarter Sentencing Act, under the

15  findings I have made, the offense level would be 38, even next

16  year.  A dangerous weapon was possessed.  I found that in the

17  Fatico, and I reiterate that now.  Under 2D1.1(b)(1), that is a

18  two-level enhancement.  He directed the use of violence under

19  2D1.1(b)(2).  It's another two-level enhancement.  That's

20  something that we again found in connection with the Fatico.

21      He imported cocaine with the use of a non regularly

22  scheduled aircraft that was dealt with in the Fatico under

23  2D1.1(b)(3).  It's another two-level enhancement.  He was

24  directly involved in a pattern of criminal conduct.  I found

25  that as part of the Fatico under 2D1.1(b)14(C) and (E).  It's

E6RMSUAS

1    another two-level enhancement.  He was a leader of the

2    organization and under 3B1.1(a), that's a four-level

3    enhancement.

4            All together, that leads to an adjusted offense level

5    of 50.  Under 5A, application note 2 -- it wasn't 3, as I

6    previously said.  It is 2.  As I see it now in my notes and I'm

7    not reciting it from memory -- if the total offense level

8    exceeds 43, it becomes 43, so it's 43.

9            Now, the Court notes that even if I had deducted two

10   levels for the Smarter Sentencing Act, it would be 48, because

11   it would have started with 50 and it would be 48.  In addition

12   to that, if I also gave three points for the acceptance of

13   responsibility, it would go from 48 to 45.  We would still end

14   at 43, criminal history category of I.

15           Counsel is welcome to comment now on any of the above.

16   We will go on to the 3553(a) any mitigation statements in a

17   moment.  Let's deal with any comments you have on these

18   arguments.  I note that by not commenting now as to particular

19   points, it does not waive them.  Your submissions are part of

20   the appellate record and so you don't have to regurgitate all

21   of the argument.  If you think I've gotten something wrong as a

22   matter of law, I would certainly like to hear about it.

23           Mr. Fee.

24           MR. FEE:  Your Honor, the government has no comments

25   and notes that the calculation as pronounced is correct, in our

E6RMSUAS

1    view.

2                THE COURT:  Mr. Meringolo.

3                MR. MERINGOLO:  No, your Honor.  We will rely on the

4    papers.

5                THE COURT:  Thank you.

6                Let's go on to counsel's statements.  I think that

7    I'll deal with some of the other points:  The Colombian

8    conviction, the extradition letter, unwarranted sentencing

9    disparities, and credit for time awaiting extradition.  I'll

10   deal with those in my comments.

11               Let's go on now to what you have to say, Mr. Fee, Mr.

12   Meringolo, and Mr. Rios Suarez, if he would like to address the

13   Court before sentence is imposed.

14               Mr. Fee.

15               MR. FEE:  Thank you, your Honor.  I will remain brief.

16   The Court has obviously immersed itself in this case.

17               I'll speak principally as to the factor we stressed in

18   our submission under 3553, specifically the seriousness of the

19   offense, the need to promote respect for the law, and to impose

20   just punishment.

21               Put simply, your Honor, this defendant is exceptional,

22   both in the sense of the crime he committed and in the broader

23   sense of the types of defendants who find themselves in a U.S.

24   Court subject to punishment.

25               This defendant was immersed at the core of the

E6RMSUAS

international drug trade for years, your Honor, decades,
really.  And what he did, along with his cousin and the rest of
their coconspirators, including, many, many employees, as this
Court heard, was managed a vertically integrated, extensive,
both in time, geographical area, and scope, and sophisticated
drug trafficking organization.

It went from the ground to the air, meaning through an
alliance with the FARC, guerrillas, a guerrilla group in
Colombia, they were able to obtain crops, coca plants from
farmers in Colombia, process them in labs first in Colombia
that were overseen by this defendant and others in his
organization, take what was processed in those labs, cocaine,
hydrochloride or powder cocaine, move them over land, and put
them on planes and send throughout the world, including most of
the time to the United States, your Honor.  This is how cocaine
gets to the streets.

This defendant and his work is how it results in
addiction, to street gangs dealing cocaine or crack.  This is
how it gets there, your Honor.  And the hallmarks of the
extremely serious nature of this offense are reflected here in
this defendant, meaning that the reasons why drug laws in the
United States or penalties for drug offenses in the United
States are so serious, specifically why penalties for the
importation of cocaine do present some of the more significant
punishments in our system, are seen in this defendant's

1    conduct.

2            Number one, as I discussed, the scope of his

3    organization was immense.  Thousands of kilograms of cocaine

4    that this Court has found and, as the witness have testified

5    to, shipped out of Colombia and Venezuela, through various

6    shipping points and sometimes directly to the United States,

7    millions of dollars of proceeds coming back to this defendant

8    and his cohorts.  You heard testimony about that as well, that

9    the money always came back on those planes in the form of U.S.

10   dollars and that these deals were lucrative for

11   Mr. Ramirez-Pajon as well as Mr. Garzon Garzon.  There was a

12   lot of money flowing back to the defendant and that's why he

13   did all this.

14           Beyond the organization, your Honor, the alliance with

15   other criminal organizations.  Here it's the FARC.  It's one of

16   the reasons why this is just about the most serious drug

17   offender I could imagine coming before this Court.

18           In order to do this, meaning to engage in an extended

19   conspiracy to manufacture and transport cocaine, this defendant

20   made a deal with the devil, so to speak.  He aligned himself

21   with a group in Colombia that is a terrorist group, as

22   designated by the U.S. State Department and as really

23   practically you can see even from the evidence in this case.

24   It's a group that used violence to impose control over broad

25   swaths of Colombia and it used the drug trade and alliances

E6RMSUAS

1    with people like Mr. Rios Suarez to enrich that group.

2            And Mr. Rios Suarez embraced, as you heard, the FARC.

3    He had meetings with the most senior leaders of that group.  He

4    allowed them access to the air strips that he used to transport

5    cocaine and sometimes to the laboratories that he used to

6    manufacture.  And he continued to have as his calling card in

7    this conspiracy the fact that he was able to manage a

8    relationship with and to form alliances with these guerrillas

9    who were violent and working against the government of Colombia

10   in the most flagrantly violent ways, as this Court heard.

11           I think that's the final hallmark of the extremely

12   serious nature of this offense, is violence.  This defendant

13   embraced, sometimes in a casual manner, the use of violence to

14   protect his drug business.  You heard testimony about this that

15   we submit was credible and both striking in the things this

16   defendant did throughout his life to maintain the sanctity of

17   his business and to ensure that no one else would be

18   interfering with it.

19           You heard about the most extreme forms of violence,

20   this defendant directing others to murder innocent people.

21   When I say innocent, all murders are extremely serious, but

22   people who essentially happened upon this defendant, organizing

23   or working together with the FARC to carry out an attack on a

24   Colombian pipeline.  And these, as the testimony characterized,

25   were simply farmers.  And this defendant elected at that time

1    to tell others to murder those two men, and they were murdered.

2         You heard other examples of the violence suffusing

3    this defendant's criminal career, including being involved in

4    the transport of ransom payments for kidnappings that had been

5    carried out by the FARC and then payments brokered by this

6    defendant to get back to him related to this conspiracy in the

7    broader sense, that it was part and parcel his relationship

8    with the FARC, and those guerrillas were the drug partners.

9         You heard also about weapons, this defendant

10   possessing them and others possessing them.  Of course, as I

11   referenced, the concluding moment of Mr. Garzon Garzon's work

12   as a confidential source was this planned bombing.  And this

13   was the level of power and hubris and sort of greed that this

14   defendant reached at his time in Colombia, that first chapter

15   of his career, that he was actually working with the FARC to

16   drop bombs on Colombian military and oil pipelines, the thought

17   being that dropping them on the pipeline would distract the

18   military from his narcotics trafficking operation in the same

19   region and, more directly, attacking the military would limit

20   their effectiveness in narcotics interdiction efforts.

21        Your Honor, these are all comments about the record.

22   The Court is certainly well aware of the record.  The reason I

23   recite some of is this is to emphasize and to highlight that

24   that is a rare opportunity to have a man like this defendant

25   sitting in a U.S. courtroom, somebody who we can actually say

E6RMSUAS

for years and years and years engaged in a conspiracy to spread

cocaine throughout the world and including into the United

States, purely for profit and to do it in an incredibly callous

matter, meaning he adopted violence as one of the tools of his

trade, and we have heard a few instances.  But it is fair to

infer that this was customary for Yesid Rios Suarez and his

coconspirators both in Colombia and Venezuela, when they were

running this drug trafficking organization.

          I will just briefly touch on some of the arguments I

expect Mr. Meringolo to raise on his behalf.  I'm not going to

go into detail on factual arguments made by defendant through

Mr. Meringolo, and I think the Court has hit this squarely,

even just taking the defendant's statements, either through his

counsel to probation or in allocuting his guilt to this Court,

he is simply not credible.

          And I do think it is appropriate that the Court deny

him credit for acceptance of responsibility, because he has not

accepted responsibility.  In fact, he has attempted to divert

this Court's attention from the actual evidence in this case

and the actual crimes he committed.

          And I bring that up to highlight that this is not a

man or person for whom this Court should impose a sentence in

light of the consideration of mercy.  This defendant spent

years committing crimes, serious crimes, including murder, use

of weapons, and, of course, trafficking cocaine.  He now finds

E6RMSUAS

1    himself in a position where it is time to be called to account

2    for what he has done.

3           And his response is not to direct his comments to the

4    substance of his crimes or even to ask the Court plainly for

5    some amount of mercy.  It is, instead, quite frankly, to lie

6    and try to push the Court away from what it now knows to be

7    true.

8           Your Honor, we would ask that based on all of the

9    3553(a) factors that this Court impose a sentence well in

10   excess of 360 months, which is a number we only use because it

11   is the bottom end of the top guidelines range.  It is

12   appropriate in this case, both based on what this defendant has

13   actually done and this Court has learned through the evidence

14   adduced at the hearing, as well as to send a clear signal about

15   what it means for someone like this defendant, who worked for

16   so long to do so much wrong, to be held to account in a United

17   States court.  Thank you, your Honor.

18           THE COURT:  Mr. Meringolo.

19           MR. MERINGOLO:  Thank you, your Honor.

20           Mr. Fee offered my client a plea which would have been

21   168 to 210 months.  Unfortunately, at that time I was not

22   competent to advise my client, which I did so, to take that

23   seven days later.

24           But after that plea offer that Mr. Fee gave my prior

25   counsel and my client, the evidence that he started to gather

E6RMSUAS

1    to prosecute this case for trial was he interviewed -- I

2    believe he went to Colombia and he interviewed a member of the

3    FARC.  And that member's name was Sofia Cardona.  And what

4    Sofia Cardona told Mr. Fee is a blatant contradiction to what

5    he just proffered to the Court.  She told Mr. Fee that my

6    client was not a member of the FARC.  She told Mr. Fee and

7    Mr. Fee wrote down that Commander Grand Nobles had a debt.  My

8    client had a debt to Commander Grand Nobles.  And she went to

9    collect that debt on behalf of the FARC as a member of the

10   FARC.

11         Mr. Rios Suarez, and this, I believe, is in the

12   handwritten notes from Mr. Fee, Mr. Rios Suarez began to cry

13   and he offered his 200 dairy cows, two farm tractors, two

14   trucks, two horses, water tanks, and construction equipment.

15   If this man was in the drug business for all these years, he

16   had no access to money, he had Commander Grand Nobles send a

17   member of the FARC to his house, put his life and his family in

18   jeopardy.

19         Also, if he was so powerful, your Honor, if he was so

20   powerful, what's evident here is his brother was killed from

21   the FARC, his brother-in-law and his nephew were kidnapped and

22   disappeared.  They bombed his mother's house.  They kidnapped

23   his brother.

24         If this is what we are saying is equivalent to Pablo

25   Escobar, these things do not happen.  Maybe he gets killed.  He

E6RMSUAS

 1    didn't pay that debt.  He did not pay that debt to the FARC.

 2             And what happened?  Honestly, I've dealt with

 3    criminals my entire life.  I may be duped.  I don't know what

 4    else to tell the Court.  I know the Court didn't accept

 5    responsibility for what my client said.  But this is evidence

 6    that we have here, your Honor.

 7             This gentleman, Mr. Garzon Garzon, although the Court

 8    deems credible, and in this case, under the Extradition Act,

 9    the Court can only sentence my client from 1997 until, I guess,

10    present day, my client was in jail for three years from the

11    beginning of 1998 to 2001 and then on house arrest.

12             Mr. Garzon stopped cooperating in 2001.  He was taken

13    off the street.  And then we had the next witness that your

14    Honor heard.  He only dealt with my client in Venezuela from

15    2007 to 2008.  We have these things.  It defies logic and

16    common sense.  It's bizarre how the government can come and

17    literally have allegations and just drop somebody in there.

18             This is not an individual that's ordered murders.  You

19    will see all the letters.  We are dealing with the entire

20    family through a translator.  These are decent people.  These

21    letters are well written.  We are not saying he's an angel, and

22    he's not.  But these murders and this violence.  Across the

23    board people that we have spoke to that maybe we couldn't put

24    letters in or represent.  This is obscene, what's going on here

25    as far as the violence, your Honor.

E6RMSUAS

1          I think when we take into consideration all the

2     3553(a) factors, and, like I said, the family, I think that

3     should be taken into consideration.  The sentence the

4     government wants, he will never see his family again.  I hope

5     that's taken into consideration.

6          The torture that he received in both the prisons, both

7     in Venezuela and Colombia, it's heavily documented that this

8     occurs.  It's heavily documented that there is many, many

9     deaths.  My client was subjected to intense torture, and all

10    the family, this multi million dollar trafficking organization,

11    all his wife could come up with, after getting from all the

12    family members $12,000.  He was on the brink of death and

13    that's all they could come up with.  Now he has made all these

14    hundreds of millions of dollars, according to the government.

15    I think that's preposterous.

16         I also would like the Court to take into consideration

17    that Mr. Garcia, a/k/a Camillo, and I believe Mr. Garzon said

18    that he was a member of the FARC, a high-ranking member, and in

19    this particular situation the boss of my client, he goes to

20    trial in the United States.  He loses at trial and he gets 24

21    years.  I respectfully request the Court not to sentence my

22    client more than somebody above him who went to trial and lost.

23    We tried our best to come in before this Court and accept

24    responsibility.  We have tried our best not to prevent the

25    trial.  I don't know if we are going to discuss the three years

E6RMSUAS

he did from '98 to 2001 and the 100-month conviction from what
we deem, your Honor, is virtually the same crime as we are
prosecuted here.  Mr. Garzon was a key witness during that
time.  He didn't testify that there was any murders.

        Unlike this country, he was paid specifically on
information that he gave to the Colombian government for
specific crimes, specific allegations.  He doesn't ever proffer
to murders until he sees Mr. Fee 14 years later.  I am not
saying there is any improprieties.  This guy decides to do this
14 years later.  This guy didn't go to the government.
Mr. Rios Suarez has been in jail since 2010.  He knew that.  He
never came forward and said these murders, but for when we
decided to go to trial, two weeks after we decided to go to
trial, potentially.  I think the Court should take into
consideration the 100 months as relevant conduct that he has to
serve.

        And in Colombia, from what I've been told by the
Colombia lawyers, there is no good time.  He is going to serve
100 months in Colombia.  Whatever sentence he gets here, which
we respectfully request should be consistent with his boss, he
still has to go to Columbia and serve 100 months.

        Mr. Rios Suarez, I don't know him prior to being
assigned to this case.  He has been very respectful to me and
to my entire staff and to my students, as some defendants are
and some defendants are not.

E6RMSUAS

1        But the allegations of the government, just from

2   dealing with him, as the Court will know, I believe, in my

3   opinion, and I could be duped and that's fine.  I've been duped

4   before and I will be duped again, but I think these allegations

5   of violence are unfounded.  And I believe that they should

6   listen to the members of the FARC that they have proffered and

7   not people who come up with these violent allegations 14, 15

8   years after cooperating.

9        With that said, your Honor, we are under the

10  guidelines and, how these cases are prosecuted, we are asking

11  for the lowest sentence possible.

12        THE COURT:  Thank you.

13        MR. MERINGOLO:  Thank you.

14        THE COURT:  Thank you, Mr. Meringolo.

15        Mr. Fee.

16        MR. FEE:  Your Honor, just briefly.  There are a

17  number of statements that I don't think were based on the

18  record in Mr. Meringolo's comments to the Court.  I won't go

19  through them detail by detail.  I just want to note that's what

20  the record reflects, that we do dispute most of the comments he

21  made.  I will just note one.

22        Your Honor, the government did not accuse this

23  defendant of being a member of the FARC.  I think Mr.

24  Ramirez-Pajon may have believed he was during his testimony and

25  that's where Mr. Meringolo gets that from.  Our view of the

E6RMSUAS

1   facts is that he aligned himself with the FARC.  To our

2   knowledge, he was not, in fact, a member.  Thank you.

3          THE COURT:  Mr. Rios Suarez, would you like to address

4   the Court before sentence is imposed?

5          THE DEFENDANT:  Yes, your Honor.

6          First of all, I would like to apologize to God and

7   also apologize to your Honor for the damage that I've done.

8   However, I would like for your Honor to know that I have never,

9   ever been involved with any murders.  I would also like to ask

10  for forgiveness for my family because of the pain and suffering

11  that I have caused them because of not being able to be with

12  them.  I will just ask of you, your Honor, and the government

13  of the United States for one more opportunity.  May God bless

14  you.

15         THE COURT:  Thank you, Mr. Rios Suarez.

16         Let me just describe how the Court arrives at its

17  determination as to what is a sufficient but not greater than

18  necessary sentence.  I have to consult the guidelines and I

19  have.  We have discussed the offense level calculation and the

20  criminal history category.

21         The Court's sentence is primarily driven by the

22  statute, the federal statute, 3553(a), which asks the Court to

23  look at a number of factors, each of which I have looked at.

24  If I don't recite each and every factor in terms of its magic

25  words now, I want to assure everyone that I always read 3553(a)

E6RMSUAS

1  before every sentencing to make sure that I've actually covered

2  each of its various aspects.

3        In general, the statute requires the Court look and

4  evaluate the nature and the circumstances of the offense, that

5  it also look at the history and the characteristics of the

6  defendant and ask itself, what is just punishment?  What is

7  appropriate punishment?  What is punishment which serves the

8  ends of justice for a particular sentence?  What kind of

9  sentence promotes respect for the law?  What type of sentence

10 actually evaluates appropriately the seriousness of the

11 offense?

12       And will both do what is necessary in terms of

13 personal deterrence in terms of general deterrence, and in

14 terms of providing a defendant with any needed educational,

15 medical, vocational or correctional treatment that might be

16 appropriate.  And I've looked at these and evaluated them.  And

17 let me describe the Court's thinking on these factors now.

18       In terms of the nature and the circumstances of the

19 offense, I do believe that it's difficult to overstate the

20 seriousness of the offense.  I'm not going to focus on any

21 violence that was used.  I have made those findings by a

22 preponderance of the evidence.

23       But what I want to focus on is the drug trafficking.

24 The drug trafficking was very significant.  It was very large.

25 Mr. Fee has described it.  There are only a few defendants who

E6RMSUAS

can control as much cocaine as Mr. Rios Suarez was able to
control and whose actions impact the United States as directly
as his have.

His actions directly brought cocaine, large amounts of
cocaine into our communities.  There are people who snorted
that cocaine, who used that cocaine in a variety of ways, who
became addicted to cocaine, who died from cocaine, whose
families suffered because of the cocaine, who themselves lost
their jobs because of cocaine, who ended up hospitalized
because of cocaine.  There are nameless people.  And those
people were on the other end of the dollar transactions or the
peso transactions, or whatever denomination of currency was
used for those transactions.  They were real people.  They were
people who made a choice perhaps to engage in the taking of
cocaine, but they were people.

And our communities are destroyed and their fabric is
deteriorated when we have people with such addictions.  The
addictions themselves are ultimately things which are enabled
and assisted by the cocaine which is distributed into our
communities and it's the large-scale distribution which
provides such a very, very pernicious platform for that.
Addictions also lead to crime.  They lead to the deterioration
of families.

The toll is just enormous.  So here we do have a
defendant whose actions were quite extensive and whose

E6RMSUAS

1    distribution was quite extensive and where the impact on the

2    United States was very, very serious.  This was a way of life

3    for the defendant.  He made his choices.  And he made his

4    choices in terms of the way in which he chose to make a living,

5    the manner in which he chose to live his life for that number

6    of years prior to his arrests, and he now has to pay the

7    consequences of those choices.

8         I think Mr. Rios Suarez, by all accounts, in the

9    Court's view, is an intelligent man.  I think he understood the

10   consequences.  I think he understood the choices he was making.

11   He is in prison and I don't think it's probably much of a

12   surprise that he's in prison, although, he, I'm sure,

13   undoubtedly wishes things turned out differently and he wasn't

14   in prison.  That would be a very human emotion.

15        The defendant, however, finds himself where he is, at

16   the end of this long road, having made these choices, and I am

17   here now to weigh the seriousness of the offense and to

18   determine the appropriate penalty.

19        The defendant's submission stated that there was no

20   danger to the American public and I want to take issue with

21   that because in an abstract sense of geographic location of the

22   defendant himself, if he were not in American prison, in terms

23   of him, if he were cabined off and not distributing cocaine, I

24   don't disagree.  When we have a defendant whose cocaine

25   distribution directly reaches into the United States, he does

E6RMSUAS

1    directly impact and he does directly endanger our communities,

2    and I take that into account.  His extraterritorial conduct

3    directly affects the United States.

4         In terms of the history and characteristics of this

5    defendant, he is a family man.  I have no doubt that just like

6    a lot of people, like a lot of criminals, he is a complicated

7    man.  I am sure he loves his children, loves the people, his

8    family, the people that are close to him, the people that wrote

9    letters.

10        The fact that he has committed these crimes does not

11   mean that he is a person without the ability to love and to

12   have those kinds of very important human relationships, and

13   that's a statement of the tragedy that this crime has resulted

14   in.  It's a crime that has tragic consequences for so many

15   people, including, while by his own personal choice, for the

16   defendant himself.  The conduct here was his chosen profession,

17   and I've taken that into consideration as well as the fact that

18   he had a family because he knew he was putting his own liberty

19   at risk in the manner in which he chose to commit the crime.

20        I do believe that if he were free today, I think he

21   would return to that conduct.  I don't think he would not do

22   the acts which he has done before.  I think that he today would

23   return to drug dealing if he could.  If his contacts were still

24   available, if he could find the same resources to do what he

25   had done before, I think he would do it again.  There is

E6RMSUAS

1     nothing in the record that suggests that he would not.

2          I have taken all of this into consideration as well as

3     the comments I made in terms of the various enhancements, in

4     terms of his role, in terms of his participation over time in

5     the criminal enterprise.  Long-term pattern of criminal

6     activity is what I mean.

7          I then ask myself, with all that we said this

8     afternoon in this now rather lengthy session, what is just

9     punishment.  I want to note now a couple of things.  It's

10    important to say how I have treated things like the Colombian

11    conviction, his prior time, his extradition letter.

12         In terms of the Colombian conviction in 2010, which

13    has led to the imposition of another sentence, I don't have any

14    facts that allow me to test that conviction.  I can't test to

15    what extent it, in fact, overlaps.

16         But, in any event, it is not time that has been

17    served.  It is time to be served.  And I don't have anything

18    which indicates to me that there are no appeals left, that

19    there are no leniency applications which could be applied for

20    in Colombia at the termination of the defendant's term here.

21         Therefore, I decline to include facts relating to that

22    Colombian conviction and relevant conduct, and I decline to

23    find that the sentence here should run concurrently.  I leave

24    it to the defendant and his legal counsel in Colombia to make

25    any appropriate applications to the Colombian court a number of

E6RMSUAS

1    years from now as to how that should be treated.

2              In terms of the unwarranted sentencing disparities,

3    there were four.  The Court found the facts that it finds on

4    all four.  They were all really quite different.

5              In U.S. v. Lopez and Metallo -- hold on.  That's

6    different from the four that were mentioned by Mr. Meringolo.

7    There was Phanor-Arizabaleta.  He wasn't similarly situated.

8    He served a short period of time, but he had a heart problem,

9    and then he was going to go serve 20 years in Colombia and he

10   also happened to be 70 years old.  Then Cabrera Cuervas.  She

11   didn't have all of the enhancements, as this defendant, not by

12   a long shot.  She served 200 months or was sentenced to 200

13   months.  Leal Garcia, he also didn't have all the enhancements.

14   I do note that he was sentenced -- many of his codefendants

15   were sentenced up to 29 years.

16             Here the defense itself asked for I think 20 years.

17   But he didn't have all of the enhancements and we looked

18   through the records there.  For Ramirez, he was a government

19   cooperator, and so he had a 5K that affected him.  I don't

20   think that the Court's sentence should be based upon those

21   sentences.  I would note that the guidelines are to provide

22   some guidance as to reducing unwarranted sentencing

23   disparities.  They provide some guidance in that regard,

24   although the Court ultimately looks to 3553(a).

25             In terms of the extradition letter, the Court did

1   receive a letter dated January 31, 2014 from the Colombian

2   consulate general that references assurances that the United

3   States Government provide in connection with the extradition of

4   this defendant.  It states that, among the assurances, that

5   this defendant shall not be sentenced to life imprisonment.

6   However, I would argue that the case law is different than that

7   from which Mr. Meringolo cites.  I think he makes that a

8   statement in terms of spirit of the letter.

9           The defendant argues, effectively, that a term of

10  years that would equal life would be contrary to the spirit of

11  the letter and also that the Colombian life expectancy for a

12  male is 58 years.  Since the defendant is 46, it would

13  resulting in something less than 12 years.  Therefore, all of

14  that should be taken into account.

15          I actually disagree with Mr. Meringolo's reading of

16  these various matters.  I note that I've carefully considered

17  the extradition letter.  I do note the substantial comity

18  issues involved and implicated.  I have looked at the case law

19  in this area.  There are situations in which this type of

20  letter was similar, but not precisely the same.  It has already

21  been exactly argued on exactly these points, which is, does the

22  imposition of a sentence which determines a number of years,

23  but which is lengthy, then one could argue equates to an

24  effective life sentence, does that violate the terms of the

25  extradition letter.  And the answer by the Second Circuit has

E6RMSUAS

1    been no.

2           Indeed, in one case Judge Scheindlin actually imposed

3    a life sentence and pronounced it as life.  And while the

4    Second Circuit indicated that perhaps there should have been

5    additional statements relating to the comity issues, they

6    upheld it as not an abuse of discretion.  I cite the U.S. v.

7    Baez case at 349 F.3d 90, pin cite 92 to 93 in that regard.

8           My sentence will reflect my careful consideration and

9    balancing of the comity issues as well as due deference to the

10   assurances given by the U.S. Government, but I am ultimately

11   I'm guided by my obligations as a judge in a separate branch of

12   government and the factors of 3553(a).

13          Finally, let me address the time served awaiting

14   extradition.  I wanted to know, did he fight extradition?

15          MR. FEE:  Yes, your Honor.  He opposed it and appealed

16   the decision.

17          THE COURT:  Then I decline to make a recommendation

18   one way or the other for the Bureau of Prisons in that regard.

19   I will let the Bureau of Prisons figure out if they are going

20   to give any time.

21          Ultimately, the determination as to time credit is a

22   BOP determination.  I would say, however, that it's a factor

23   against getting credit if you've actually fought the

24   extradition to use the conditions of confinement as a basis for

25   getting credit.  If you're in a four-by-four windowless cell

E6RMSUAS

1    that's got terrible conditions, you think you wouldn't fight

2    extradition quite so hard.  In any event, that was a decision

3    that was made by the defendant.  He had the right to avail

4    himself of the appropriate legal processes available in

5    Colombia in that regard.  But I declined under such

6    circumstances to state whether or not credit should be given.

7            With all of this said and all of these points made, I

8    am now ready to impose sentence.  I would ask you to please

9    stand, Mr. Rios Suarez.

10           Mr. Rios Suarez, it is my determination, as a federal

11   judge sitting in the Southern District of New York, based upon

12   my consideration of all of the factors set forth in 3553(a),

13   that you be sentenced to a term of years of 54 years.  54 years

14   will equate to a term of months, that is, I think I've got to

15   do the math, but it's 54 years.  We will do the term in months.

16   This sentence is sufficient but not greater than necessary to

17   achieve the various purposes of 3553(a).

18           In the Court's view, while I acknowledge it is

19   effectively a life sentence, I am not pronouncing a life

20   sentence.  It's 648 months.  I'm not pronouncing a life

21   sentence.  And this defendant has the ability to appeal, and

22   various appeals may reduce the sentence by way of enhancement

23   reductions.  But, in any event, the Court does believe that a

24   54-year sentence is the appropriate sentence for this

25   defendant.

E6RMSUAS

```
 1              I also note that the Colombia consulate general knew
 2      from various cases that it was possible that such a result
 3      could have occurred, because it has occurred in the past,
 4      exactly this kind of issue with respect to the extradition
 5      letter, and the consulate general could have written a
 6      different kind of letter which would have said that there could
 7      not have been an effective life sentence.  And that is the U.S.
 8      v. Lopez and Metallo case, 305 Fed. App. 818 at 819.  That is
 9      my determination as a determinate sentence of 648 months.
10              You may be seated, sir.
11              The Court also declines to impose a period of
12      supervised release because this defendant will be deported
13      following his term of incarceration.  There will be a special
14      assessment of $100 and the Court does impose a fine of $1
15      million, which covers the cost of prosecution as well as the
16      cost of confinement, as well as a monetary penalty.  It is up
17      to the government to find a way to collect that, but based upon
18      the evidence provided, there should be resources someplace that
19      would support such a fine.
20              The defendant is also required to forfeit any property
21      or proceeds traceable to the offense, if any.  I don't know if
22      there are any that are findable or obtainable.  There are no
23      identifiable victims and, therefore, no order of restitution.
24              Do counsel have any legal or other reason why sentence
25      should not be imposed as stated?
```

E6RMSUAS

1          MR. FEE:  No, your Honor.

2          MR. MERINGOLO:  No, your Honor.

3          THE COURT:  I do order that sentence be imposed as

4     stated.

5          Are there any open counts?  There wouldn't be.  He

6     pled to the indictment.

7          MR. FEE:  Yes, your Honor.

8          THE COURT:  Mr. Rios Suarez, you have a right to

9     appeal.  Any notice of appeal must be filed within 14 days of

10    the filing of the judgment of conviction in this matter.  If

11    you can't afford the cost of appeal, you can apply to have

12    those costs waived by applying to proceed in forma pauperis.

13         Are there any other applications?

14         MR. FEE:  Not from the government, your Honor.

15         MR. MERINGOLO:  Nothing from the defense, your Honor.

16         THE COURT:  We are adjourned.  Thank you.

                              o0o

17

18

19

20

21

22

23

24

25